UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BOROUGH OF UPPER SADDLE, NEW JERSEY          **07 CIV 0109 (ER)**
KAREN MILLER, ROY OSTROM, MARIA FLORIO,
MARK RUFFOLO AND LINDA MCDONALD

                                         **PLAINTIFFS'**
                                         **STATEMENT**
                       Plaintiffs,          **OF MATERIAL FACTS**
     -against-                          **NOT IN DISPUTE**
                                         **PURSUANT TO**
ROCKLAND COUNTY SEWER DISTRICT #1,       **L.CIV.R.56.1**

                         Defendant.
-------------------------------------------------------------------X

       Plaintiffs, Borough of Upper Saddle River, New Jersey, Karen Miller, Roy Ostrom, Maria Florio, Mark Ruffolo and Linda McDonald (hereafter collectively "plaintiffs"), by and through their attorneys, Burke, Miele & Golden, LLP, respectfully submit the following statement of material facts to which there is no dispute, pursuant to United States Local Civil Rule 56.1. This statement is being submitted as part of plaintiffs' motion for summary judgment seeking an Order determining that defendant, Rockland County Sewer District # 1, as a matter of law:

     (a) has violated the Clean Water Act;

     (b) has violated its own State Pollution Discharge Elimination System permit; and

     (c) has violated applicable New Jersey state statutes and common law pertaining to pollution of waters, private nuisance, public nuisance, and trespass.

## BACKGROUND INFORMATION

     1.    Plaintiff, the Borough of Upper Saddle River, New Jersey (hereafter "USR" or "municipal plaintiff") is a municipality under the laws of the State of New Jersey. (Ex. "M" at ¶ "9").

2.      USR's border abuts the County of Rockland, State of New York. (*Id.*).

3.      Roger B. DeBarardine, a representative of USR and a member of its Council, resides in Upper Saddle River, New Jersey. (Ex. "W" at p. 6, lines 20 thru 23).

4.      Plaintiff, Karen Miller (a/k/a as one of the "individual plaintiffs"), resides with her family in Upper Saddle River, New Jersey. (Ex. "T" at p. 4, lines 11 thru 15 and p. 7, lines 2 thru 7).

5.      Plaintiff, Roy Ostrom (a/k/a as one of the "individual plaintiffs"), resides with his wife in Upper Saddle River, New Jersey. (Ex. "R" at p. 4, lines 11 thru 14 and p. 10, lines 17 thru 19).

6.      Plaintiff, Maria Florio (a/k/a as one of the "individual plaintiffs"), resides with her family in Upper Saddle River, New Jersey. (Ex. "P" at p. 4, lines 11 thru 14 and p. 6, lines 7 thru 10).

7.      Plaintiff, Mark Ruffolo (a/k/a as one of the "individual plaintiffs"), resides with his family in Upper Saddle River, New Jersey. (Ex. "Q" at p. 4, lines 11 thru 14 and p. 5, line 20 thru p. 6, line 13).

8.      Plaintiff, Linda MacDonald (a/k/a as one of the "individual plaintiffs"), resides with her family in Upper Saddle River, New Jersey. (Ex. "S" at p. 4, lines 11 thru 14 and p. 6, lines 2 thru 7).[1]

9.      USR is a "citizen" within the meaning of the citizen suit provisions of section 505(a) of the Clean Water Act. 33 U.S.C. § 1365(a).

---

[1] This individual plaintiff's last name was inadvertently misspelled in the pleadings and the correct spelling of "MacDonald" came to light at her deposition conducted on November 18, 2010 (Ex. "R"). The names Linda "MacDonald" and Linda "McDonald" relate to the same individual and henceforth the name "Linda MacDonald" will be used.

10.     Each of the individual plaintiffs is a "citizen" within the meaning of the citizen suit provisions of section 505(a) of the Clean Water Act. 33 U.S.C. § 1365(a).

11.     Defendant, Rockland County Sewer District #1 (hereafter "RCSD#1" or "defendant"), is a county improvement district organized and existing pursuant to Article 5-A of New York County Law. (Ex. N at ¶ "13").

12.     Defendant owns and operates wastewater treatment facilities, major interceptors, and twenty-seven (27) pumping stations in the Towns of Ramapo, Clarkstown and Orangetown, including the treatment facility located in Orangeburg. (Ex. "Z" at ¶ "4"; Ex. "U" at p. 101, lines 4 thru 8).

13.     Defendant maintains all publically owned sewers in the Villages of Spring Valley and New Square. (*Id.*).

14.     Defendant is responsible to properly operate and maintain the treatment facilities, major interceptors, pumping stations and sewers within its boundaries. (Ex. "N" at ¶ "13").

15.     Defendant operates and maintains the treatment facilities, major interceptors, pumping stations and sewers within its boundaries pursuant to a State Pollutant Discharge Elimination System ("SPDES") permit. (Ex. "Z" at ¶ "4").

16.     Defendant's wastewater treatment facilities, major interceptors, and twenty-seven (27) pumping stations comprise "treatment works" as that term is defined at 33 U.S.C. § 1292(2)(A) and (B), and a "publically owned treatment works" as that term is defined by 40 Code of Federal Regulations §§ 122.2 and 403(q).

17.     Defendant is a "person" within the meaning within the meaning of the citizen suit provisions of section 505(a) of the Clean Water Act. 33 U.S.C. § 1365(a).

18.     The New York State Department of Environmental Conservation (hereafter "DEC") administers the State Pollution Discharge Elimination System ("SPDES"), which issued a SPDES permit to RCSD#1, under the authority of the Clean Water Act. 33 U.S.C. § 1362(7). *See also* Article 17 of the New York State Environmental Conservation Law, Title 5, § 17-0501 *et seq.*

19.     The Clean Water Act defines "pollutant" to include "...solid waste,...sewage, garbage,...[and] sewage sludge..." 33 U.S.C. § 1362(6).

20.     The Clean Water Act defines the phrase "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

21.     The Clean Water Act prohibits the discharge of "any pollutant to navigable waters from any point source", except pursuant to and in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1362(12), 1311(a), and 1342. The State of New York is authorized to issue State Pollutant Discharge Elimination System ("SPDES") permits in lieu of the NPDES permits pursuant to the Clean water Act. 33 U.S.C. § 1342; Article 17 of the New York State Environmental Conservation Law, Title 5, § 17-0501 *et seq.*

22.     The phrase "waters of the United States" within the meaning of the Clean Water Act includes "navigable waters" as defined at 33 U.S.C. § 1362(7).

23.     The Saddle River, its tributaries and adjacent associated wetlands are waters of the United States within the meaning of the Clean Water Act. (*Id.*).

4

24.     The term "design storm" term is a "shorthand" for two kinds of storms: one "is the total rainfall over a relatively long period of time, in that case a day in storm,,," and the other storm "is short-term intense storm, you known, a downpour from a thunderstorm, which can put a lot of water into the storm sewer, or a sanitary sewer, if you've got inflow in a very short period of time." (Ex. "X" at p. 34, lines 7 thru 20).

25.     The term "sanitary sewer overflow" is abbreviated as "SSO" and "sanitary sewer overflows" as "SSOs".

26.     Defendant's expert, Dr. Bruce A. Bell, agrees that sanitary sewer overflows are violations of a SPDES permit. (Ex. "X", at p. 31, lines 3 thru 6).

27.     Raw sewage contains various biological materials including fecal coliform bacteria, organic materials exerting chemical and biological oxygen demands in the waters, nutrients including nitrogen and phosphorus, suspended and dissolved solids including toilet paper and sewage solids, salts, metals, solid wastes, pathogens and disinfectants. (Ex. "U" at p. 177, line 7 thru p. 178, line 23).

28.     In certain concentrations, the various biological materials found in raw sewage could be harmful to aquatic life. (Ex. "U" at p. 181, line 14 thru p. 182, line 2).

29.     A sewage spill from RCSD#1's collection system that is introduced into a water body, such as the Saddle River, is a contributing factor for increased levels of fecal coliform bacteria, ammonia and rags. (Ex. "U" at p. 55, line 17 thru p. 59, line 16).

30.     A sewage spill from RCSD#1's collection system that is introduced into a water body, such as the Saddle River, affects the river's clarity and color. (Ex. "U" at p. 59, line 22 thru p. 60, line 4).

31.    A sewage spill from RCSD#1's collection system that is introduced into a water body, such as the Saddle River, is a contributing factor to the river becoming murky. (Ex. "U" at p. 60, lines 5 thru 8).

32.    The term "rags" refers to concentrations of solids, a "clumpy gray matter" that can include human feces, toilet paper, other sanitary products such as shredded feminine products, grease, and other items that people flush into RCSD#1's sewer system. (Ex. "U" at p. 31, line 13 thru p. 32, line 16; Ex. "X" at p. 18, lines 12 thru 16).

33.    The term "floatables" typically includes sanitary napkins, condoms, and toilet paper, plastics and plastic applicators. (Ex. "X" at p. 68, line 24 thru p. 69, line 8).

34.    RCSD#1 maintains spill reports and is required to provide these reports to the DEC. (Ex. "U" at p. 141, lines 6 thru 17).

35.    Whenever a sewage spill occurs that affects a water body that reaches New Jersey, RCSD#1 is required to notify the New Jersey Department of Environmental Protection ("DEP"). (Ex. "U" at p. 17, line 19 thru p. 18, line 9; Ex. "V" at p. 52, lines 8 thru 14). Notifying New Jersey's DEP is part of RCSD#1's procedure where, depending on the time of day, RCSD#1's Director of Plant Facilities or his assistant would notify the New Jersey DEP or, if during off shift hours, weekends or holidays, an individual from RCSD#1's operations staff would perform the notification. (Ex. "V" at p. 52, line 19 thru p. 53, line 6). The failure to provide such notification to the New Jersey DEP when a sewer spill occurs in New York and flows down into New Jersey would be a violation of RCSD#1's own procedures. (*Id.* at p. 52, lines 15 thru 18).

36.    The Saddle River Pump Station is owned and operated by RCSD#1. (*Id.* at p. 107, lines 18 thru 20).

37.    The Saddle River Pump Station is located on Saddle River Road, in front of the Saddle River Valley Swim and Tennis Club (hereafter "Swim Club"). (Ex. "U" at p. 29, lines 13 thru 24).

38.    The Swim Club is physically located at 750 Saddle River Road, Monsey, New York.

39.    The Saddle River Pump Station has been identified by RCSD#1 as well as the DEC as a problematic pump station, meaning that spills occur at this location more often than at other pump stations. (Ex. U" at p. 76, line 22 thru p. 77, line 9 and p. 298, line 25 thru p. 299, line 5).

40.    The installation of new pumps at the Saddle River Pump Station in or about the fall of 2007/January 2008 has failed prevent continued occurrences of sanitary sewer overflows. (Ex. "V" at p. 37, line 24 thru p. 38, line 4).

41.    There presently remains capacity issues at the Saddle River Pump Station during wet weather events such that, under certain circumstances, this pump station continues to experience sanitary sewer overflows. (Ex. "V" at p. 61, lines 6 thru 18).

42.    A pump station, such as the Saddle River Pump Station, is part of RCSD#1's collection system. (Ex. "V" at p. 110, line 25 thru p. 111, line 8).

43.    A RCSD#1 pump station, such as the Saddle River Pump Station, is not an authorized outsource of a sanitary sewer overflow. (Ex. "V" at p. 21, lines 5 thru 12).

44.    Defendant's expert, Dr. Bruce A. Bell, agrees that it's much better for RCSD#1 to be able to state that their sanitary sewer overflows do not enter a water body since that would be "something that wasn't good for them." (Ex. "X" at p. 57, line 15 thru p. 58, line 2).

45.    RCSD#1's SPDES permit only allows for discharges from its treatment plant, and any other discharges (e.g., from a manhole, a pump station) that entered a waterway would be a violation of the SPDES permit. (Ex. "U" at p. 182, line 3 thru p. 183, line 23; Ex. "V" at p. 20, line 21 thru p. 21, line 4).

46.    Any sanitary sewer overflow that reaches a water body is in violation of Article 17 of New York State's Environmental Conservation Law. (Ex. "U" at p. 434, lines 2 thru 6).

47.    In the event a sanitary sewer overflow reaches a water body of the United States, defendant's expert, Dr. Bruce A. Bell, concedes that such an event would be prohibited by the Clean Water Act. (Ex. "X" at p. 110, lines 5 thru 9).

48.    Defendant's expert, Dr. Bruce A. Bell, believes that the Saddle River is a water body of the United States. (Ex. "X" at p. 110, lines 10 thru 14).

49.    The Order on Consent, entered into between RCSD#1 (as "Respondent") and the DEC, is dated May 10, 2006. (Ex. "B"). The Order pertains to "multiple sanitary sewer overflows ('SSO')" specifically limited to the time period from "January 2, 2003 [through] December 16, 2005" at "multiple [RCSD#1] sewer collection sites" in violation of § 17-0803 of the NYS Environmental Conservation Law ("ECL"). (*Id.*). Title 8 of Article 17 of the ECL is entitled "State Pollutant Discharge Elimination System" and this title establishes the SPDES permit program and enables New York to take over enforcement of effluent discharges from the federal authorities pursuant to the Clean Water Act, 33 U.S.C. §§ 1251 *et seq. See* ECL § 17-0801. Such discharges must conform to and meet all applicable requirements of CWA. (*Id.*). ECL § 17-0803 involves SPDES permits and dictates that discharges without, or in excess of, a SPDES permit are unlawful not only under this section of Title 8 of Article 17 of the ECL but also under the Clean Water Act pursuant to 33 U.S.C. § 1341. *See* ECL § 17-0803. In pertinent part, this statute

8

states "…it shall be unlawful to discharges pollutants to the waters of the state from any outlet or point source without a SPDES permit issued pursuant hereto or in a manner other than as prescribed by such permit." (*Id.*).

50.     The Order on Consent sets forth in Appendix A the multiple sanitary sewer overflows involving the RCSD#1 whereby "untreated raw sewage and stormwater [went into] the waters of the State" at multiple sewer collection system sites. (*Id.*).

51.     Defendant's expert, Dr. Bruce A. Bell, concedes that any sanitary sewer overflow that occurred within RCSD#1's collection system, whether before or after the Order of Consent dated May 10, 2006 (Ex. "B"), were not pursuant to or in compliance with be their SPDES permit. (Ex. "X" at p. 97, line 16 thru p. 98, line 12 and p. 109, line 23 thru p. 110, line 4).

52.     The Rockland County Sewer Use Law was in effect both prior to and after the Order on Consent dated May 10, 2006, and assuming further that RCSD#1 is a 'person' under this law, defendant's expert, Dr. Bruce A. Bell, admits that RCSD#1 violated this sewer law both before and after the Order on Consent since RCSD#1 "did things that are contrary to this law." (*Id.* at p. 100, line 16 thru p. 102, line 14).

53.     On March 6, 2006, October 6, 2006, January 18, 2008, April 4, 2008, and April 7, 2008 (Ex. "A", "C", "H" and "I"), municipal plaintiff, pursuant to the provisions of 33 U.S.C. § 1365(b)(1)(A) of the Clean Water Act, gave notice of violations of the Clean Water Act and its intent to file suit against, *inter alia,* RCSD#1.

54.     On January 18, 2008, April 4, 2008 and April 7, 2008 (Ex. "H" and "I"), the individual plaintiffs along with the municipal plaintiff, pursuant to the provisions of 33 U.S.C. § 1365(b)(1)(A) of the Clean Water Act, gave notice of violations of the Clean Water Act and its intent to file suit against, *inter alia,* RCSD#1.

55.     Eleven months after close of fact discovery in this matter, RCSD#1, as Respondent, and the DEC recently entered into another, separate Order on Consent dated November 11, 2012. (Ex. "Z"). This recent document does not revise, modify or amend the prior Order on Consent dated May 10, 2006. (*Id.*). In fact, this recent document does not even mention or refer to the prior Order on Consent. (*Id.*).

56.     Stating that on April 7, 2010 the DEC "documented violations of ECL Article 17 by [RCSD#1]", this Order on Consent was not executed until more than thirty-one (31) months later. (*Id.*). Unlike the prior Order on Consent - which involved a violation of § 17-0803 of the New York State ECL - this recent Order states that RCSD#1 violated § 17-0501 of the ECL as a result of multiple incidents of "discharging sewage into the waters of the State of New York" on various dates between April 2, 2009 and April 1, 2010 at various locations, including the Saddle River Pump Station and manholes 10171, 10172 and 10174. (*Id.*). § 17-0501 of the ECL states, in pertinent part, that it "shall be unlawful for any person, directly or indirectly, to throw, drain, run or otherwise discharge into such waters organic or inorganic matter that shall cause or contribute to a condition in contravention of standards by the department." (*Id.*) By its terms, this recent Order on Consent largely addresses the Sloatsburg Wastewater Treatment Plant and that plant's own SPDES permit and not the Orangeburg facility or its SPDES permit. (*Id.*)

57.     By its own terms, the recent Order on Consent does not address or cover those sanitary sewer overflows regarding RCSD#1's sewer collection system sites from December 16, 2005 (i.e., the outside date set forth in the Order on Consent dated May 16, 2006) to April 1, 2009; it does not address those sanitary sewer overflows that occurred after April 1, 2010 to date; and it does not address those sanitary sewer overflows that occurred between April 2, 2009 and April 1, 2010 that are not listed at paragraph "5". (*Id.*).

58.     For any spill or overflow by RCSD#1's collection system that reached and entered the Saddle River, RCSD#1 has never taken any water samples in order to analyze the level of pollutants that entered this water body - despite the fact the Sewer District was capable of performing such tests. (Ex. "U" at p. 122, line 3 thru p. 123, line 25).

## DEPOSITION TESTIMONY

### Testimony of Municipal Plaintiff's Representative, Roger B. DeBarardine

59.     Mr. DeBarardine is married; he and his family have lived in Upper Saddle River, New Jersey since 1969; he is a graduate of St. John's University School of Law; he is an attorney admitted to practice law in the State of New York since 1954; and he appeared for his deposition as a representative of USR. (Ex. "W" at p. 7, line 25 thru p. 8, line 4; p. 8, line 18 thru 22; and p. 9, lines 9 thru 17).

60.     Mr. DeBarardine is a member of the member of the Council of the Borough of Upper Saddle River. (*Id.* at p. 8, lines 5 thru 17).

61.     Mr. DeBarardine is an original member of the Saddle River Valley Swim and Tennis Club (hereafter "Swim Club"), and its President. (*Id.* at p. 12, lines 4 thru 25). The Swim Club is located in Monsey, New York and "immediately adjacent to the New Jersey State line. [The Swim Club is] the first property north of the East Saddle River Road." (*Id.* at p. 22, 8 thru 13).

62.     He testified that he "was aware of the flooding problems in Town, and the flooding of the Saddle River with sewerage from Rockland County." and that he knew of such "because as a member of the [Swim Club], we also had flooding problems of sewage onto our property." (*Id.* at p. 10, lines 5 thru 7; p. 9 thru p. 10, line 3).

11

63.    Mr. DeBarardine identified a list signed by him in his capacity as President of the Swim Club which tabulates "sewage overflow onto the property of the [Swim Club]" from August 3, 2002 through the summer of 2005. (*Id.* at p. 21, line 17 thru p. 22, line 19). (*See* Ex. "AA" for a copy of this list - which was identified as exhibit B during this witness's deposition).

64.    He also testified about overflows that occurred at the Swim Club in March of 2007 and identified two color photographs that depict the condition - stating that the pictures show "the sewerage that permeated the property of the [Swim Club] at the northern end of the property, immediately adjacent to the sewer, which is indicated just outside the northern boundary line of the [Swim Club]." (*Id.* at p. 29, line 23 thru p. 31, line 24). (*See* exhibit "BB" for the two color photographs). As a result of these overflows, Mr. DeBarardine, in his capacity as President, did the following: (a) he arranged for a laboratory analysis to be performed of the Swim Club's soil "because of the flow of sewerage onto the property of the [Swim Club], and we were concerned that the sewage would permeate into the property, which was being used by our membership, and I wanted to know whether or not there was a problem with fecal matter and any other deleterious substance permeating the soil of the club." The test was performed by Accurate Analytical Laboratory dated April 16, 2007 regarding the overflows that occurred on or about March 2, 2007, March 14, 207 and March 15, 2007; (b) he made a written complaint to Rockland County Department of Health regarding the overflows with a request the department inspect their property "to ascertain and confirm that we received sewage flooding on the property of the [Swim Club]."; and (c) he received a written report from the Rockland County department of Health "documenting the sewage overflow onto the property of the [Swim Club]." (*Id.* at p. 22, line 20 thru p. 23, line 17; p. 23, line 21 thru p. 24, line 8; and p. 24, line 9 thru 18). (*See,*

respectively, exhibits "CC", "DD" and "EE" for the lab test, written complaint and written report - which were identified during this witness's deposition as, respectively, exhibits C, D and E).

65.    Thereafter, the Swim Club commenced a legal action against Rockland County Sewer District #1 for, *inter alia,* the costs incurred by the Swim Club for expenses incurred in rectifying the damages caused by the sewage overflows. (*Id.* at p. 24, line 21 thru p. 26, line 6). The matter eventually settled with Rockland County Sewer District #1 paying the Swim Club the sum of $31,491.62. (*Id.* at p. 27, lines 14 thru 23).

66.    Finally, when asked if he was aware of any Upper Saddle River residents currently fishing in the Saddle River, Mr. DeBarardine replied that he was not aware of anyone doing so "because I believe the fishing has been discontinued since it was resolved that there was contamination but it's a well known fact in Town that the Saddle River is no longer acceptable for fishing." (*Id.* at p. 43, lines 12 thru 21).

## **Testimony of Plaintiff, Karen Miller**

67.    Mrs. Miller is married with three children; she has lived at her current address approximately nineteen years; and she has an undergraduate degree in International Business and Marketing from Northwestern University and a Masters Degree in Marketing from Fairleigh Dickinson University. (Ex. "T" at p. 7, lines 2 thru 7 and 13 thru 20; p. 8, lines 11 thru 24).

68.    Mrs. Miller testified that years ago her daughter Sara would, depending on the water level, walk on the rocks and stones in the Saddle River with one or more friends when walking to and from nearby Lions Park. (*Id.* at p. 14, lines 7 thru 23). A portion of the Saddle River is within Lions Park. (*Id.* at p. 15, lines 5 thru 16). Now, Mrs. Miller does not "permit [Sara] to play near the [Saddle] River anymore." (*Id.* at p. 17 thru 25). Mrs. Miller also testified about an experience involving her daughter Jacqueline, who came into contact with the Saddle

13

River. In brief, when Jacqueline arrived home, Mrs. Miller became aware of "unpleasant, offensive conditions and smells." coming from Jacqueline's clothing. (*Id.* at p. 16, lines 2 thru 8). *See also* Ex. "FF" - plaintiffs' Response to Defendant RCSD#1's Interrogatories dated October 4, 2007 at Interrogatory "3".

69.    Mrs. Miller has witnessed the aftermath of spills including an April 2007 spill behind the Swim Club as well as witnessed an ongoing spill within the past year occurring at Cherry Lane. (*Id.* at p. 29, line 16 thru p. 30, line 14).

70.    As part of a volunteer River Assessment Team, Mrs. Miller would take water samples of the Saddle River and forwarding the samples to a chemist to perform the assessment. (*Id.* at p. 23, line 2 thru 11 and p. 23, line 23 thru p. 24, line 7). Mrs. Miller took water samples at segment three of the Saddle River (i.e., behind Hopper Farm Road just over the New Jersey border line) from 2005 through 2009. (*Id.* at p. 25, lines 11 thru 20). An example of such a water test marked identified at Mrs. Miller's deposition is the Analytical Results Summary dated March 7, 2008 regarding a water sample taken March 5, 2008. (*Id,* at p. 5; Ex. "GG" (bate stamped 002765 together with a hand drawn map showing the location of segment three at bate stamp 002766)). This water test is positive for fecal coliform for segment three measuring 8,200 cfu/100ml.

## Testimony of Plaintiff, Roy Ostrom

71.    Mr. Ostrom has lived in Upper Saddle River, New Jersey for thirty-nine years; he and his wife have lived at their current address since approximately 1977; the Saddle River abuts and runs behind his property; and there is a point at which his property extends to the riverbank. (Ex. R at p. 8, lines 10 thru 13; p. 9, lines 3 thru 8; p. 10, lines 4 thru 6; and p. 27, lines 11 thru

14

19; and p. 40, lines 16 thru 19). Mr. Ostrom and his wife live year round in their Upper Saddle River home. (*Id.* at p. 10, lines 17 thru 21).

72.　　　Mr. Ostrom received his Bachelor of Science in Mechanical Engineering from Fairleigh Dickinson University in 1963; he received his Masters of Science in Aeronautical and Astronomical Engineering from New York University in 1966; and he is a professional engineer in New York and New Jersey whose license is currently retired. (*Id.* at p. 6, line 17 thru p. 7, line 9 and p. 53, lines 5 thru 15).

73.　　　Mr. Ostrom used to fish (i.e., catch and release) for native trout in the Saddle River where it abutted his property - identifying two spots where the Saddle River "used to hold trout.": one area being a little pond near an adjacent culvert, and the other being a "little ponding at the foot of our master bedroom, that it's a small pond and the trout sit in the tail water, and that's very pretty to see." (*Id.* at p. 29, line 12 to p. 30, line 9).The last time he fished in the Saddle River was ten years ago. (*Id.* at p. 29, lines 12 thru 15). He stopped fishing in the Saddle River due to the sewage spills into the Saddle River. (*Id.* at p. 29, lines 9 thru 15. *See also* Ex. "FF" at interrogatory "4" and Ex. "HH" (Plaintiffs' Response to Defendant RCSD#1's [Second] Set of Interrogatories dated August 31, 2010) at interrogatory "4").

74.　　　With a portion of the Saddle River running directly behind his house, Mr. Ostrom has witnessed "squished up toilet paper" and "human turds." (*Id.* at p. 40, lines 16 thru 24). According to Mr. Ostrom, the toilet paper was "rather fresh" and "it had to [have] come from the Swim Club, and - - and just that I'm only a little bit down River from the Swim Club, basically." (*Id.* at p. 50, lines 3 thru 19).

75.　　　When asked about sewerage smells coming from the Saddle River, Mr. Ostrom testified "[y]ou know what's interesting is because my house is on a - - on a bluff overlooking the

15

River, the bluff acts like a chimney, and I get the air right off the River, right to my backyard, and if I leave the doors open into the house and I just have to go on my back deck and get foul odors. At times I can pick out some high hydrocarbon, but it's like Russian roulette, you never know what you're going to get when you open the back door to the deck." (*Id.* at p. 31, line 17 thru p. 32, line 12). When asked if the smell was more intense during certain times of the year, Mr. Ostrom responded "[a]ll year round." (*Id.* at p. 32, lines 13 thru 15). Mr. Ostrom added that "it's like Russian roulette to go outside and see what smell is gonna assault you. Just last week we had a big rain, and I was hoping that it would be clean smelling. And although you had the must [sic] of the earth from this moisture, there was still this odor coming through, where this River area has just been so radically changed from my early days when I built this house, and it's a constant thing….there's a residue that the water leaves that becomes an odor, it becomes a vaporizer…I just want to make that point, because this isn't trivial." (*Id.* at p. 103, lines 9 thru 19; p. 103, lines 21 thru 23; and p. 104, lines 23 thru 25).

76.     Due to the continuing unpleasant odors coming from the Saddle River, Mr. Ostrom and his wife have been unable to use their backyard for the past fifteen years. (*Id.* at p. 34, line 24 thru p. 35, line 7). The Ostroms do not cook outdoors, with Mr. Ostrom adding that "staying in doors [sic] is what I really do." (*Id.* at p. 35, lines 20 thru 22; and p. 35, line 25 thru p. 36, line 4).. Instead, the Ostroms leased summer homes to entertain family and friends for ten years and then, in 2008, they purchased a summer home of their own. (*Id.* at p. 33, line 22 thru p. 34, line 4; p. 34, line 24 thru p. 35, line 7; and p. 35, line 12 thru 15). *See also* Ex. "FF" at interrogatory "4" and Ex. "HH" at interrogatory "4".

## Testimony of Plaintiff, Maria Florio

77.     Maria Florio is married to co-plaintiff Mark Ruffolo; she and her husband have
five children with ages ranging from two to ten years old; and she has lived her entire life in
Upper Saddle River, New Jersey. (Ex. "P" at p. 6, lines 7 thru 23 and p. 9, lines 11 thru 17). Ms.
Florio is a licensed real estate agent in the State of New Jersey since she was eighteen years old,
and she is also a title broker. (*Id.* at p. 6, line 24 thru p. 7, line 4 and p. 33, line 13 thru p. 34, line
7). She follows the housing market in Bergin County closely. (*Id.* at p. 34, lines 19 thru 25).

78.     Although the nearest portion of the Saddle River is approximately a quarter of a
mile away from her home, she has a drainage easement on her property. (*Id.* at p. 12, line 17 thru
p. 13, line 15 and p. 43, lines 15 thru 20). Near this drainage easement is a grate with a warning
not to "dump waste or anything in here, because it's [sic] trout protected waters, because it's a
tributary to the Saddle River." (*Id.* at p. 56, line 25 thru p. 57, line 14).

79.     With the exception of two streets in Upper Saddle River, the town's residents have
their own septic. (*Id.* at p. 30, line 24 thru p. 31, line 9).

80.     Ms. Florio has been a member of the Swim Club from birth to approximately age
fifteen, then she was not a member for approximately ten years, and she then returned as a
member to date. (*Id.* at p. 14, lines 11 thru 17). She has also been a member of the Swim Club's
Board for eight years. (*Id.* at p. 14, lines 18 thru 21). The Swim Club is open each year from
Memorial Day to Labor Day. (*Id.* at p. 24, line 25 thru p. 25, line 6). The Swim Club is located in
Monsey, New York; it is licensed by the State of New York; it pays taxes and water bills in the
State of New York; and it is not on a septic system but, instead, is hooked up to the Rockland
County sewer system. (*Id.* at p. 29, line 7 thru p. 30, line 9). Being only a quarter of a mile away

17

from the Swim Club, she passes the Swim Club "five to six times a day", whether in-season or off-season. (*Id.* at p. 24, 19 thru 24).

81.     When asked, Ms. Florio testified she has seen "[m]any" sewerage spills at the Swim Club. (*Id.* at p. 21, line 11 thru p. 22, line 2). For example, "[t]here's been spills on a clear day, while you're eating your lunch you could see the manhole cover with a little fountain of sewage coming out of it, and the aroma blowing over the eating pavilion. On a perfectly fine day, not during a rainstorm and not after a rainstorm." (*Id.* at p. 21, line 21 thru p. 22, line 2). At other times she observed "sewerage rushing" down the driveway at the Swim Club and that sewage "would come out of that manhole cover and stream down the driveway and cover the whole corner of the lawn, which could be 20 times the size of this office, of toilet paper, used, bloated tampons, paper. Not just one or two-pieces. If this was an area of the grass that that water flowed through, it was every - - scattered every six, seven, eight inches. Stuff everywhere. To the point where the first time it covered the Swim Club, with the sewage, we had landscapers come to try and blow some of the debris, and they couldn't even get it all up so, we covered it with dirt, there was so much of it. You couldn't - - it wasn't something you could cleanup." (*Id.* at p. 24, line 3 thru 10 and p. 27, lines 4 thru 23). Ms. Florio also testified about the spills that occurred inside the Swim Club, noting that in 2006 "we even had floods inside, would come up from the floors, the sewage, in our office. We spent tons of money on the office, on the conference room. The bathrooms. The sewerage came up in the snack bar." (*Id.* at p. 26, lines 9 thru 22).

82.     When at nearby Lions Park and walking alongside that portion of the Saddle River, she has viewed unidentified objects in the Saddle River for the past ten years, as well as observing "foam and the weird things in the water." (*Id.* at p. 15, line 14 thru p. 16, line 25 and p. 18, line 4 thru p. 19, line 11). As a result of finding the Saddle River at Lions Park to be murky

18

and smell of sewerage in/about 2006, Ms. Florio and her family "stay away - - for years we boycotted [the Saddle River]. After this happened we stayed away from it." (*Id.* at p. 20, lines 20 thru 25). (*See also* Ex. "FF" at interrogatory "5" and Ex. "HH" at interrogatory "5").

83.    Given that with the exception of two streets all of Upper Saddle River has septic, "all the sewerage spills at the Swim Club is [sic] not Swim Club sewage and it's not - - because the Swim Club everything gets turned off, off season, so no one's flushing toilets, there's no plumbing, there's no water, there's nothing. And it's not from Upper Saddle River residents, because they have septic. So any sewage coming into the Saddle River is coming from New York....At any location. There's no sewers surrounding the Saddle River in Upper Saddle River. It's not an opinion. There's just no sewer hookups. The schools are on septic. Everyone's on septic." (*Id.* at p. 30, line 24 thru p. 31, line 23). "The sewage comes in on the New York side at the Swim Club side....The sewerage is already in the water and it flows downstream....[The sewage is] entering in New York, which is a few feet away from the Upper Saddle River border, which is the [Saddle] River....So I'm testifying that I've seen sewage on the property of the Swim Club. I've seen it flowing. I've seen photographs of it, numerous e-mails of sewerage going into the [Saddle] River." (*Id.* at p. 58, line 25 thru p. 59, line 16).

**Testimony of Plaintiff, Mark Ruffolo**

84.    Mr. Ruffolo is married to co-plaintiff Maria Florio; they have five children; and he and his wife have lived at their current address in Upper Saddle River, New Jersey since 1996. (Ex. "Q" at p. 5, line 20 thru p. 6, line 13). Mr. Ruffolo received his Law Degree from Duquesne University in 1994 and was admitted to practice law in the State of New Jersey in 1995, (*Id.* at p. 7, lines 17 thru 25). He is a solo practitioner with a focus on real estate, general business and commercial disputes. (*Id.* at p. 7, lines 10 thru 14).

19

85.     Mr. Ruffolo, along with his family, has been a member of the Swim Club for a number of years. (*Id.* at p. 27, line 21 thru p. 28, line 8 and p. 58, line 18 thru p. 59, line 6). The Swim Club is located on East Saddle River Road in New York with a portion of the Saddle River running behind the club. (*Id.* at p. 28, line 9 thru p. 29, line 15).

86.     When asked about observing sewage spills at the Swim Club, Mr. Ruffolo - an avid runner - testified that one of his loops takes him towards the Swim Club where in 2005 through 2007 he would observe "literally a stream of sewage going down into New Jersey." (*Id.* at p. 29, line 16 thru p. 30, line 18). Mr. Ruffolo added that sometime in 2007, a crew came out working in front of Swim Club to deal with "sewage that was coming out. And they were there for quite a period of time, it could have been a week, working to I guess fix whatever was going on there. After they worked, I haven't really seen that stream go down anymore, -- but now what I see is that further north, before you make a left on Hillside [Avenue], there's a house that has a - - a stone wall, it's probably, you know, about three feet tall of all stones, -- and there's a stop sign, probably about a 50-foot section that's wet, and it just - - it smells like sewage...why I remember it so much is I can't run in that dirt, because my shoes would just get all mucky and dirty and just smell...it's like that all the time...even in summertime, when it's hot out, you still have this - - this condition there... it looks like the issue may have just been moved a little further north, in a sense of what there were able to do down by the Swim Club." (*Id.* at p. 30, line 22 thru p. 33, line 3).

87.     Mr. Ruffolo also testified about spills that he didn't personally observe but that he had "seem some photos of the overflow of sewage that would go into corner of the Swim Club....I didn't see the active flow of the sewage, but I've been there after, a couple of days

afterward, to go and see the condition of the corner of the Swim Club, and it's that spongy, smelly area." (*Id.* at p. 35, line 10 thru p. 36, line 4).

88.     Currently, when Mr. Ruffolo jogs by the Swim Club, there remains "a real stench....you've got about a 50-foot section where you're running and you can't hold your breath, but you limit your breathing, because it smells pretty bad, especially if the wind's coming towards you." (*Id.* at p. 33, line 18 thru p. 34, line 9).

89.     Mr. Ruffolo has taken his children often to Lions Park, especially since he is "a coach in many of the sports that they play." (*Id.* at p. 16, lines 2 thru 9). The athletic fields at Lions Park are adjacent to the Saddle River. (*Id.* at p. 18, lines 17 thru 19). Prior to 2007 he personally did not notice smells of sewerage in Lions Park. (*Id.* at p. 16, line 22 thru p. 17, line 3). Since 2007, however, at Lions Park "the athletic fields are like, and I - - smell like a swamp. Smell like sewer. When we play - - we've actually had to move practices. And I have no idea where the smells come from, why, but I'm just answering your question....[T]here's been times we had to call practices, because it's had such a murky, and people have actually described it as a septic smell to it." These smells were not as bad back in 2005. (*Id.* at p. 19, lines 21 thru 23). Mr. Ruffolo also recalls in or about 2007 while down by the Saddle River at Lions Park observing what "looked to be like toilet paper" in the water. (*Id.* at p. 22, 5 thru 18).

90.     Mr. Ruffolo believes that the sewerage spills have adversely affected the value of his property "in the sense of a stigma in the Town." (*Id.* at p. 46, line 5 thru p. 47, line 2). Relating a conversation he was having with a client about where he lived in Upper Saddle River, Mr. Ruffolo testified that the client told him that he lives "where there's a sewer problem." (*Id.* at p. 46, lines 5 thru 24). When asked about the manner in which he believed the value of his property has been adversely affected, he testified "I think that I wouldn't be able to articulate to

21

you the decline in value in the sense of desirability, but this is a person [i.e., the aforedescribed client] who was looking to buy a house in Town, and correlated my section of the Town to be the Town that has the sewer problem." (*Id.* at p. 46, line 25 thru p. 47, line 7) (*See also* Ex. "FF" at interrogatory "5" and Ex. "HH" at interrogatory "5").

## Testimony of Plaintiff, Linda MacDonald

91.     Linda MacDonald is married with two children - ages 10 and 12. (Ex. "S" at p. 6, lines 2 thru 9). She is a home maker and has lived her entire life at her Upper Saddle River, New Jersey home. (*Id.* at p. 5, lines 24 thru 25 and p. 12, lines 14 thru 24).

92.     There is a brook in the back of her home which she believes is a part of the Saddle River. (*Id.* at p. 7, lines 16 thru 21). Growing up, Mrs. MacDonald would use and enjoy the Saddle River, inclusive of the brook behind her house and that portion of the Saddle River at Lions Park, for such activities as fishing for large carp and catfish and catching tad poles, river walks, etc. (*Id.* at p. 16, lines 9 thru p. 17, line p. 5 and p. 32, line 25 thru p. 34, line 6). Mrs. MacDonald has not seen any carp, catfish or tad poles in her brook since 2000. (*Id.* at p. 34, lines 7 thru 14).

93.     Mrs. MacDonald testified about two incidents regarding the brook - which is "usually a very calm brook." (*Id.* at p. 23, line 25). The first incident occurred on Father's Day in 2008; she was sitting outside in the back of her home by her pool with family members; she heard a loud noise and then observed the water rushing down the brook; the water became very, very dark or black in color and appeared mucky; the brook got wider due to the amount of this water flow; it appeared to her as a "big flush or a big rush"; and the incident lasted approximately fifteen minutes. (*Id.* at p. 22, line 9 thru p. 24, line 17). Mrs. MacDonald does not recall there being a large rain event preceding this incident. (*Id.* at p. 22, lines 2 thru 4). The following day

Mrs. MacDonald notified the New Jersey Department of Environmental Protection. (*Id.* at p. 24, lines 21 thru 24). The second incident occurred in early January 2009 when she observed a "rush of water, enough to significantly raise the water level, you know, the flow of the water, and the color of the water." (*Id.* at p. 28, line 25 thru p. 29, line 16 and p. 30, line 25 thru p. 31, line 6). As with the first incident, Mrs. MacDonald does not recall there being a significant rain event preceding this incident. (*Id.* at p. 29, lines 20 thru 22). The following day she contacted the Bergin County Department of Health about the incident. (*Id.* at p. 30, lines 8 thru 21). Mrs. MacDonald believes that these two incidents could have an adverse impact upon the value of her home. (*Id.* at p. 41, lines 16 thru 21).

94.     The Borough of Upper Saddle River maintains Lions Park. (*Id.* at p. 18, lines 7 thru 9). Growing up, Mrs. MacDonald fished in the Saddle River at Lions Park. (*Id.* at p. 16, lines 5 thru 20). However, she now has problems using Lions Park and for the same reason she has problems using the brook behind her home: "[f]ear of pollutants" - some of which are visible, including sewage, foam in the water, and a loss of clarity of the water in that on some days the Saddle River looks "dark, not as clear. It's not consistent. Some days it looks fine. Some days it does not." (*Id.* at p. 8, line 9 thru p. 9, line 16 and p. 19, line 19 thru p. 20, line 8).(*See also* Ex. "FF" at interrogatory "6" and Ex. "HH" at interrogatory "6").

## Testimony of RCSD#1 Witness, Dianne Phillips

95.     Diane Phillips is the Executive Director of the Rockland County Sewer District Number 1 ("RCSD#1") and her duties include overseeing the maintenance and operation of the wastewater treatment plant and the collection system. (Ex. "U" at p. 9, lines 5 thru 10 and p. 10, lines 17 thru 23). She began her employment with RCSD#1 in 1989 and has occupied, in the following order, the following titles: Engineer III (1989 to 2003), Assistant Director (2003 to

23

2004), and Executive Director (2003 to date). (*Id.* at p. 9, line 11 thru 17; p. 11, lines 7 thru 11; and p. 254, line 24 thru p. 255, line 24).

96.    As part of its sewer collection system RCSD#1 has various interceptors that work their way toward the treatment facility in Orangeburg, including the Ramapo interceptor. (*Id.* at p. 100, line 14 thru p. 101, line 8). All of the interceptors operate via gravity (i.e., they're pitched so that they flow down). (*Id.* at p. 101, lines 11 thru 15). When the interceptors are unable to be constructed in this manner, pumps are installed. (*Id.* at p. 101, lines 16 thru 19). With regard to pump stations along the border of New Jersey, the flow is headed towards New Jersey by means of gravity and then pumped back up by pumping stations. (*Id.* at p. 101, line 20 thru p. 102, line 2). The Ramapo interceptor begins at manhole 10019 and the force main from the Tallman Pump Station as well as the force main from the Twin Lakes Pump Station discharge at this point. (*Id.* at p. 285, line 8 thru p. 288, line 13; Ex. "LL" - a map of RCSD#1's existing sewer interceptors which includes a circle marking the location of manhole 10019 made by Ms. Phillips together with her initials as well as the location of various pumping stations including Tallman, Twin Lakes, Cherry Lane and Saddle River, with the Saddle River Pump Station (hereafter "SRPS") located on the New York - New Jersey border.). The Pine Brook Pump Station pumps into the SRPS, the SRPS pumps upward into the Twin Lakes Pump Station, and the Twin Lakes Pump Station pumps to the point where the Ramapo interceptor begins. (*Id.* at p. 288, line 14 thru p. 289, line 7). Ms. Phillips conceded that for at least ten years there had been capacity issues at the Ramapo interceptor, and that this capacity issue was never reported to the DEC. (*Id.* at p. 317, line 10 thru p. 318, line 10 and p. 327, lines 9 thru 13).

24

97.     Although the separate towns maintain the smaller eight-inch lines, once the flow comes into the RCSD#1's interceptors and pump stations, RCSD#1 is responsible to oversee and maintain the flow, inclusive of rags. (*Id.* at p. 299, line 9 thru p. 300, line 22).

98.     When there is too much flow down towards New Jersey that can't be handled by these pump stations - inclusive of extreme wet weather events, mechanical failures and electrical failures - Ms. Phillips concedes that overflows of sewage can occur. (*Id.* at p. 102, lines 3 thru 24).

99.     When the Twin Lakes Pump Station fails or overflows, it spills into a tributary of the Saddle River. (*Id.* at p. 290, lines 21 thru 25).

100.    When the Pine Brook Pump Station fails or overflows, there is a nearby water body that is probably a tributary of the Saddle River. (*Id.* at p. 291, lines 2 thru 9).

101.    The SRPS is owned by the RCSD#1. (*Id.* at p. 107, lines 18 thru 20). The SRPS was likely designed back in the 1980s and its design (i.e., dry well, wet well and pumps) is basically the same as other pump stations including the Pine Brook Pump Station and the Twin Lakes Pump Station. (*Id.* at p. 77, lines 19 thru 21 and p. 78, line 23 thru p. 79, line 17). SRPS is considered a 'high head station" which refers to "the amount of water that has to be moved or the height it has to be moved....a difference of 200 feet, 250 feet versus 40 feet." (*Id.* at p. 21, lines 4 thru 16). Ms. Phillips concedes that as a high head station the SRPS's pumps "have to work harder. They take more of a beating." (*Id.* at p. 20, lines 15 thru 23). SRPS's pumps "have to be replaced more frequently." (*Id.*).

102.    Ms. Phillips concedes that the SRPS "has been a problematic station, requiring more - - more frequent upgrades." and spills occur here more often than at other pump stations.

(*Id.* at p. 20, lines 9 thru 14 and p. 76, line 22 thru p. 77, line 15). Ms. Phillips also identified Twin Lakes Pump Station as a problematic pump station. (*Id.* at p. 21 thru 24).

103.    In 1996, the SRPS was upgraded: the station went from two pumps to three pumps. (*Id.* at p. 89, lines 3 thru 13). According to Ms. Phillips, she believes the upgrade was "more of a reliability issue" - although admits that more spills were still occurring to the SRPS after the 1996 upgrade as opposed to other pump stations and the SRPS was still labeled a problematic pump station despite the 1996 upgrade. (*Id.* at p. 89, line 24 thru p. 90, line 12).

104.    Ms. Phillips was shown a four page report entitled "SEWER DISTRICT #1 - FOIL report sent to Peter Strasser July 20, 2005". (*Id.* at p. 140, line16 thru p. 141, line 14; Ex. "JJ" and identified as exhibit 3 during her deposition). Ms. Phillips confirms that this document contains similar information contained in the spill reports maintained by the RCSD#1, including locations, dates, spillage in gallons (if available), manholes involved (if applicable), and if any fresh water body is affected. (*Id.*; Ex. "KK"). This list sets forth sewage spills from February 11, 2000 through April 18, 2005. (Ex. "KK"). The spill locations include Saddle River Road, South Monsey Road and Hillside Avenue; manholes that are involved include manholes 10171, 10172 and 10019; the Saddle River itself is identified as a fresh water body affected by a spill thirteen separate times; and the spillage in gallons per event - when a number is provided - runs from a low of fifty (50) gallons to a high of one hundred thousand (100,000) gallons. (*Id.*). All told, ninety (90) separate sewage spills are listed during this five year period with a known total spillage of approximately eight hundred thirty-thousand four hundred (830,400) gallons. (*Id.*).

105.    On February 25, 2002, a spill occurred whereby sewerage flowed from a catch basin to a stream that leads to a pond at Candy Mountain Day Park; the stream ultimately flows to Lake Lucille and then the Hackensack River; Ms. Phillips prepared a written report dated

26

March 4, 2002 (Ex. "II" and identified as exhibit 2 during her deposition); and Ms. Phillips concedes that based upon her own report fish that lived in the pond were killed as a result of the sewage being introduced to these waterways. (*Id.* p. 44, line 10 thru p. 46, line 11). This fish kill is referenced in the FOIL report sent to Peter Strasser July 20, 2005. (*See* Ex."KK", entry number "26"). RCSD#1 took water samples and performed laboratory analysis, including readings regarding fecal coliform. (*Id.* at p. 47, line 16 thru p. 50, line 23). *See also* Ex. "II" at bate 1170 , 1171 and 1172). RCSD#1 restocked the pond with fish. (*Id.* at p. 51, lines 14 thru 16). The New Jersey Department of Environmental Protection was not notified of this sewage spill that resulted in the death of fish from a tributary that connects Lake Lucille and the Hackensack River. (*Id.* at p. 65, line 9 thru p. 66, line 11).

106.    RCSD#1 and the DEC conducted discussions and negotiations that eventually culminated in an Order on Consent dated May 10, 2006. (*Id.* at p. 354, line 23 thru p. 356, line 8; Ex. "B"). Ms. Phillips was personally involved in the negotiations, including discussions pertaining to drafts of the Order on Consent. (*Id.* at p. 356, lines 9 thru 17). Enclosed with the letter dated February 22, 2006 from the DEC (Kelly R. Turturro, Assistant Regional Attorney) to the RCSD#1 (Dianne Phillips (Ex. "JJ") is the DEC's draft Order on Consent which the DEC offered "to resolve the violation(s) noted by the DEC staff" involving multiple RCSD#1 overflow sites. (*Id.* at bate PLDW000337). With regard to the draft Order on Consent (Ex. "JJ"), and comparing and contrasting same with the eventually executed Order on Consent dated May 10, 2006 (Ex. "B"), Ms. Phillips testimony included the following:

(a) the draft recites at paragraph "B" that between January 2, 2003 and December 16, 2005 the DEC documented violations by RCSD#1 at multiple sewer collection system sites; that RCSD#1 "experienced approximately one hundred (100) sanitary sewer overflows ("SSO")

27

events discharging untreated raw sewage and stromwater to the waters of the State."; and specific dates, locations, spill amounts and the number of gallons involved are listed. (Ex. "U" at p. 357, line 22 thru p. 358, line 11; Ex. "JJ" at bates PLDW000338-341). By contrast, paragraph "B" of the executed Order on Consent, which was accepted by RCSD#1, omits much of this language and simply says multiple sewer overflows and then attaches as Appendix A a list of dry weather events and wet weather events. (Ex. "U" at p. 358, lines 13 thru 23; Ex. "B");

(b) as part of the attached Compliance Schedule, the draft sets forth two immediate requirements - one of which was that the RCSD#1 "shall cease and desist from any and all future violations of the New York State Environmental Conservation Law and the rules and regulations enacted pursuant thereto." (Ex. "U" at p. 359, lines 16 thru p. 360, line 10; Ex. "JJ" at bate PLWD000343). Ms. Phillips conceded that this requirement was not acceptable to RCSD#1, and not a part of the executed Order on Consent, because RCSD#1 could not comply with not violating the NYS Environmental Conservation Law as the DEC had requested in the draft Order on Consent. (*Id.* at p. 360, line 11 thru p. 361, line 6). RCSD#1 sought to omit this immediate requirement on the advice of their legal counsel. (Ex. "U" at p. 367, lines 9 thru 19); and

(c) two of the locations which the DEC considered to be a priority for corrective action included Saddle River Road and South Monsey Road. (*Id.* at p. 373, line 24 thru p. 374, line 12).

107.    Ms. Phillips confirms receiving a letter from the DEC (Manju Cherian, P.E.) dated September 18, 2007 (Ex. "WW" - and identified as exhibit 24 during her deposition) advising that the engineering report the RCSD#1 submitted pursuant to the Order on Consent "is not approvable." (*Id.* at p. 381, line 25 thru p. 382, line 12). Relative to the SRPS, Ms. Phillips concedes that according to the DEC the RCSD#1 was not in compliance with the Order on Consent in that the evaluation regarding this pump station should have been part of the

28

RCSD#1's engineering report. (*Id.* at p. 383, line 13 thru p. 383, line 14) (*See also* Ex. "WW" at page two, paragraph "4" with bate RSHC00008137 which references that "[s]anitary sewer overflows from [the Saddle River Pump Station] have resulted in lawsuits from bordering communities in NJ.").

108.    Ms. Phillips' attention was addressed to the Notice of Intent To Sue Letter dated January 18, 2008 - which is an attachment to the Second Amended Complaint (Ex. "M"). Pages 2, 3 and 4 of this letter recite spills of raw sewage discharging from various locations (i.e., Cherry Lane Pump Station, 64 Cherry Lane, a manhole on/adjacent to South Monsey Road, Hillside Avenue, Saddle River Road, the SRPS, the Twin Lakes Pump Station, Meadow Lane, East Saddle River Road, Cottage Lane) on various dates (i.e., between April 2, 2006 through December 23, 2007 with thirty-nine total entries). (Ex. "M" - attachment to Second Amended Complaint). This list of sewage discharges was not exhaustive, and this Notice of Intent To Sue Letter recites that at least some of these spills "are discharging pollutants from point sources into waters of the United States without or in violation of SPDES permits." (*Id.*). If the spills recited in the Notice of Intent To Sue Letter occurred, and they reached waters of the United States, Ms. Phillips concedes that RCSD#1's SPDES permit would not allow it to have these discharges. (*Id.* at p. 182, line 3 thru p. 183, line 23). RCSD#1's SPDES permit only allows for discharges from its treatment plant, and any other discharges (e.g., from a manhole, a pump station) that entered a waterway would be a violation of the SPDES permit. (*Id.*).

109.    Ms. Phillips' attention was then drawn to the allegations of various unpermitted discharges set forth in paragraph "34" of the Second Amended Complaint (Ex. "M"), consisting of fifteen separate spill dates from August 23, 2006 to on or about March 2, 2007 with the inclusion that "upon information and belief additional unreported spills from at least August 23,

29

2006 to present." (Ex. "U" at p. 176, line 22 thru p. 177, line 2). Ms. Phillips concedes that according to RCSD#1's SPDES permit, any such discharge of sewage into a water body would be an unpermitted discharge. (*Id.* at p. 177, lines 3 thru 6).

110.    Ms. Phillips was questioned about 2006 spills relative to documents provided by defendant during discovery entitled "Spills 2006 File". (Ex. "MM" - with bate stamp PLDW...56 - ...104 and identified as exhibit 8 during her deposition). Bate 58: memo Eugene Yetter (of RCSD#1 and hereafter "Yetter") to Ms. Phillips listing number of spills occurred 11-7-2006 and 11-8-2006... incident involving Cherry Lane Pump Station due to a pump control problem/electrical problem; 32,000 gallons...incident involving manhole 10019; 4,000 gallons...Strawtown Road spill; tributary of Hackensack River...20,000 gallons into Pascack Brook...Bate 60: manhole 10118; 1,500 gallons; into tributary of Saddle River; Twin Lakes Pump Station; operation issue/equipment failure; so that 1,500 gallons of sewage that was likely not diluted discharged into the waterway...vandalism event involving Cherry Lane area spill that flowed into Cherry Brook; cinderblock found in manhole...Bate 70: letter to witness from Village of Airmont Village Clerk w/ e-mail enclosure (Bate 71) which references another spill of 10-3-2004 of 50,000 gallons of raw sewage...Bate 75: estimated report of 4,000 gallons regarding the spill of 8-27 and 8-28...Bate 88: report Yetter to witness dated 12-5-2005 and revised 1-27-2006 regarding sewage spill SRPS; dry weather event; no indication of a wet weather event; spill estimated at 6,000 to 10,000 gallons; percentage drained into Saddle River but no indication at all as to what that percentage was (90%? 75%? etc.*)*...Bate 90: memo Yetter to Ms. Phillips regarding spills of 1-18-2006; again, South Monsey Road area w/ manhole 10019; not subside for seven-and-a-half hours; estimated quantity of 500 gallons of dilute sewage...Bate 92: cover letter Ms. Phillips' office to Brendal Logan which attaches spill reports

and sewer overflow charts from 1996 thru 2005...Bate 94: handwritten notes by Ms. Phillips; bate 94 references 24 total spills but in Ms. Phillips' handwriting "four heavy rain events"...Bate 95: 1997 total spills 11 and Ms. Phillips' handwriting "one heavy rain event"...in 1998 15 spills and in handwriting zero heavy rain events...in 1999 22 spills and in handwriting two rain events - but all due to Hurricane Floyd w/ different locations but one event...2000 9 spills and zero rain events; spill 7-25-2000 involved SRPS and due to equipment failure; 8-16-2000 SRPS pump failure; 12-6-2000 SRPS pump failure...2001 16 spills and handwriting two rain events; entries for SRPS for 3-30 and 8-27 due to pump failure per the RCSD's own report...2001 has a SRPS spill due to equipment failure...2002 11 spills and handwriting zero rain events...2003 18 spills and handwriting 4 rain events; entry 6-3-3003 spill Hillside Avenue (near the SRPS) whereby odor control dish fell from the manhole's casting so as to block the flow; 12-12-2003 and 12-24-2003 for South Monsey Road; 8-14-2003 SRPS w/ power outage w/ overflow delay to the pumping cycle...Bate 102: 15 spills...Bate 102 regarding 2004: 9-18-2004 South Monsey Road w/ extremely heavy rain; 10-3-2004 Cherry Lane w/ blockage/tree branches...2005: April, October and November w/ the last entry noted to be due to electrical component failure and not heavy rains. (Ex. "U" at p. 185, line 12 thru p. 209, line 14).

111.   Ms. Phillips was questioned about 2007 spills relative to documents provided by defendant during discovery counsel entitled "Spills 2007 File". (Ex. "NN" - with bate stamp PLDW...114 - ...170 and identified as exhibit 9 during her deposition). Bate 117 and 118: sewage overflows 12-23-2007 vicinity of Swim Club; estimated 800 gallon overflow; excessive rag and debris buildup on both operational pumps that caused one pump to fail and the other pump at reduced capacity; rags "have tendency to form balls inside the pumps on the impellers." and "tendency to get in between the impeller and, you know, in between the wear rings, causing

it to not be able to turn as well or causing it to go out on either vibration or excessive current, because it impedes the flow or it could keep the impeller from - - just makes it difficult for the pumps to turn." due to buildup of the rags; during dry periods, as experienced during recent weeks, rags and debris tend to settle within the collection system; can possibly result in an increase of these settable solids in the lines being sent to the pump stations. (Ex. "U" at p. 209, line 19 thru p. 212, line 21).

(a)     Bate 118: 12-23-2007 spill resulted in quantity of overflow into Saddle River...bate 119: letter from Ms. Phillips to Ms. Cherian of DEC; asking to enforce the *force majeure clause* (i.e., act of God clause) of the Consent Decree; due to excessive storm, unable to abide by Consent Decree; DEC did not issue any violations, but apparently not sure if DEC granted the request; and according to Ms. Phillips, this was the first time RCSD asked for relief for spills (that violated their SPDES permit) after Consent Decree. (*Id.* at p. 217, line 13 thru p. 220, line 6).

(b)     Ms. Phillips concedes that spills have continued to occur since entering Order on Consent that did not result in violations from the DEC even though such spills were in violation of RCSD#1's SPDES permit. (*Id.* at p. 220, lines 11 thru 20).

(c)     Bate 120: rain event ask for relief under Consent Decree; spill areas include Saddle River, Hillside Avenue; SRPS found to be off-line approx. 2:30 am; manholes 10172 and 10174 (i.e., two manholes located at the Swim Club) overflowing; pumps re-set but the inflow was greater than the station's capacity such that overflows continued; prior memo noted this pump station not running at 100% capacity; overflow diminished and subsided approx. 4:00 am on 4-17-2007 (i.e., more than 24 hours); an estimated 390,000 gallons of diluted sewage may have been released and drained into Saddle River; investigation references failure of telemetry

32

system to report mechanical problems at SRPS; never rec'd an alarm due to problem w/ phone line...also, at Hillside overflow of 12,000 gallons flowed into Saddle River on the 15th...manhole 10019 South Monsey Road overflow w/ 100,000 gallons into tributary of Saddle River...all told, over half a million gallons of dilute sewage entered into the Saddle River, either directly or indirectly into one of its tributaries...NY DEP is not listed as an entity to notify. Also, 270,000 gallons flowed into tributaries of Pascack Brook and another 385,000 gallons dilute sewage flowed into Pascack Brook...another 215,000 flowed into Sparkhill Creek or one of its tributaries...Bate 130: spill at Twin Lakes Pump Station 11-28-2007; overflow 3,000 gallons via dry weather event; drain into tributary of Saddle River...Bate 135: sewer overflow 10-12-2007; dry weather event; vicinity of Swim Club; 500 to 1,000 gallons that seeped into ground or flowed into Saddle River; higher concentration of sewage and contaminants...Bate 137: 3-18-2007 reciting sewage spill from March 2, 2007; reference to manhole near Mr. Schneider's home...Bate 139: spills March 19, 2007 regarding spills of March 2nd w/ 14,000 gallons released into Saddle River. (*Id.* at p. 220, line 21 thru p. 239, line 13).

112.    Ms. Phillips is aware of an individual named David Schneider; that there is an manhole (identified as manhole 10019) right near Mr. Schneider's home on South Monsey Road; that there are problems with this manhole overflowing; and the tributary located near manhole 10019 probably flows into the Saddle River. (*Id.* at p. 97, line 14 p. 100, line 2; p. 132, line 21 thru p. 133, line 2; and p. 135, lines 5 thru 19). Color photographs - many of which contain their own date stamp of April 16, 2007 or April 17, 2007- depict overflows to manhole 10019 on South Monsey Road near Mr. Schneider's home with one photograph depicting an overflow at the Swim Club. (*Id.* at p. 274, line 24 thru p. 279, line 2; Ex. "SS" - and identified as exhibit 15 during her deposition).

33

113.   Ms. Phillips concedes that at one time a locking mechanism was attached to manhole 10019 and some time thereafter manhole cover 10019 was blown off due to the force of an eruption from the sewer main. (*Id.* at p. 398, line 12 thru p. 399, line 10 and p. 175, line 16 thru p. 176, line 6). In fact, the force at manhole 10019 was such that it blew the road apart. (*Id.* at p. 399, lines 5 thru 10).

114.   Ms. Phillips was questioned about 2008 spills relative to documents provided by defendant during discovery entitled "Spills 2008 File". (Ex. "OO" - with bate stamp PLDW...171 - ...201 and identified as exhibit 16 during her deposition). Bate 175: spill report 3-5-2008 Swim Club/SRPS; RCSD#1 employee responded to SRPS, two of the pumps faulted and off-line and temporary pump not operating - the new pumps that were installed less than two months earlier; equipment failure and human error was cause of spill as well as reference to maintenance issue due to "rags" and debris built up causing pumps to fail; estimates 3,000 gallons of sewage overflowed and into Saddle River...Bates 181-82: spill report 2-13-2008; (various streets named); 57,000 gallons sewage which flowed into Pascack Brook, 21,000 gallons sewage flowed into tributary Sparkhill Creek, and reference to multiple overflows...Bates 187-88: spill report Yetter to Ms. Phillips dated 5-29-2008; sewage spill Hillside Road w/ overflow Cherry Lane Pump Station...Bates: 191: spill report dated 11-18-2008 regarding 11-15-2008 from Yetter to Ms. Phillips; Cherry Lane spill; spill attributed to pumps being inoperable due to a control system issue w/ 50 gallons of sewage spilled...Bate 195: spill 10-5-2008; no power to pump at Grandview Pump Station; sewage overflow; 23,000 gallons sewage overflow due to equipment failure; Willow Tree Brook, tributary of Mahwah River, involved which flows into New Jersey; report does not indicate that NJ DEP notified...Bate 197: report dated 9-22-2008 regarding sewage spills of 9-6-2008 and 9-7-2008;

34

large rain event (Tropical Storm Hannah); multiple overflows; no indication that RCSD#1 sought relief under the *force majeure clause* of the Order on Consent and Ms. Phillips does not recall if this ever done; pump failure at SRPS; seven months after new pumps installed; pumps failed due to "rags"; 15,000 gallons overflowed into Saddle River; the heavy rain acted as a flush of all the buildup of rags   from further up the line...Bates: 200-01: spill 3-9-2008; involving the Grandview Pump Station; emergency generator not producing power and attempts to reset failed; eventually, power restored but not before estimated 375,000 gallons diluted sewage affecting tributary of Mahwah River. (*Id.* at p. 280, line 10 thru p. 303, line 9).

(a) As to any of the spills discussed with regard to Ex. "OO", Ms. Phillips concedes that RCSD#1 did not perform any samplings of any water body that was affected by these sewage spills. (*Id.* at p. 303, lines 10 thru 20).

115. As of approximately January 2008, the three pumps at the SRPS were removed and new pumps installed. (*Id.* at p. 257, lines 7 thru 19; p. 267, lines 5 thru 20). Despite the new pumps being installed, Ms. Phillips concedes that replacing the old pumps has not addressed the problem of sanitary sewer overflows at the SRPS. (*Id.* at p. 260, lines 6 thru 17).

116. Ms. Phillips was shown color photographs (Ex. "PP") of a spill at the Swim Club on March 5, 2008, including an adjacent manhole. (*Id.* at p. 268, line 3 thru p. 269, line 20 - and identified as exhibit 13 during her deposition). The photographs demonstrate a line of debris from the manhole that includes rags, "what looks like maybe left over sewage.", and possibly toilet paper. (*Id.*). Ms. Phillips concedes that the installation of the new pumps at the SRPS two months earlier did not stop this sewage overflow. (*Id.*).

117. Ms. Phillips confirms receiving a letter from the DEC (Manju Cherian, P.E.) dated April 23, 2008 (Ex. "XX" - and identified as exhibit 30 during her deposition) expressing

35

the DEC's concerns "especially in light of the additional work being performed in the collection system as part of [the] Order on Consent requirements." (*Id.* at p. 402, line 21 thru p. 404, line 7; Ex. "XX"). The DEC's concerns included possible inadequate spare parts inventory for the plant and collection system as well as reduced staffing levels at the RCSD#1 over the past few years. (*Id.*).

118.    Ms. Phillips was shown additional color photographs (Ex. "QQ") of a spill at Swim Club on September 6th through September 7th, 2008, including the adjacent manhole. (*Id.* at p. 273, line 10 thru p. 274, line 23 - and identified as exhibit 14 during her deposition). The photographs depict debris on the ground that came from the manhole, including toilet paper and other sewage. (*Id.*). The installation of the new pumps at the SRPS did not prevent this overflow either. (*Id.*).

119.    Additional color photographs of the Swim Club and the adjacent manhole were shown to Ms. Phillips. (*Id.* at p. 168, line 13 thru p. 171, line 22; Ex. "RR" with bates 1476 - 1478). Ms. Phillips identified these photographs as including the Swim Club and the manhole which she described as a chamber that "overflows during wet weather events."; that the manhole/chamber is where overflows occur; and lime appears to be have been applied to the area and on top of the manhole/chamber cover. (*Id.*). Ms. Phillips describes the manhole/chamber as a "strange chamber"; that it is not a typical manhole used by the RCSD#1 and is "probably the only chamber we have that's like that."; and concedes that "[i]t's possible" that the design of the chamber causes it to overflow more than other chambers in RCSD#1's system. (*Id.*).

120.    With regard to this manhole/chamber that is adjacent to the Swim Club, Ms. Phillips concedes that when overflows occur they run down toward and possibly enter the Saddle River and that whatever is contained in the sewer system "...the sewage and the toilet paper and

36

everything that [RCSD#1] has, flows down into the [Saddle] River." (*Id.* at p. 30, line 23 thru p. 31, line 23; p. 32, lines 17 thru 23). RCSD#1 prepares reports that include estimates of the number of gallons that reach a water body, such as the Saddle River, when a spill or overflow occurs. (*Id.* at p. 32, line 24 thru p. 33, line 4).

121.   When asked, Ms. Phillips testified that locking mechanisms at the manholes located at/near the Swim Club (i.e., manholes 10172 and 10174) wouldn't work because the amount of force from the sewer main would "just blow the whole manhole top off." (*Id.* at p. 398, line 20 thru p. 399, line 4).

122.   Ms. Phillips is aware that a berm exists at the Swim Club and is that the existence of the berm directs the flow from sanitary sewer overflows from the manhole/chamber more directly into the Saddle River. (*Id.* at p. 125, line 7 thru p. 126, line 5).

123.   With regard to any spill or overflow by the RCSD#1 that reached and entered the Saddle River, Ms. Phillips concedes that the RCSD#1 has never taken any water samples in order to analyze the level of pollutants that entered the water - despite the fact the Sewer District was capable of performing such tests. (*Id.* at p. 122, line 3 thru p. 123, line 25).

124.   Ms. Phillips concedes that since she has been at RCSD#1 (i.e., 1989 to date) there have been complaints of odors at the SRPS, and that the RCSD#1 has continuously used one product or another in an effort to combat the odors. (*Id.* at p. 323, line 7 thru 325, line 15).

125.   Ms. Phillips was questioned about 2009 spills relative to documents provided by defendant during discovery entitled "Spills 2009 File". (Ex. "TT" - with bate stamp PLDW...202 - ...217 and identified as exhibit 18 during her deposition). Bates: 206-07: sewage spill 4-26-2009 at SRPS; failure of motor control center; estimated 78,000 gallons of sewage overflowed; no indication that it was a wet weather event; thus, more concentrated; due to failure, manholes

10171 and 10172 near the SRPS overflowed into the Saddle River - near/at the Swim Club; NJ DEP not notified per report...Bate 208: sewage spill 5-20-2009 involving SRPS; same circuit breaker failed again; estimated 5,000 gallons of overflow; manholes 10172 and 10174 involved...Bate 212: spill report dated 9-23-2009 regarding 9-15-2099 spill; Hackensack Pump Station w/ Hackensack River adjacent to the station; pumps not running; loose wire and control board (i.e., equipment?) failures resulting in estimated 320,000 gallons sewage overflow that drained into Hackensack River; no indication of a wet weather event and therefore higher concentration. (*Id.* at p. 304, line 23 thru p. 315, line 2).

126.    The DEC performed an inspection of the RCSD#1 facility on August 5, 2009 "for the purpose of evaluating compliance with the [SPDES] permit and Article 17 of the Environmental Conservation Law." (*Id.* at 446, lines 13 thru 19; Ex. "UU" - letter DEC (M. Cherian) to RCSD#1 (D. Phillips) dated August 10, 2009. "CBOD" refers to biological oxygen levels and "TSS" refers to total suspended solids. (Ex. "U" at p. 447, line 19 thru p. 448, line 17). Ms. Phillips concedes that this letter indicates the RCSD#1, based upon a review of the facility's monthly discharge monitoring reports, violated its SPDES permit affluent limits for CBOD in March and June 2009 and for TSS limits in March 2009 - a total of three violations. The letter also identifies that RCSD#1 may also be in violation of the CBOD limit in July 2009. (Ex. "UU"). Identified as a Notice of Violation, the letter states that each of the three items constitutes a violation of Article 17 of the ECL and subjects RCSD#1 to potential penalty of "up to $37,500 per violation per day." (*Id.*). Ms. Phillips concedes that nothing went beyond this Notice of Violation, and the RCSD#1 was never fined by the DEC for these violations. (Ex. "U" at p. 448 at lines 7 thru 17).

38

127.    Ms. Phillips was questioned about 2010 spills relative to documents provided by defendant during discovery entitled "Spills 2009 File." (Ex. "VV" - with bate stamp PLDW...218 - ...238 and identified as exhibit 19 during her deposition). Bate 220: sewage spill 5-24-2010; report Yetter to Ms. Phillips spill on South Monsey Road; SRPS force main involved...Bate 220: 1,000 gallon overflow; due to corroded fitting on a clean out assembly...Bates 223,224 and 225: report Yetter to Ms. Phillips regarding spill from 3-13-2010 thru 3-15-2010; one of the areas Saddle River Road and Ramapo Lane; overflow into Pascack Brook; spill also SRPS with overflow draining into tributary of Saddle River; no estimate of # of gallons; another spill Town Ramapo w/ overflow draining into a tributary of Saddle River...Bates 226: report Yetter to Ms. Phillips dated 1-22-2010; sewage spill Twin Lakes Pump Station 1-12-2010; catastrophic mechanical failure two pumps; (i.e., SRPS pumps to Twin Lakes Pump Station); tributary of Saddle River present there; failure due to excessive "rags"; estimate 70,000 gallons into stream which is tributary of Saddle River; not a wet weather event; higher concentration; equipment failure...Bates 230-31: spill report Yetter to Ms. Phillips dated 3-9-2010 regarding spill 2-28-2010; Grandview Pump Station; estimated 20,000 gallon overflowed; human error by RCSD#1 employee; portion flowed to Willow Tree Brook, tributary of Mahwah River...Bate 232: spills 3-27-2010 thru 3-30-2010; SRPS - two years after new pumps installed and just shy four years after Order on Consent; also identifies manholes 10172 and 10174 adjacent to Swim Club; overflow - amount not stated; does state overflow drained into tributary of Saddle River; manhole 10006 also overflowed and drained into tributary of Saddle River...Bate 237: spill report Yetter to Ms. Phillips dated 4-15-2010 regarding spill 4-1-2010; Twin lakes Pump Station; alarm at 11:15 pm and spill stop approx. 3:00 am; estimated 50,000 gallons into tributary of Saddle River; no indication that wet weather event; higher concentration

of pollutants and sewage into tributary of Saddle River; since not wet weather event, not result of infiltration or inflow; infiltration and inflow typically referenced when there's a greater amount of storm water coming in through the sewer system; due to mechanical failure. (Ex. "U" at p. 315, line 11 thru p. 316, line 7 and p. 334, line 20 thru p. 350, line 7).

128.    Ms. Phillips was shown an e-mail chain from Thomas Rudolph (Regional Water Engineer of the Rockland County Department of Health) to an individual named John to Manju Cherian (DEC) to Elizabeth Zicca (DEC) regarding RCSD#1 (Ex. "YY" - and identified as exhibit 34 during her deposition) which refers to the suspended penalty (i.e., $10,000.00) contained in the Order on Consent dated May 10, 2006. (*Id.* at p. 421, line 19 thru p. 422, line 24; Ex. "YY"). According to Ms. Phillips, she was not aware of any such request being made by the DEC, or payment made by the RCSD#1, regarding this suspended penalty. (*Id.*).

129.    Ms. Phillips was questioned about a Notice of Violation letter addressed to her by the DEC (Manju Cherian, P.E.) dated January 19, 2010 (Ex. "ZZ" - and identified as exhibit 37 during her deposition). (*Id.* at p. 432, line 2 thru p. 434, line 25). This violation notice involves an incident that occurred on January 12, 2010 regarding the Twin Lakes Pump Station with approximately 100,000 gallons of sewage was discharged into the Saddle River. (*Id.*; Ex. "ZZ"). The violation notice confirms that "[s]anitary sewer overflows are violations of Article 17 of the Environmental Conservation Law and may be subject to penalties of up to $37,500 per day per violation." (Ex. "ZZ"). When asked about this overflow, Ms. Phillips concedes that in addition to violating New York State's Environmental Conservation Law, this overflow could also be in violation of the Clean Water Act. (Ex. "U" at p. 433, lines 11 thru 21). Although subject to possible penalties of up to $37,500.00 per day per violation, the RCSD#1 did not pay any fine for this violation. (*Id.* at p. 434, lines 10 thru 25).

130. A technical compliance conference was held at the DEC which Ms. Phillips attended to discuss the Twin Lakes Pump Station overflow that occurred in January 2010. (*Id.* at p. 438, lines 12 thru 21; Ex. "AAA" - letter DEC (Manju Cherian, P.E.) to RCSD#1 (Dianne Phillips, Executive Director) dated February 2, 2010 and identified as exhibit 39 during her deposition). As a result of this incident as well as "[o]ther significant pump station overflows", the DEC requested that a report be prepared as "an addendum to the Dry Weather SSO Abatement Report required under the referenced Order on Consent." (Ex. "AAA"). The DEC's letter also memorializes RCSD#1's indication that it has "insufficient staffing to perform pump station operation and maintenance especially during wet weather events." (Ex. "U" at p. 439, lines 20 thru 24; Ex. "AAA"). The DEC noted that "[i]nsufficient staffing can directly affect a facility's ability to maintain SPDES compliance." (Ex. "AAA").

131. RCSD#1's Addendum Dry Weather Sewer System Overflow Abatement Report dated March 19, 2010 (Ex. "BBB" and identified as exhibit 38 during her deposition) - and sent to the DEC per the technical compliance conference - was prepared by Ms. Phillips and Eugene T. Yetter, P.E. (Director of RCSD#1's Plant Facilities). (*Id.* at p. 435, lines 8 thru 17). With regard to the SRPS, RCSD#1's addendum report lists as part of Attachment C at bates 002633 dry weather sanitary sewer overflows from 2000 to February 2010 involving the Saddle River Pump Station on the following dates:

> 7-25-2000
> 8-16-2000
> 12-6-2000
> 8-27-2001
> 8-14-2003
> 11-30-2005
> 3-2-2007
> 4-15-2007
> 4-16-2007
> 4-17-2007

> 10-12-2007
> 12-23-2007
> 3-5-2008
> 9-6-2008
> 4-26-2009
> 5-20-2009
> 2-17-2010

132.    Ms. Phillips was questioned about another Notice of Violation letter addressed to her by the DEC dated April 7, 2010 (Ex. "CCC" - and identified as exhibit 36 during her deposition). (*Id.* at p. 427, line 18 thru p. 428, line 4). This violation letter identifies a number of sanitary sewer overflows in the RCSD#1 collection system including manholes 10172, 10174 and 10434 Saddle River Road near the SRPS for 4-26-2009, manholes 10172, 10174 and 10434, Saddle River Road near the SRPS for 5-20-2009, 10-25-2009 Twin Lakes Pump Station, 2-17-2010 on Saddle River Road near the SRPS, and 4-2-2010 Twin Lakes Pump Station. (*Id.* at p. 428, lines 5 thru 23; Ex. "CCC"). This list specifically states that it does not include the "numerous wet weather overflows which occurred during [the DEC's] period of review from January 2009 thru [the] present." (*Id.* at p. 428, line 24 thru p. 429, line 4; Ex. "CCC"). The DEC scheduled a compliance conference to discuss these sanitary sewer overflows, as well as reminded such overflows are violations of Article 17 of the ECL and are subject to penalties of up to $37,500.00 per day per violation. (*Id.* at p. 429, lines 5 thru 10; Ex. "CCC"). According to Ms. Phillips RCSD#1 has never been fined for any of these post-Order on Consent overflows. (*Id.* at p. 429, line 23 thru p. 430, line 18).

133.    Ms. Phillips confirmed that with the exception of the $10,000.00 paid as part of the Order on Consent dated May 10, 2006, RCSD#1 has never paid any fines or penalties to the DEC for any sanitary sewer overflow. (*Id.* at p. 434, lines 18 thru 25 and p. 430, lines 12 thru 18).

42

### Testimony of RCSD#1 Witness, Eugene Yetter, Jr.

134.    Mr. Yetter has been the Director of Plant Facilities with RCSD#1 for thirteen years; he works primarily at the Orangeburg plant, but does leave the plant to perform site inspections; and as Director his duties include maintaining RCSD#1's collection system. (Ex. "V" at p. 8, lines 8 to 19; p. 9, lines 3 thru 8; and p. 20, lines 7 thru 11). His boss is Executive Director Dianne Phillips. (*Id.* at p. 10, lines 11 thru 13).

135.    Mr. Yetter describes a "wet weather event" as "[g]enerally heavy rain, short period of time, usually something over two to three inches of rain in a 24-hour period...[which] could be less, depending on the situation, such as frozen ground, snow pack or ice melt or snow melt." (*Id.* at p. 23, lines 15 thru 22). When these "parameters are met" (i.e., two to three inches of rain in a 24-hour period), Mr. Yetter's experience during his thirteen year career is that the RCSD#1 "[tends] to have overflows in the system." (*Id.* at p. 24, lines 11 thru 22). At certain locations, Mr. Yetter concedes that these resulting sanitary sewer overflows reach water bodies. (*Id.* at p. 24, line 23 thru p. 25, line 2).

136.    Mr. Yetter is familiar with "dry weather events" that occur at pump stations and cause sanitary sewer overflows, and these overflows are generally caused by equipment failure and/or human error (e.g., setting gauges too low, having a power switch shut off, etc.). (*Id.* at p. 28, line 16 thru p. 29, line 7). Mr. Yetter concedes, in contrast to a wet weather event, that when a dry weather sanitary sewer overflow occurs, the sewage is less dilute; that there is a higher concentration of sewage and pollutants in the overflow; and that should this higher concentration of sewage and pollutants reach a water body, it could have greater environmental impact. (*Id.* at p. 38, lines 5 thru 18). In terms of cleanup following a dry weather event that causes a sanitary sewer overflow that reaches a water body, RCSD#1 will inspect the area, collect "any visible

43

solids from the area", rake and repair erosion as needed, and dispense lime to address odor issues. (*Id.* at p. 74, line 19 thru p. 75, line 10).

137.    Mr. Yetter is not aware of any water samples taken or lab reports prepared when a sanitary sewer overflow reached a water body, regardless of whether the overflow was a wet weather or dry weather event. (*Id.* at p. 39, lines 10 thru 24). When asked why such samples were not taken or lab reports prepared - despite the fact the fact that had RCSD#1 had its own in-house lab (with Lab Supervisor/Pollution Control Supervisor Mr. Hwang) that was capable to perform such tests so as to determine the degree of pollutants that reached a water body - Mr. Yetter responded "It's not part of our - - our normal procedure." (*Id.* at p. 38, line 19 thru p. 40, line 3).

138.    When asked about capacity issues regarding the Ramapo interceptor, Mr. Yetter confirmed that "[d]uring wet weather the flow through Ramapo interceptor exceeds the capacity of those pipes...[so as to] cause a sewer overflow." (*Id.* at p. 23, lines 4 thru 14).

139.    Mr. Yetter was aware of sanitary sewer overflows that flowed "more than a few" times into water bodies that are used for drinking water, including the Hackensack River which is used for drinking water by some residents of Bergen County, New Jersey. (*Id.* at p. 40, line 22 thru p. 41, line 15).

140.    RCSD#1's SPDES permit, issued by the DEC, allows for certain discharges pursuant to treatment levels and discharge requirements from the treatment plant itself. (*Id.* at p. 20, line 21 thru p. 21, line 12). Although Mr. Yetter was "not sure" if any spill or overflow from one of RCSD#1's pump stations would be a violation of the SPDES permit, he did concede that a pump station was not an authorized source of such a spill or overflow. (*Id.*).

44

141.    In terms of the method used by RCSD#1 employees to estimate the number of gallons that comprise a sanitary sewer overflow, Mr. Yetter referenced a study done by the City of San Diego which contains detailed photographs of overflowing manholes at given flow rates; that his staff has this 'cheat sheet' that each person carries with them as their "estimating guide for gallons per minute overflow"; and he concedes that some of his staff "are familiar enough that they have a pretty good feel at this point in time, fortunately or unfortunately. " (*Id.* at p. 94, line 12 thru p. 95, line 13). No testing is done to determine what the concentration of sewage or pollutants are before it discharges from a pump station in an overflow. (*Id.* at p. 95, lines 20 thru 24).

142.    With regard to the Saddle River Pump Station ("SRPS"), Mr. Yetter described it as a pump station that is "higher head and higher capacity, which is unique in our system, and therefore does require a little more attention than some other stations." (*Id.* at p. 14, lines 12 thru 15). "The design of the [SRPS] is such that a problem at that station, the size of the wet well, the volume, the flow rate of the pump station is such that when there's a problem out there, by the time [RCSD#1] can respond to a problem out there, depending on the degree of the problem, there's a good chance that there will be an overflow related to loss of that pump station." (*Id.* at p. 15, line 16 thru p. 16, line 2). When such an overflow occurs, it can reach a water body - the Saddle River or one of its tributaries. (*Id.* at p. 16, lines 7 thru 14).

143.    Per Mr. Yetter, new pumps were installed at the SRPS "I want to say fall of [2007]." (*Id.* at p. 33, line 23 thru p. 34, line 2). The new pumps were the current version of the pumps being replaced, including the same manufacturer. (*Id.* at p. 70, lines 13 thru 22). Mr. Yetter was questioned about 2008 spills relative to documents provided by defendant during discovery entitled "Spills 2008 File". (Ex. "OO" - with bate stamp PLDW...171 - ...201 and

identified as exhibit 16 during his deposition). Reports of the RCSD#1 that comprise Ex. "OO"
confirm a sanitary sewer overflow involving the SRPS on 3-5-2008...at bate 197: report from
Mr. Yetter to Dianne Phillips regarding sanitary sewer overflows on 9-6-2008 and 9-7-2008 from
the SRPS with a spill of 15,000 gallons. (*Id.* at p. 34, line 12 thru p. 36, line 4; Ex. "OO"). Mr.
Yetter was questioned about 2009 spills relative to documents provided by defendant during
discovery entitled "Spills 2009 File". (Ex. "TT" - with bate stamp PLDW...202 - ...217 and
identified as exhibit 18 during his deposition). At bate # 206: report from Mr. Yetter to Dianne
Phillips involving a sanitary sewer overflow at the SRPS with an overflow of 78,000 gallons of
sewage that reached the Saddle River. (*Id.* at p. 36, line 13 to p. 37, line 15; Ex. "TT"). Mr.
Yetter does not dispute the estimates of these spills contained in the 2008 and 2009. (*Id.* at p. 37,
lines 12 thru 23). In fact, for the most part Mr. Yetter himself created the RCSD#1 reports
contained in Ex. "OO" and Ex. "TT". (*Id.*). When asked. Mr. Yetter concedes that putting in the
new pumps at the SRPS has not addressed the issues of sanitary sewer overflows at this location.
(*Id.* at p. 37, line 24 thru p. 38, line 4).

144.    Mr. Yetter admits that presently there are still capacity issues at the SRPS during
wet weather events such that, under certain circumstances, this pump station continues to
experience sanitary sewer overflows. (Ex. "V" at p. 61, lines 6 thru 18).

145.    When asked if there has even been any discussions about diverting the flow from
the SRPS to avoid sanitary sewer overflows, Mr. Yetter replied "[n]ot - - not in any serious
degree, no." (*Id.* at p. 59, lines 9 thru 13). When asked in the very next question "[w]hy not?", he
responded "I honestly don't know." and thereafter adding that he was "[s]ure" that such a
diversion could be done, although that would need to be looked at and analyzed. (*Id.* at p. 59,
line 14 thru p. 60, line 4). When, for example, a dry weather event occurs at the SRPS, nothing

46

can be done during the event itself to divert the flow so as minimize the impact of the overflow - the priority being to get the pumps up and running and get back on line. (*Id.* at p. 93, line 19 thru p. 94, line 11).

146. Mr. Yetter is also aware of large sanitary sewer overflows, during both dry and wet weather events, regarding the Cherry Lake Pump Station that have reached and entered a nearby tributary of the Saddle River. (*Id.* at p. 131, line 23 thru p. 132, line 17). The Cherry Lane Pump Station has the same design configuration as the SRPS. (*Id.* at p. 133, lines 6 thru 9).

147. Mr. Yetter was questioned about the manholes located at/near the SRPS (i.e., manholes 10172 and 10174) as well as the Swim Club - confirming the location per various color photographs (Ex. "RR"). (*Id.* at p. 75, line 11 thru p. 76, line 11). With regard to the manhole adjacent to the Swim Club, he testified that this particular manhole was modified many years ago "in [an] effort to preclude backups from wet weather in the line to the Saddle River Pump Station, in an effort to stop backups going into the [Swim Club]. This was designed as an overflow to overflow out this manhole, rather than flooding the [Swim Club]. It has since been redesigned, so as to not have that feature of ability to overflow"...the modification included the "addition of a wall and a plate and almost designed to act as a check valve, so as" to allow sewage to come out this location, but rather then flood the front of the [Swim Club]." (*Id.* at p. 76, line 4 thru p. 77, line 16). This modification didn't address anything since, as Mr. Yetter admits, not only do sanitary sewer overflows still occur at this manhole adjacent to the Swim Club, they still occur to the two other manholes located in the Swim Club's parking lot. (*Id.* at p. 77, line 23 thru p. 79, line 18). Mr. Yetter concedes that this modification actually caused sanitary sewer overflow to flow down into the Saddle River as opposed to away from the river and towards the Swim Club's parking lot. (*Id.*).

47

148.    Mr. Yetter also testified that the manhole adjacent to the Swim Club underwent modifications some time ago, including adding a watertight cover so as to attempt to prevent the manhole from blowing (i.e., overflowing). (*Id.* at p. 80, line 23 thru p. 81, line 21). Mr. Yetter concedes that despite the watertight cover, this manhole has continued to experience overflows that flow down into the Saddle River - whether a dry weather or wet weather event. (*Id.* at p. 82, lines 5 thru 13). Given the watertight cover, he concedes that it takes pretty good amount of pressure to blow the cover and release the overflow. (*Id.* at p. 81, lines 22 thru 25).

149.    When shown additional color photographs (Ex. "PP" and one picture from Ex. "SS"), he confirms that the photographs depict a trail of debris, inclusive of rags, from the manhole near the SRPS heading down towards the Saddle River. (*Id.* at p. 83, line 5 thru p. 84, line 7; p. 121, lines 18 thru 25).

150.    With regard to rags, he is aware that rags build up as materials flow down the collection system which, if in a large enough quantity, can cause blockages. (*Id.* at p. 53, lines 10 thru 23). At the SRPS, a device known as a bar rack assembly is used to collect rags and other debris that might cause pump problems. (*Id.* at p. 53, line 24 thru p. 54, line 8). This device consists of a series of stainless steel rods which is maintained daily. (*Id.*). Mr. Yetter is also familiar with another mechanism employed in the industry to deal with rags - grinders, which do a better job of removing rags. (*Id.* at p. 54, lines 9 thru 12; p. 63, line 8 thru p. 64, line 5). According to Mr. Yetter, a study was performed by the engineering department - which apparently is in draft form - to address the possibility of installing grinders at the SRPS. (*Id.*). Mr. Yetter recalls seeing this draft study two or three years ago. (*Id.* at p. 66, lines 12 thru 21). During Mr. Yetter's time with RCSD#1, there has never been a contract or in-house project that provided for grinders to be installed in a pump station. (*Id.* at p. 68, lines 9 thru 13).

48

151.    Mr. Yetter is familiar with manhole 10019 which is located where David Schneider lives; he confirms receiving odor complaint from Mr. Schneider; he confirms that this manhole has previously been identified as a problematic area; and it is problematic in that it's "actually a low section of that particular line, and there have been times in wet weather, again, where sewage has overflowed from that particular manhole and into the area." (*Id.* at p. 45, line 9 thru p. 46, line 12). Mr. Yetter identified various color photographs (Ex. "SS") as this problematic area. (*Id.* at p. 116, line 17 thru p. 117, line 20; p. 121, lines 10 thru 13).

152.    Mr. Yetter concedes that there have been staffing issues within his department during the past few years, including maintenance personnel. (*Id.* at p. 29, lines 8 thru 14). Mr. Yetter's manpower has been down twenty percent (20%) for the past seven years and, in his opinion, his department is understaffed. (*Id.* at p. 29, line 15 thru p. 30, line 9). In light of this understaffing, he admits that his department's response time and ability to address sanitary sewer overflows has been impacted. (*Id.* at p. 31, line 23 thru p. 32, line 4). Mr. Yetter believes that the DEC, during the process leading up to the Order on Consent review (back in 2006) did admonish RCSD#1 that it was understaffed and should make efforts to increase their staffing - and that Rockland County is now apparently "in the process of paying heed to that admonishment." (*Id.* at p. 90, lines 15 thru 23).

### EXPERT WITNESS INFORMATION & TESTIMONY

#### Testimony of Plaintiffs' Expert, Dennis Lindsay, P.E.

153.    Dennis Lindsay, P.E. was retained as an expert by plaintiffs and a copy of his original report and his resume are set forth, respectively, as Ex. "GGG" and "HHH". (Ex. "Y" at p. 38, line 21 thru p. 39, line 10 and p. 7, lines 4 thru 11). Mr. Lindsay also prepared a

49

supplemental report dated September 26, 2012 and a copy of same is set forth at Ex. "III". (*Id.* at p. 55, lines 7 thru 20).

154.    Mr. Lindsay has a New York State Grade 4A wastewater treatment plant operator's license and has taken a number of courses regarding this license as well as in connection with his professional license, including operations of wastewater treatment plants and the design of wastewater collection systems. (*Id.* at p. 8, line 16 thru p. 10, line 20). Before becoming a licensed sewage treatment operator Grade 4A, Mr. Lindsay's experience includes designing pump stations, pipelines and treatment facilities for several municipalities including the Village of Suffern. (*Id.* at p. 11, lines 2 thru 21).

155.    The Saddle River is a trout stream. (*Id.* at p. 101, line 10 thru p. 103, line 14; Ex. "GGG" as part of the attachment entitled "New Jersey Freshwater Fishing Digest" for January 2010).

156.    According to Mr. Lindsay a dry weather sanitary sewer overflow "has a more significant impact on the stream as opposed to wet weather [SSO] when the stream is swollen. They both have impact, but in dry weather it would be greater...[b]ecause there is less dilution and ...less assimilative capacity in the stream to absorb and to accept the waste load." (*Id.* at p. 60, line 20 thru p. 61, line 18).

157.    Mr. Lindsay was questioned about a document he prepared, and which is attached to his original report (Ex. "GGG"), entitled "New York State DEC Spill File, List of actions & Resident Records Rockland County Sewer District No. 1." (*Id.* at p. 38, line 21 thru p. 39, line 10 and p. 39, line 23 thru p. 40, line 6; Ex. "GGG"). This list recites multiple sanitary sewer overflow events beginning on 2-11-2000 through 9-8-2011; it describes the various locations of such events, including the Swim Club, the SRPS, Saddle River Road, the Twin Lakes Pump

50

Station, South Monsey Road, the Ramapo interceptor, Cherry Lane, Hillside Avenue, and manholes 10171, 10172, and 10019; it identifies the water body affected, if any, including various references to the Saddle River; and it sets forth that the average sanitary sewer overflow measures 12,000.00 gallons. (Ex. "GGG"). Mr. Lindsay describes the list as "a list of spill events in chronological order that [his office] received from a number of sources." - such sources including reports generated by RCSD#1 and the DEC's spill database. (*Id.* at p. 40, line 7 thru p. 41, line 10). When a sanitary sewer overflow occurs, it is Mr. Lindsay's understanding that the permit holder is to notify the DEC as soon as possible, usually with a phone call. (*Id.* at p. 41, line 16 thru p. 42, line 2). The DEC, in turn, gives the overflow a spill number and the event is put on the DEC's spill database. (*Id.* at p. 41, lines 11 thru 15). The permit holder is also required to provide "follow-up written notification" to the DEC, with the report to generally provide "the spill date, the time, the location, the amount of the spill if you know and what remedial action was taken..." (*Id.* at p. 42, line 16 thru p. 44, line 12).

158.    When asked about this list, Mr. Lindsay stated "[t]he list was intended to show that there were events that took place and the number of events, many events took place prior to the Order [on Consent] and that the events were continuing after the Order [on Consent] and that was it. When we looked at spill impacts - - well, we looked at, in this particular case, [RCSD#1] required that I look at the average impact of spill events. And in my subsequent report I selected two spill events after the Order [on Consent] was in place to look at specific impacts from those spills." (*Id.* at p. 46, lines 7 thru 23). Later on, Mr. Lindsay was shown a copy of plaintiffs' Second Amended Complaint (Ex. "M") and directed to the fact that this amended pleading sets the time frame for sanitary sewer overflows as from August 2006 forward. (*Id.* at p. 79 line 22 thru p. 80, line 13). When asked why he included spills that occurred from 2000 to December

51

2005, Mr. Lindsay responded that "I thought I answered that. That was that I was showing that there was [sic] spills that occurred before the Order [on Consent] and spills that occurred after the Order [on Consent] and spills that occurred after the schedule for the Consent Order was to be complied with."...[t]hat was to show that there were spills that occurred and that they were just continuing....[j]ust to show that there was a continuing - - continuous spills, that's all." (*Id.* at p. 80, line 19 thru p. 81, line 25).

159.    Regarding Priority 1 improvements that RCSD#1 was to complete by 2009 pursuant to the Order of Consent, Mr. Lindsay understood Priority 1 improvements were "those associated with the Order [on Consent] at perhaps various locations, but also at the Saddle River Pump Station and the Twin Lakes Pump Station and I forgot where else, but in this area...[m]y understanding was that those were the items that needed to be complete because of the overflows that were - - that caused the Order [on Consent] to be enacted. That was my understanding of this and when I looked at the schedules and I looked at the locations, that's where I thought it was; that those were the critical items for the overflows that are experiencing and impacting the Saddle River." (*Id.* at p. 104, line 12 thru p. 107, line 12).

160.    Mr. Lindsay's initial report includes a separate table that sets forth a "Spill History" at page two; his report notes that "[o]bvioulsy untreated discharges at unregulated points along the collection system is a violation of the SPDES permit."; that such discharges are also a violation of section 301 Rockland County's Sewer Use Law; and that despite some improvement made by RCSD#1 per the Order on Consent related to sanitary sewer overflows, sanitary sewer overflows continue "both under dry and wet weather conditions." (Ex. "GGG"). In fact, when asked by defense counsel "[i]s it fair to say that [RCSD#1] has had no [sanitary sewer overflows] in the year 2012, to your knowledge?", Mr. Lindsay replied "There was one that was

reported" and Mr. Lindsay referenced that this 2012 spill was contained in the report of the defendant's expert, Dr. Bruce A. Bell. (*Id.* at p. 111, line 16 thru p. 112, line 3).

161.    Mr. Lindsay prepared a supplemental report dated September 26, 2012 (Ex. "III") after reviewing the report of defendant's expert, Dr. Bruce A. Bell, dated July 23, 2012 (Ex. "DDD"). (*Id.* at p. 55, lines 7 thru 20). After reading Dr. Bell's report, Mr. Lindsay prepared his supplemental report to "clarify" some things. (*Id.*). Additionally, the list in his supplemental report focuses on sanitary sewer overflows involving the Saddle River or one of its tributaries - "looking at spills that occurred in the Saddle River that would have impacted the Saddle River." (*Id.* at p. 56, line 16 thru p. 57, line 10). When asked in what manner his supplemental report list of spills differs from the list in his original report, Mr. Lindsay stated "in general we changed a few dates, because we had the reported date as opposed to the actual date of the spill. It usually changed by one or two days. We put some additional information regarding the volume of spill from the [RCSD#1] letters. That's basically it." (*Id.* at p. 58, lines 7 thru 18).

162.    This list records multiple sanitary sewer overflows from August 29, 2008; it identifies various spill locations, including Cherry Lane, South Monsey Road, Saddle River Road, Hillside Avenue, East Saddle River Road, the Twin Lakes Pump Station, the SRPS, and various manholes; the spill amounts range, when a figure is included, from 50 gallons to 390,000 gallons; and the Saddle River is identified as an affected water body for a number of the spills. (Ex. "III" at Table 1). However, the focus of the opinions contained in his supplemental report involve two specific sanitary sewer overflows that reached the Saddle River: one occurred on April 26, 2009 and the other January 10, 2010. (*Id.* at p. 64, line 18 thru p. 65, line 5). In terms of rainfall data, this information in his supplemental report came from one source (i.e., National Oceanic and Atmospheric Administration site in Midland Park) as opposed to several sources in

his original report - with Mr. Lindsay disagreeing that it was critical for him to have the exact amount of rainfalls "[b]ecause what I was looking for is was it a rain event or wasn't it rain. The one inch number that I picked over 72 hours was a fairly low number. And the reason for that was just to try to take out of the equation any times when we might have swollen rivers or swollen stream that would dilute impact. I guess the fundamental thing is that when I looked at the two spill events that I looked and drew my conclusions upon, there was no rain over that period. So you could - - there was no - - and we looked at the streamflows at those times and I had streamflow data and I had no rain at that time, so I could draw reasonable conclusions upon those two spills. The rest was just to provide a summary overview of how many might fall into that category or might fall into a range where wet weather would have dilutional impacts." (*Id.* at p. 62, line 24 thru p. 64, line 17). According to Mr. Lindsay, streamflow data as opposed to rainfall data is "much more important because that's actually what's in the stream and that's what is the dilutional impact." (*Id.* at p. 66, lines 6 thru 16).

163. The April 26, 2009 sanitary sewer overflow occurred at the SRPS where 78,000 gallons was spilled. (*Id.* at p. 64, lines 18 thru 22). He does not note any rainfall that day. (*Id.* at p. 65, lines 6 thru 11). Mr. Lindsay was shown a RCSD#1 report from Eugene Yetter (Director of Plant Facilities) to Dianne Phillips (Executive Director) dated May 8, 2009 (Ex. "JJJ") regarding this sewage spill at the SRPS on April 29, 2009. (*Id.* at p. 70, line 23 thru p. 71, line 13). This report mentions overflows from manholes 10172 and 10174, which are located close to one another (i.e., approximately 150 feet apart) and with one of them located closer to the Saddle River. (*Id.* at p. 71, line 14 thru p. 72, line 9). When asked if he could estimate how much of the 78,000 gallons of sewage came out of each manhole, Mr. Lindsay stated "[n]ot specifically" but added "I've looked at those manholes, at least on Google Earth, and actually physically walking

54

the site, manhole [10]174 appears to be approximately three feet lower in elevation that [10]172. Now, that just Google Earth and it may be a little different. And also it's my observation that it's higher. So [10]174 being that much lower, I would expect most of the discharge to take place there. I also viewed - - this was on April 26, 2009. I also viewed photos, aerial photos from a time right after the spill events and saw the remainders of the cleanup that occurred and there was extensive lime and materials spread along the path where [manhole] [10]104 discharged down to the Saddle River and there was some lime a little bit spread around the location right around manhole [10]174."

164.     Mr. Lindsay visited the location of this spill and examined the path of the discharge. (*Id,* at p. 67, lines 21 thru 23). "At the Saddle River Pump Station from manhole 10174 it discharges directly onto a graveled roadway which is used as access by United Water. It's a packed roadway and wastewater would flow directly down that to the river, not going through a vegetated strip, if you will, just going along a graveled roadway. I've seen photos of the discharge and I've seen how it flows down that and it stays within that roadway area. I've also been there in a rainstorm and visited and looked at how the rainfall flows down that to the river; that's at the Saddle River Pump Station. I don't think there is any appreciable reduction in microbiology or bacteria along that path." (*Id.* at p. 67, lines 21 thru p. 68, line 15).

165.     In his supplemental report, Mr. Lindsay estimated that the 78,000 gallons entered the Saddle River. He testified that the SRPS "has an average dry weather flow of 1.78 MGD (i.e., million gallons per day). If you look at the 1,780,000 gallons it would see in a normal day and you divide it by 24 hours, just taking an average rate, all right...the average flow of the [SRPS] would be about 140,000 gallons plus, and that's just on an average flow." (*Id.* at p. 73, line 12 thru p. 74, line 10). Referring to RCSD#1's own report (Ex. "JJJ"), the SRPS was out of service

55

as of approximately 5:15 pm - when you would typically have "high flows in a system" - and the overflow ended by 7:50 pm. (*Id.*; Ex. "JJJ"). Mr. Lindsay accepted the 78,000 gallons despite his opinion that this estimate appeared to him to be "very low." (*Id.* at p. lines 11 thru 21 and p. 98, line 14 thru p. 99, line 17). Based upon his visit to the site, and seeing the flow path, Mr. Lindsay accepted the 78,000 gallons going into the Saddle River given that he saw "very little opportunity for ponding." (*Id.* at p. 73, line 12 thru p. 74, line 21 and p. 98, line 14 thru p. 99, line 17).

166.    The January 12, 2010 sanitary sewer overflow occurred at the Twin Lakes Pump Station involving the Saddle River. (*Id.* at p. 64, line 23 thru p. 65, line 5 and p. 57, lines 7 thru 10). According to RCSD#1's own documents, the spill was 100,000 gallons whereas the DEC reported the spill as 70,000. (*Id.*). Mr. Lindsay used the lower figure (i.e., 70,000 gallons) for his analysis and opinion. (*Id.*). As with the April 26, 2009 spill, he does not state any rainfall that day and he did visit the site of the spill. (*Id.* at p. 65, lines 6 thru 11 and p. 67, lines 13 thru 23). At the Twin Lakes Pump Station there's a "manhole that's right outside the Twin Lakes Pump Station right at the gate where you enter. When it discharges, if it discharged - - for the flows that did discharge at that point, they would flow right over a roadway about 15 to 18 feet, enter a drainage pipe and discharge directly into the tributary of the Saddle River." (*Id.* at p. 68, line 16 thru p. 69, line 6). Similar to the spill at the SRPS, Mr. Lindsay testified that although there could be a small amount of ponding, it would be of "minimal amounts." (*Id.* at p. 98, line 14 thru p. 99, line 17).

167.    Mr. Lindsay's supplemental report addresses the bacterial pollution of the Saddle River using both the New York State standard (i.e., fecal coliform) and the New Jersey standard (i.e., E.coli). (*Id.* at p. 91, line 18 thru p. 97, line 15; Ex. "III" at Table 2A on page 3 and bacterial

standards set forth on pages 4-5). This report notes that sanitary sewer overflow from RCSD#1's collection system have impacted the Saddle River in that the bacterial quality of the river - whether measured by the fecal coliform or the E.coli standard - has caused the river to be polluted in excess of state standards. (Ex. "III"). According to Mr. Lindsay, the sanitary sewer spills of April 26, 2009 and January 12, 2010 violated the water quality standards in New Jersey. (*Id.* at p. 86, line 23 thru p. 87, line 11).

168.    When asked about focusing on the two sanitary sewer overflows, Mr. Lindsay stated "[m]y analysis shows two example spills, specific spills and shows what impacts it had. In my original report I did it on a generalized discharge and flow regime. That Dr. Bell objected to, and I can understand why. So I went back and looked at two specific spills. You could look at other spills and determine them as well. I didn't do every single spill. I did these to show what the impacts would be, to show that it contravenes the standards in the stream both by New York State standards and by New Jersey standards. Not marginally, but significantly." (*Id.* at p. 86, lines 3 thru 22). Additionally, in terms of these two spills and what they did to Lions Park, Mr. Lindsay's "opinion was that they exceeded the standards at Lions Park and they exceeded the standards at the location of the spills..." (*Id.* at p. 89, line 23 thru p. 90, line 6).

169.    Mr. Lindsay was asked questions about "comminutors", which he described as "basically it's a grinder. Two opposing sets of teeth move opposite each other and chop up materials that they come into contact with....They chop up everything from rags to tampons, applicators, actually 2X4's I've seen go through them, so they're pretty strong devices." (Id. at p. 114, lines 3 thru 18).

170.    He described the term "rags", as used in the wastewater industry, as various different items that "can be wipes, they can be toilet paper, they can be just products that come

57

down and are not biodegradable or not the typical the biodegradable waste from people, or liquid." (*Id.* at p. 114, line 19 thru p. 115, line 3).

171.    He has prior experience designing treatment plants using comminutors as well as replacing or adding-on comminutors at pump stations. (*Id.* at p. 115, lines 4 thru 22). Typically, a comminutor is part of a wet well; wastewater comes into the comminutors, it chops up pieces/solids that enter and they fall into the wet well; and the pieces then get pumped out up at the pump station. (*Id.* at p. 117, lines 9 thru 19). When asked about his opinion, as reflected in his reports, that he believed that RCSD#1 could install comminutors to deal with what he terms a rag problem, Mr. Lindsay testified "I read the testimony from Dianne Phillips and from Eugene Yetter, they talk about comminutors as a possible solution. I think they may be a possible solution to some of the problems that they've had. I know they commissioned a study, you know that from one of their engineers and I read that study. He talks about how they might [be] able to do that or the equipment that he suggested. And what I said in my report was that, yes, that's something that I would look at. If you have rags clogging pumps, it's one of the solutions that we have looked at for stations we've employed and they've work [sic] just fine." (*Id.* at p. 119, line 13 thru p. 120, line 11). In Mr. Lindsay's opinion comminutors can solve rag problems, and although he didn't look at the SRPS to determine whether comminutors could solve the problem at this pump station, he stated that if "there is space problems that could be there, but like I said we had space problems and we built separate chambers so I think [RCSD#1] can probably overcome that...I can tell you this, that I'm surprised. I have read reports that came in and I'm surprised with all of the rags that they are clogging with the screens that they have. I've designed a lot of pump stations, I've participated in the operation of a lot of pump stations and, quite frankly, after reading this I called a lot of the old operators and people that I know in the industry

58

to ask them about the pumps that we put in and do they have repeated problems with rags and the answer is no. We put comminutors in and, quite frankly, in some of the stations we put comminutors in response to a rag problems and I've been advised that they are working just fine. So, I'm surprised of all the problems that are having and that they are tolerating them." (*Id.* at p. 119, line 13 thru p. 121, line 22). To the extent RCSD#1 has a rag problem, Mr. Lindsay agrees that the installation of comminutors could help with this problem. (*Id.* at p. 122, lines 4 thru 8).

## Testimony of RCSD#1's Expert, Dr. Bruce A. Bell

172.    Dr. Bruce A. Bell was retained as an expert by RCSD#1 in this action in late 2007. (Ex. "X" at p. 4, lines 21 thru 23 and p. 115, lines 17 thru 21). He prepared a report dated July 23, 2012 - which includes his curriculum vitae - and a copy of same is set forth at Ex. "DDD". (*Id.* at p. 5, lines 21 thru 25). Dr. Bell also prepared a supplemental report dated October 1, 2010 and a copy of same is set forth at Ex. "EEE". (*Id.* at p. 35, line 23 thru p. 36, line 2).

173.    Dr. Bell admits that all sanitary sewer overflows are violations of a SPDES permit. (*Id.* at p. 31, lines 3 thru 6).

174.    The following items are flushed into a sanitary sewer system: sewage; feminine products, some with plastic applicators; wipes; condoms; and pharmaceuticals. (Ex. "X" at p. 18, line 17 thru p. 19, line 21). These items would enter into the system's pipes and, hopefully, make their way into the treatment plant. (*Id.* at p. 19, line 25 thru p. 20, line 3). If these items do not make it to the treatment plant, there could be a sanitary sewer overflow. (*Id.* at p. 20, lines 4 thru 7). When such a sanitary sewer overflow occurs, the materials that were flushed down people's toilets could flow down and into a water body such as a river depending upon how the overflow is occurring. (*Id.* at p. 20, line 8 thru 22). Some of the factors to consider include velocity of the flow, the slope of the land, and the distance of the flow. (*Id.*).

59

175.    Paper takes a long time to biodegrade. (*Id.* at p. 22, lines 10 thru 13). With the exception of some of the newer biodegradable plastics, most plastics take a long time to biodegrade. (*Id.* at p. 22, lines 14 thru 17). The rate of plastic degradation "depends on the plastic composition and the exposure to UV light. They don't really biodegrade. They are degraded." (*Id.* at p. 22, line 18 thru p. 23, line 2). In general terms, "traditional plastics take a long time in the environment" to degrade; certainly "more than months" and, for some plastics, years. (*Id.* at p. 23, lines 3 thru 17).

176.    Relative to water quality, the State of New York uses fecal coliform as the standard and the State of New Jersey uses E.coli. (*Id.* at p. 92, lines 10 thru 16). In other words, each state uses a different bacteria to test water quality, but "[t]he procedure they use to set those standards are [sic] the same." (*Id.* at p. 93, line 25 thru p. 94, line 2). The "water quality standards are used primarily in most states to set discharge limits on plants and to close public swimming areas." (*Id.* at p. 93, lines 8 thru 12). If one goes "to a permit you will find that there is a general prohibition in the permit that says don't cause or contribute to the violation of the water quality standards." (*Id.* at p. 93, lines 13 thru 19).

177.    If a sanitary sewer overflow entered a water body in sufficient concentrations, Dr. Bell concedes that such a spill could cause damage to the affected water body. (*Id.* at p. 98, lines 6 thru 12). For example, bacteria within the sewage overflow (e.g., fecal coliform, E.coli), if in sufficient concentrations, can cause harm to a water body, such as a river. (*Id.* at p. 98, line 24 thru p. 99, line 21; p. 83, lines 5 thru 12). At the point where a flow reaches a water body, such as the Saddle River during a dry weather event, the harm is instantaneous at this mixing point. (*Id.* at p. 82, lines 7 thru 15).

60

178.   Dr. Bell testified that RCSD#1 proposed what is referred to as a "design storm": three inches of rain within 24 hours. (*Id.* at p. 33, lines 9 thru 15). Dr. Bell added that a design storm refers "not solely [to] the amount of rain that falls in 24 hours" but that the term is a "shorthand" for two kinds of storms: one "is the total rainfall over a relatively long period of time, in that case a day in storm,,," and the other storm "is short-term intense storm, you known, a downpour from a thunderstorm, which can put a lot of water into the storm sewer, or a sanitary sewer, if you've got inflow in a very short period of time." (*Id.* at p. 34, lines 7 thru 20). Conceding that the term design storm is "a synthetic storm, it's not meant to be a real storm, that combines the two.", he nonetheless concedes that a sanitary sewer overflow within RCSD#1's collection system during an event that was less than the design storm would be a violation of RCSD#1's SPDES permit. (*Id.* at p. 34, line 3 thru p. 35, line 18).

179.   Dr. Bell's initial report (Ex. "DDD") includes as "Figure 3-1" a map that depicts, among other things, the location of two USGS gauges: gauge #01390450 (which Dr. Bell used) and gauge #01390250 (which plaintiffs' expert, Dennis Lindsay, used). (Ex. "X" at p. 87, lines 12 thru 20). Dr. Bell concedes that he never actually went to gauge #01390250. (*Id.* at p. 92, lines 2 thru 3). This map also provides the location of the Swim Club and the SRPS - each adjacent to the New York -New Jersey border. (*Id.*).

180.   Dr. Bell's initial report also includes as an attachment a three page Table entitled "Analysis of SSOs as Reported in Appendix 1 of the Lindsay Report."[2] This Table references multiple sanitary sewer overflows at various times from August 28, 2006 through September 8, 2011; it references various locations including Cherry Lane, the SRPS, Hillside Avenue, East Saddle River Road, South Monsey Road, Saddle River Road, Twin Lakes Pump Station, and

---

[2] The reference to "Lindsay Report" refers to the initial report of plaintiffs' expert, Dennis Lindsay, and a complete copy of Mr. Lindsay's report is set forth at Ex. "GGG".

manholes 10171, 10172, 10174; and the Saddle River or one of its tributaries is listed at various entries as a sanitary sewer overflow destination. (Ex. "DDD" Table). Although Dr. Bell disagrees with some of Mr. Lindsay's opinions regarding the date of the spill, the cause of the spill, the sanitary sewer destination, etc., he does admit that generally all sanitary sewer overflows are a violation of SPDES permits. (*Id.*; Ex. "X" at p. 31, lines 4 thru 6). Dr. Bell also concedes that all sanitary sewer overflows that occurred after May 10, 2006 (i.e., the date of the Order on Consent) within RCSD#1's collection system would not be permitted under RCSD#1's SPDES permit. (*Id.* at p. 97, line 16 thru p. 98, line 12).

181.   Dr. Bell was questioned about his supplemental report (Ex. "EEE"), and the attached "Table A" which references multiple dry and wet weather sanitary sewer overflows from August 28, 2006 through December 29, 2011 at various locations including Cherry Lane, South Monsey Road, Saddle River Road, Hillside Avenue, Twin Lakes Pump Station, East Saddle River Road, the SRPS, and manholes including 10172 and 10174. (*Id.* at p. 36, lines 6 thru 10; Ex. "EEE" at Table A). All of these spills occurred after the Order on Consent dated May 10, 2006. (*Id.* at p. 36, lines 11 thru 25). With the exception of the entry for 8-29-2011, the remaining thirty-three (33) overflows did not exceed a rainfall total of three inches "The Design Storm" - with Dr, Bell stating he used a different rain gauge (United Water) that used by Mr. Lindsay (Midland Park), but that Dr. Bell did not include in his report any of the several apparent significant differences he found when comparing each gauge's daily rain data. (*Id.* at p. 37, line 2 thru p. 39, line 20). Dr. Bell testified that RCSD#1 prepares spill reports for the DEC and that it is required, when able, to estimate the volume of the spill. (*Id.* at p. 40, lines 6 thru 8 and p. 42, lines 14 thru 23). The DEC also maintains reports regarding spills. (*Id.* at p. 40, lines 9 thru 11).

182.    During questioning about these thirty-four (34) spill events, Dr. Bell concedes that just about one-half of the events list the Saddle River as a water source affected by an overflow. (*Id.* at p. 41, line 16 thru p. 44, line 5; p. 48, line 21 thru p. 65, line 10; p. 76, line 18 thru p. 77, line 18).

183.    Dr. Bell agrees that it is more than likely that a dry weather sanitary sewer overflow, when compared to a wet weather event, would have a higher degree of fecal coliform and E.coli in the spill. (*Id.* at p. 80, lines 14 thru 22). In such a dry weather event, "[t]he bacteria will be higher." (*Id.* at p. 81, lines 8 thru 23).

184.    Dr. Bell was shown color photographs regarding a sanitary sewer overflow that occurred on March 5, 2008 at the Swim Club (Ex. "FFF" - and identified as exhibit 4 during his deposition). (*Id.* at p. 70, line 16 thru p. 71, line 7). The Swim Club is "right there" at the New Jersey border. (*Id.* at p. 85, lines 14 thru 16). Dr. Bell recognizes the manhole that is adjacent to the Swim Club, and the photographs of the manhole look like the remnants of an overflow at this manhole inclusive of toilet paper and sanitary products continuing down towards the Saddle River. (*Id.* at p. 71, line 8 to p. 72, line 11). The ground slopes downward from the manhole towards the Saddle River. (*Id.* at p. 69, line 19 thru p. 70, line 5). Dr. Bell concedes that there is a flow depicted in the photographs that enters the Saddle River, and that it appears cloudy. (*Id.* at p. 73, lines 16 thru 24; p. 74, lines 4 thru 15).

185.    Lions Park is approximately a mile and a quarter from the Swim Club and this park is in close proximity to the gauging station (i.e., gauge #01390450) Dr. Bell used (*Id.* at p. 86, lines 2 thru 10). Should a sanitary sewer overflow from the manhole adjacent to the Swim Club enter the Saddle River, and flow downstream to Lions Park, Dr. Bell concedes that ninety

percent (90%) of the bacteria that originally entered the Saddle River would not have yet died off when the flow reached Lions Park. (*Id.* at p. 85, line 17 thru 21 and p. 86, lines 11 thru 20).

186. Dr. Bell concedes that the property of plaintiff, Roy Ostrom, is closer to gauging station #01390250 (i.e., the station used by plaintiff's expert, Dennis Lindsay) that to the gauging station he used. (*Id.* at p. 87, line 12 thru p. 88, line 6). Dr. Bell did not examine Mr. Ostrom's, property to see the flow of the Saddle River at this location. (*Id.* at p. 88, lines 7 thru 9). In fact, Dr. Bell did not know if the Saddle River flowed by and/or abutted Mr. Ostrom's property. (*Id.* at p. 88, lines 10 thru 12).

187. When asked specifically about a sanitary sewer overflow that occurred on April 26, 2009 at the SRPS where the overflow entered the Saddle River, Dr. Bell concedes that the concentration of bacteria levels would be higher at that portion of the river that flowed through Mr. Ostrom's property than when the overflow reached the gauging station that he used. (*Id.* at p. 88, line 20 thru p. 89, line 16).

188. Regarding all sanitary sewer overflows within RCSD#1's collection system that occurred before or after May 10, 2006 (i.e., date of the Order on Consent), Dr. Bell admits that each such spill would not be permitted since they would not be pursuant to or in compliance with RCSD#1's SPDES permit. (*Id.* at p. 97, line 16 thru p. 98, line 12 and p. 109, line 23 thru p. 110, line 4).

189. Regarding all sanitary sewer overflows within RCSD#1's collection system that occurred before or after May 10, 2006 (i.e., date of the Order on Consent) and reached a water body of the United States, Dr. Bell admits that each such spill would be prohibited by the Clean water Act. (*Id.* at p. 109, line 23 thru p. 110, line 9). Although not within his expertise, Dr. Bell

64

believes that the Saddle River to be a water body of the United States. (*Id.* at p. 110, lines 10 thru 14).

190.    Dr. Bell admits that 33 of the 34 SSOs after the May 2006 consent decree would not be covered by the consent decree because the rain fall did not exceed the design storm of 3 inches in a 24 hour period. (*Id.* at p. 30, line 18 to p. 35, line 18).

191.    When asked about Rockland County's Sewer Use Law, which was referenced in Dennis Lindsay's initial report (Ex. "GGG"), Dr. Bell stated he was not familiar with this law nor did he go look at it after reviewing Mr. Lindsay's report. (*Id.* at p. 99, line 22 thru p. 100, line 15). After a portion of the law was read to him, - and assuming that RCSD#1 is a 'person' under this law and that this law existed prior to the Order on Consent - Dr. Bell opines that RCSD#1 violated this sewer law both before and after the Order on Consent since RCSD#1 "did things that are contrary to this law." (*Id.* at p. 100, line 16 thru p. 102, line 14).

192.    Dr. Bell identified "comminutors" as being "like grinders." (*Id.* at p. 17, lines 12 thru 14).

193.    The phrase "response time", per Dr. Bell, "in the industry is getting out there and starting to address the spill. Depending on what you find when you get there, you can sometimes fix it immediately, sometimes it's going to take you six hours to fix the problem. The only thing you really have control over is the response time." (*Id.* at p. 44, lines 6 thru 13). Response time is controlled "[b]y staffing and chain of command to get people out." (*Id.* at p. 44, lines 14 thru 17). Dr. Bell was then shown a copy of a letter from the DEC (Manju Cherian, P.E.) to RCSD#1 (Dianne Phillips) dated February 2, 2010 (Ex. "AAA" - another copy of this same exhibit was shown to Dr. Bell and marked as exhibit 3 during his deposition), which references insufficient staffing to perform pump station operation and maintenance and urges Rockland County to

secure funding for these "critical positions." (*Id.* at p. 45, line 10 thru p. 47, line 8; Ex. "AAA").

At the time of Dr. Bell's deposition, he did not know if the staffing issue had been addressed by

Rockland County. (*Id.* at p. 47, lines 7 thru 14).

194.    Given his experience, Dr. Bell has heard complaints of foul odors and smells from

people who live near sanitary sewer overflows, as well as complaints from people that they don't

use a water body, such as a river, anymore due to spills entering the water body. (*Id.* at p. 105,

line 16 thru p. 107, line 15).

Dated: March 29, 2013
       Goshen, New York

                                        Michael K. Burke

                                        Michael K. Burke (7854)
                                        Burke, Miele & Golden, LLP
                                        *Attorneys for Plaintiffs*
                                        40 Matthews Street, Suite 209
                                        Post Office Box 216
                                        Goshen, New York 10924
                                        (845) 294-4080