UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

BOROUGH OF UPPER SADDLE RIVER, NEW JERSEY       **07 CIV 0109 (ER)**
KAREN MILLER, ROY OSTROM, MARIA FLORIO,
MARK RUFFOLO AND LINDA MCDONALD,

                                             Plaintiffs,    **PLAINTIFFS' AMENDED STATEMENT OF MATERIAL FACTS NOT IN DISPUTE PURSUANT TO L.CIV.R.56.1**

       -against-

ROCKLAND COUNTY SEWER DISTRICT #1,

                                          Defendant.
-----------------------------------------------------------------------X

       Plaintiffs, Borough of Upper Saddle River, New Jersey, Karen Miller, Roy Ostrom, Maria Florio, Mark Ruffolo and Linda McDonald (hereafter collectively "Plaintiffs"), by and through their attorneys, Burke, Miele & Golden, LLP, respectfully submit the following statement of material facts to which there is no dispute, pursuant to United States Local Civil Rule 56.1. This statement is being submitted as part of Plaintiffs' motion for summary judgment seeking an Order determining that Defendant, Rockland County Sewer District # 1, as a matter of law:

    (a) Has violated the Clean Water Act;

    (b) Has violated its own State Pollution Discharge Elimination System permit; and

    (c) Has violated applicable statutes and common law pertaining to pollution of waters, private nuisance, public nuisance, and trespass.

### BACKGROUND INFORMATION

       1.    Plaintiff, the Borough of Upper Saddle River, New Jersey (hereafter "USR" or "municipal Plaintiff") is a municipality under the laws of the State of New Jersey. (Ex. "M" at ¶ "9").

2.      USR's border abuts the County of Rockland, State of New York. *Id.*

3.      Roger B. DeBarardine, a representative of USR and a member of its Council, resides in Upper Saddle River, New Jersey. (Ex. "W" at p. 6, lines 20 thru 23, p. 7, line 25, p. 8, lines 2 thru 17).

4.      Plaintiff, Karen Miller (a/k/a as one of the "individual Plaintiffs"), resides with her family in Upper Saddle River, New Jersey. (Ex. "T" at p. 4, lines 11 thru 15 and p. 7, lines 2 thru 20).

5.      Plaintiff, Roy Ostrom (a/k/a as one of the "individual Plaintiffs"), resides with his wife in Upper Saddle River, New Jersey. (Ex. "R" at p. 4, lines 11 thru 14 and p. 10, lines 13 thru 19).

6.      Plaintiff, Maria Florio (a/k/a as one of the "individual Plaintiffs"), resides with her family in Upper Saddle River, New Jersey. (Ex. "P" at p. 4, lines 11 thru 14, p. 5, lines 23 thru 25 and p. 6, lines 7 thru 10).

7.      Plaintiff, Mark Ruffolo (a/k/a as one of the "individual Plaintiffs"), resides with his family in Upper Saddle River, New Jersey. (Ex. "Q" at p. 4, lines 11 thru 14 and p. 5, lines 20 thru 25, p. 6, lines 2 thru 13).

8.      Plaintiff, Linda MacDonald (a/k/a as one of the "individual Plaintiffs"), resides with her family in Upper Saddle River, New Jersey. (Ex. "S" at p. 4, lines 11 thru 15 and p. 6, lines 2 thru 10).[1]

9.      Defendant owns and operates wastewater treatment facilities, major interceptors, and twenty-seven (27) pumping stations in the Towns of Ramapo, Clarkstown and Orangetown,

---

[1] This individual Plaintiff's last name was inadvertently misspelled in the pleadings and the correct spelling of "MacDonald" came to light at her deposition conducted on November 18, 2010 (Ex. "S"). The names Linda "MacDonald" and Linda "McDonald" refer to the same individual and henceforth the name "Linda MacDonald" will be used.

including the treatment facility located in Orangeburg. (Ex. "Z" at ¶ "4"; Ex. "U" at p. 101, lines 4 thru 10).

10.    Defendant operates and maintains the treatment facilities, major interceptors, pumping stations and sewers within its boundaries pursuant to a State Pollutant Discharge Elimination System ("SPDES") permit. (Ex. "Z" at ¶ "4").

11.    The New York State Department of Environmental Conservation (hereafter "DEC") administers the State Pollution Discharge Elimination System ("SPDES"), which issued a SPDES permit to RCSD#1, under the authority of Section 402 of the Clean Water Act, 33 U.S.C. § 1362(7). (Ex. "N" at ¶ 27.).

12.    The DEC and the EPA have not commenced any court actions against RCSD#1 related to Plaintiffs' allegations. (Ex. "N" at ¶ "7").

13.    The term "design storm" is a "shorthand" term for two kinds of storms: one storm "is the total rainfall over a relatively long period of time, in that case a day in storm...." and the other storm is a "short-term intense storm, you known, a downpour from a thunderstorm, which can put a lot of water into the storm sewer, or a sanitary sewer, if you've got inflow in a very short period of time." (Ex. "X" at p. 34, lines 7 thru 20).

14.    The term "sanitary sewer overflow" is abbreviated as "SSO" and "sanitary sewer overflows" as "SSOs". (Ex. "U", at p. 57, lines 19 thru 23.)

15.    Sanitary sewer overflows ("SSOs") are violations of a SPDES permit. (Ex. "X", at p. 31, lines 3 thru 6).

16.    Raw sewage contains various biological materials including fecal coliform bacteria, organic materials exerting chemical and biological oxygen demands in the waters, nutrients including nitrogen and phosphorus, suspended and dissolved solids including toilet

3

paper and sewage solids, salts, metals, solid wastes, pathogens and disinfectants. (Ex. "U" at p. 177, line 7 thru p. 178, line 23).

17.    In certain concentrations, the various biological materials found in raw sewage could be harmful to aquatic life. (Ex. "U" at p. 181, line 14 thru p. 182, line 2).

18.    A sewage spill from RCSD#1's collection system that is introduced into a water body, such as the Saddle River, is a contributing factor for increased levels of fecal coliform bacteria, ammonia and rags. (Ex. "U" at p. 55, line 17 thru p. 59, line 16).

19.    A sewage spill from RCSD#1's collection system that is introduced into a water body, such as the Saddle River, affects the river's clarity and color. (Ex. "U" at p. 59, line 22 thru p. 60, line 4).

20.    A sewage spill from RCSD#1's collection system that is introduced into a water body, such as the Saddle River, is a contributing factor to the river becoming murky. (Ex. "U" at p. 60, lines 5 thru 8).

21.    The term "rags" refers to concentrations of solids, a "clumpy gray matter" that can include human feces, toilet paper, other sanitary products such as shredded feminine products, grease, and other items that people flush into RCSD#1's sewer system. (Ex. "U" at p. 31, line 13 thru p. 32, line 16; Ex. "X" at p. 18, line 12 thru p. 20, line 22).

22.    The term "floatables" typically includes sanitary napkins, condoms, and toilet paper, plastics and plastic applicators. (Ex. "X" at p. 68, line 24 thru p. 69, line 8).

23.    RCSD#1 maintains spill reports and is required to provide these reports to the DEC. (Ex. "U" at p. 141, lines 6 thru 17).

24.    RCSD#1 is required to notify the New Jersey Department of Environmental Protection ("DEP") when a sewage spill reaches a water body at or near the New Jersey border. (Ex. "U" at p. 17, line 19 thru p. 18, line 9; Ex. "V" at p. 52, lines 5 thru 18).

25.    Notifying New Jersey's DEP is part of RCSD#1's procedure where, depending on the time of day, RCSD#1's Director of Plant Facilities or his assistant would notify the New Jersey DEP or, if during off shift hours, weekends or holidays, an individual from RCSD#1's operations staff would perform the notification. (Ex. "V" at p. 52, line 19 thru p. 53, line 6).

26.    The failure to provide such notification to the New Jersey DEP when a sewer spill occurs in New York and flows down into New Jersey would be a violation of RCSD#1's own procedures. (*Id.* at p. 52, lines 15 thru 18).

27.    The Saddle River Pump Station is maintained by RCSD#1. (*Id.* at p. 20, lines 7 thru 14).

28.    The Saddle River Pump Station is located on Saddle River Road, in front of the Saddle River Valley Swim and Tennis Club (hereafter "Swim Club"). (Ex. "U" at p. 29, lines 13 thru 24).

29.    The Saddle River Pump Station has been identified by RCSD#1 as well as the DEC as a problematic pump station, meaning that spills occur at this location more often than at other pump stations. (Ex. "U" at p. 76, line 22 thru p. 77, line 15 and p. 298, line 25 thru p. 299, line 5).

30.    The installation of new pumps at the Saddle River Pump Station has failed prevent continued occurrences of sanitary sewer overflows. (Ex. "V" at p. 37, line 24 thru p. 38; line 4).

5

31.     There presently remain capacity issues at the Saddle River Pump Station during wet weather events such that, under certain circumstances, this pump station continues to experience sanitary sewer overflows.  (Ex. "V" at p. 61, lines 6 thru 18).

32.     A pump station, such as the Saddle River Pump Station, is part of RCSD#1's collection system.  (Ex. "V" at p. 110, line 25 thru p. 111, line 8).

33.     A RCSD#1 pump station, such as the Saddle River Pump Station, is not an authorized outsource of a sanitary sewer overflow.  (Ex. "V" at p. 21, lines 5 thru 12).

34.     RCSD#1's sanitary sewer overflows that enter a water body is "something that wasn't good for them [RCSD#1]."  (Ex. "X" at p. 57, line 15 thru p. 58, line 2).

35.     RCSD#1's SPDES permit only allows for discharges from its treatment plant; any other discharges (*e.g.,* from a manhole, a pump station) that entered a waterway would be a violation of that SPDES permit.  (Ex. "U" at p. 182, line 3 thru p. 183, line 23; Ex. "V" at p. 20, line 21 thru p. 21, line 4).

36.     Any sanitary sewer overflow that reaches a water body is in violation of Article 17 of New York State's Environmental Conservation Law.  (Ex. "U" at p. 434, lines 2 thru 6).

37.     In the event a sanitary sewer overflow reaches a water body of the United States, such an event would be prohibited by the Clean Water Act.  (Ex. "X" at p. 110, lines 5 thru 9).

38.     The May 10, 2006 Order on Consent, entered into between RCSD#1 (as "Respondent") and the DEC, pertains to "multiple sanitary sewer overflow ('SSO') events" specifically limited to the time period "between January 2, 2003 and December 16, 2005" at "multiple [RCSD#1] sewer collection system sites" in violation of § 17-0803 of the NYS Environmental Conservation Law ("ECL").  (Ex. "B").

39.     In pertinent part, the Order on Consent states "Specifically: Respondent violated ECL Section 17-0803, which makes it unlawful to discharge pollutants to the waters of the state from any outlet source in a manner other than as prescribed by SPDES permit, when Respondent's sewer collection system experienced multiple . . . [SSO] events discharging untreated raw sewage and stormwater to the waters of the State." (*Id.*).

40.     Any sanitary sewer overflow that occurred within RCSD#1's collection system, whether before or after the Order of Consent dated May 10, 2006 (Ex. "B"), were not pursuant to or in compliance with its SPDES permit. (Ex. "X" at p. 97, line 16 thru p. 98, line 12 and p. 109, line 23 thru p. 110, line 4).

41.     On March 6, 2006, October 6, 2006, January 18, 2008, April 4, 2008, and April 7, 2008, the Borough of Upper Saddle River, pursuant to the provisions of 33 U.S.C. § 1365(b)(1)(A) of the Clean Water Act, gave notice of violations of the Clean Water Act and its intent to file suit against, *inter alia,* RCSD#1. (Ex. "A", "C", "H" and "I").

42.     On January 18, 2008, April 4, 2008 and April 7, 2008 (Ex. "H" and "I"), the individual plaintiffs along with the Borough of Upper Saddle River, pursuant to the provisions of 33 U.S.C. § 1365(b)(1)(A) of the Clean Water Act, gave notice of violations of the Clean Water Act and its intent to file suit against, *inter alia,* RCSD#1.

43.     Eleven months after close of fact discovery in this matter, RCSD#1, as Respondent, and the DEC recently entered into another, separate Order on Consent dated November 29, 2012. (Ex. "Z").

44.     The November 2012 Order on Consent does not revise, modify or amend the prior Order on Consent dated May 10, 2006. (*See* Ex. "B" and Ex. "Z").

45.     The November 29, 2012 Order does not even mention or refer to the prior Order on Consent. (Ex. "Z").

46.     Stating that on April 7, 2010 the DEC "documented violations of ECL Article 17 by [RCSD#1]", the November 2012 Order on Consent was not executed until more than thirty-one (31) months later. (*Id.*).

47.     Unlike the prior May 2006 Order on Consent – which involved a violation of § 17-0803 of the New York State ECL – this recent Order states that RCSD#1 violated § 17-0501 of the ECL as a result of multiple incidents of "discharging sewage into the waters of the State of New York" on various dates between April 2, 2009 and April 1, 2010 at various locations, including the Saddle River Pump Station and manholes 10171, 10172 and 10174. (*Id.*).

48.     By its terms, this recent Order on Consent largely addresses the Sloatsburg Wastewater Treatment Plant and that plant's own SPDES permit and not the Orangeburg facility or its SPDES permit. (*Id.*)

49.     The November 29, 2012 Order on Consent does not address or cover those sanitary sewer overflows concerning RCSD#1's sewer collection system sites from December 16, 2005 (*i.e.*, the outside date set forth in the Order on Consent dated May 16, 2006) to April 1, 2009. (*Id.*)

50.     The November 29, 2012 consent decree does not address those sanitary sewer overflows that occurred after April 1, 2010 to date; and the November 29, 2012 does not address those sanitary sewer overflows that occurred between April 2, 2009 and April 1, 2010 that are not listed at paragraph "5". (*Id.*).

51.     For any spill or overflow by RCSD#1's collection system that reached and entered the Saddle River, RCSD#1 has never taken any water samples in order to analyze the

8

level of pollutants that entered this water body – despite the fact the Sewer District was capable of performing such tests. (Ex. "U" at p. 122, line 3 thru p. 123, line 25).

## DEPOSITION TESTIMONY

### Testimony of Municipal Plaintiff's Representative, Roger B. DeBarardine

52.     Mr. DeBarardine, a representative of USR and a resident of Upper Saddle River, New Jersey since 1969, is an attorney admitted to practice law in the State of New York since 1954, and is a member of the Council of the Borough of Upper Saddle River. (Ex. "W" at p. 7, line 25 thru p. 8, line 4; p. 8, line 5 thru 20; and p. 9, lines 9 thru 17).

53.     Mr. DeBarardine is an original member of the Saddle River Valley Swim and Tennis Club (hereafter "Swim Club"), and its President. (*Id.* at p. 12, lines 4 thru 25).

54.     The Swim Club is located in Monsey, New York and is "immediately adjacent to the New Jersey State line. [The Swim Club is] the first property north of the East Saddle River Road." (*Id.* at p. 22, 8 thru 13).

55.     Mr. DeBarardine "was aware of the flooding problems in Town, and the flooding of the Saddle River with sewerage from Rockland County", and he knew of such "because as a member of the [Swim Club], we also had flooding problems of sewage onto our property." (*Id.* at p. 9 thru p. 10, line 3; p. 10, lines 5 thru 7).

56.     Mr. DeBarardine identified a list signed by him in his capacity as President of the Swim Club which tabulates "sewage overflow onto the property of the [Swim Club]" from August 3, 2002 through the summer of 2005. (*Id.* at p. 21, line 12 thru p. 22, line 7, lines 14 thru 17).  (*See* Ex. "AA" for a copy of this list – which was identified as exhibit B during this witness's deposition).

9

57.    The pictures contained in exhibit "BB" show the sewerage that permeated the property of the [Swim Club] at the northern end of the property, in March 2007 "immediately adjacent to the sewer, which is indicated just outside the northern boundary line of the [Swim Club]." (*Id.* at p. 29, line 23 thru p. 31, line 24). (*See* exhibit "BB" for the two color photographs).

58.    As a result of these overflows (Ex. "AA"), Mr. DeBarardine, in his capacity as President of the Swim Club, arranged for Accurate Analytical Laboratory to perform an analysis of the Swim Club's soil "because of the flow of sewerage onto the property of the [Swim Club], and we were concerned that the sewage would permeate into the property, which was being used by our membership, and I wanted to know whether or not there was a problem with fecal matter and any other deleterious substance permeating the soil of the club." (*Id.* at p. 22, line 20 thru p. 23, line 11).

59.    Accurate Analytical Laboratory prepared a report dated April 16, 2007 regarding the overflows that occurred on or about March 2, 2007, March 14, 2007 and March 15, 2007. (*Id.* at p. 22, line 20 thru p. 23, line 17). (*See* exhibit "CC", which was identified during this witness's deposition testimony as exhibit C.)

60.    Mr. DeBarardine made a written complaint to the Rockland County Department of Health regarding the overflows with a request the department inspect their property "to ascertain and confirm that we received sewage flooding on the property of the [Swim Club]", and subsequently received a written inspection report from the Rockland County Department of Health "documenting the sewage overflow onto the property of the [Swim Club]." (*Id.* at p. 23, line 21 thru p. 24, line 5; and p. 24, line 9 thru 18). (*See,* respectively, exhibits "DD" and "EE"

for the written complaint and written report – which were identified during this witness's deposition as, respectively, exhibits D and E).

61.    "The fishing [in the Saddle River] has been discontinued since it was resolved that there was contamination . . . it's a well known fact in Town that the Saddle River is no longer acceptable for fishing." (*Id.* at p. 43, lines 12 thru 21).

## Testimony of Plaintiff, Karen Miller

62.    Mrs. Miller is married with three children; she has lived at her current address approximately nineteen years. (Ex. "T" at p. 4, lines 11 thru 15; p. 7, lines 2 thru 7 and 13 thru 20).

63.    Years ago, Mrs. Miller's daughter Sara would, depending on the water level, walk on the rocks and stones in the Saddle River with one or more friends when walking to and from nearby Lions Park. (*Id.* at p. 14, lines 7 thru 23).

64.    A portion of the Saddle River is within Lions Park. (*Id.* at p. 15, lines 5 thru 16).

65.    Mrs. Miller does not "permit [Sara] to play near the [Saddle] River anymore." (*Id.* at p. 17 thru 25).

66.    When Mrs. Miller's other daughter Jacqueline arrived home after coming into contact with the Saddle River, Mrs. Miller became aware of "unpleasant, offensive conditions and smells" coming from Jacqueline's clothing. (*Id.* at p. 16, lines 2 thru 8). (*See also* Ex. "FF" – Plaintiffs' Response to Defendant RCSD#1's Interrogatories dated October 4, 2007 at Interrogatory "3".)

67.    Mrs. Miller has witnessed the aftermath of spills including an April 2007 spill behind the Swim Club as well as witnessed an ongoing spill within the past year occurring at Cherry Lane. (*Id.* at p. 29, line 16 thru p. 30, line 14).

11

68.     As part of a volunteer River Assessment Team, Mrs. Miller would take water samples of the Saddle River and forward the samples to a chemist to perform the assessment. (*Id.* at p. 23, line 2 thru 11 and p. 23, line 23 thru p. 24, line 7).

69.     Mrs. Miller took water samples at segment three of the Saddle River (*i.e.*, behind Hopper Farm Road; it is part of the east branch of the Saddle River) from 2005 through 2009. (*Id.* at p. 25, lines 11 thru 20).

70.     The Analytical Results Summary dated March 7, 2008 concerning a water sample taken March 5, 2008 is an example of such a water test. (*Id,* at p. 5; Ex. "GG" (bates stamped 002765 together with a hand drawn map showing the location of segment three at bates stamp 002766)). This water tested is positive for fecal coliform for segment three measuring 8,200 cfu/100ml. (Ex. "GG").

## Testimony of Plaintiff, Roy Ostrom

71.     Mr. Ostrom has lived in Upper Saddle River, New Jersey for thirty-nine years. (Ex. "R" at p. 8, lines 10 thru 13)

72.     The Saddle River abuts and runs behind Mr. Ostrom's property; and there is a point at which his property extends to the riverbank. (Ex. "R" at p. 27, lines 8 thru 20).

73.     Mr. Ostrom and his wife live year round in their Upper Saddle River home. (*Id.* at p. 10, lines 17 thru 21).

74.     Mr. Ostrom used to fish (*i.e.*, catch and release) for native trout in the Saddle River where it abutted his property – identifying two spots where the Saddle River "used to hold trout": one area being a little pond near an adjacent culvert, and the other being a "little ponding at the foot of our master bedroom, that it's a small pond and the trout sit in the tail water, and that's very pretty to see." (*Id.* at p. 29, line 12 to p. 30, line 9).

12

75.    The last time Mr. Ostrom fished in the Saddle River was ten years ago. (*Id.* at p. 29, lines 12 thru 15).

76.    Mr. Ostrom stopped fishing in the Saddle River due to the sewage spills into the Saddle River. (*Id.* at p. 29, lines 9 thru 15. *See also* Ex. "FF" at interrogatory "4" and Ex. "HH" (Plaintiffs' Response to Defendant RCSD#1's [Second] Set of Interrogatories dated August 31, 2010) at interrogatory "4").

77.    With a portion of the Saddle River running directly behind his house, Mr. Ostrom has witnessed "squished up toilet paper" and "human turds." (*Id.* at p. 40, lines 16 thru 24).

78.    According to Mr. Ostrom, the toilet paper was "rather fresh" and "it had to [have] come from the Swim Club, and - - and just that I'm only a little bit down River from the Swim Club, basically." (*Id.* at p. 50, lines 3 thru 19).

79.    The smell of the Saddle River is not more intense during certain times of the year, it is "[a]ll year round." (*Id.* at p. 32, lines 13 thru 15). (*Id.* at p. 103, lines 8 thru 19; p. 103, lines 21 thru 23; and p. 104, lines 23 thru 25).

80.    Due to the continuing unpleasant odors of sewage coming from the Saddle River, Mr. Ostrom and his wife have been unable to use their backyard for the past fifteen years, and do not cook outdoors. (*Id.* at p. 34, line 24 thru p. 35, line 7). (*Id.* at p. 35, lines 20 thru 22; and p. 35, line 25 thru p. 36, line 4).

81.    Instead, the Ostroms leased a summer home to entertain family and friends for ten years and then, in 2008, they purchased a summer home of their own. (*Id.* at p. 33, line 22 thru p. 34, line 4; p. 34, line 24 thru p. 35, line 7; and p. 35, line 12 thru 15). *See also* Ex. "FF" at interrogatory "4" and Ex. "HH" at interrogatory "4".

## Testimony of Plaintiff, Maria Florio

82.     Maria Florio is married to co-plaintiff Mark Ruffolo. (Ex. "P" at p. 9, lines 11 thru 17).

83.     She has lived her entire life in Upper Saddle River, New Jersey. *(Id.* at p. 6, lines 11 thru 23).

84.     Ms. Florio has been a licensed real estate agent in the State of New Jersey since she was eighteen years old, and she is also a title broker. *(Id.* at p. 6, line 24 thru p. 7, line 4 and p. 33, line 13 thru p. 34, line 7). She follows the housing market in Bergin County closely. *(Id.* at p. 34, lines 19 thru 25).

85.     Ms. Florio has a drainage easement on her property. *(Id.* at p. 43, lines 15 thru 20).

86.     Near this drainage easement is a grate with a warning not to "dump waste or anything in here, because it's [sic] trout protected waters, because it's a tributary to the Saddle River." *(Id.* at p. 57, line 10 thru line 14).

87.     With the exception of two streets in Upper Saddle River, the town's residents have their own septic systems. *(Id.* at p. 30, line 24 thru p. 31, line 9).

88.     Ms. Florio is a member of the Swim Club for many years, and has been a member of the Swim Club's Board for eight years. *(Id.* at p. 14, lines 11 thru 21).

89.     The Swim Club is open each year from Memorial Day to Labor Day. *(Id.* at p. 25, line 4 thru line 6).

90.     Ms. Florio has seen "[m]any" sewerage spills at the Swim Club. *(Id.* at p. 21, line 11 thru p. 22, line 2).

14

91.     Ms. Florio has seen "the manhole cover with a little fountain of sewage coming out of it, and the aroma blowing over the eating pavilion; on a perfectly fine day, not during a rainstorm and not after a rainstorm." (*Id.* at p. 21, line 21 thru p. 22, line 2).

92.     Ms. Florio has observed "sewerage rushing" down the driveway at the Swim Club and that sewage "would come out of that manhole cover and stream down the driveway and cover the whole corner of the lawn, which could be 20 times the size of this office, of toilet paper, used, bloated tampons, paper. Not just one or two-pieces." (*Id.* at p. 24, line 3 thru 10 and p. 27, lines 4 thru 23).

93.     If "this was an area of the grass that that water flowed through, it was every - - scattered every six, seven, eight inches. Stuff everywhere. . . . it wasn't something you could cleanup. (*Id.*)

94.     The Swim Club "had floods inside, [it] would come up from the floors, the sewage, in our office." (*Id.* at p. 26, lines 9 thru 22).

95.     The Swim Club "spent tons of money on the office, on the conference room. The bathrooms. The sewerage came up in the snack bar." (*Id.*).

96.     As a result of finding the Saddle River at Lions Park to be murky and smell of sewerage in/about 2006, Ms. Florio and her family "stay away - - for years we boycotted [the Saddle River]." (*Id.* at p. 20, lines 20 thru 25). (*See also,* Ex. "FF" at interrogatory "5" and Ex. "HH" at interrogatory "5").

## Testimony of Plaintiff, Mark Ruffolo

97.     Mr. Ruffolo is married to co-plaintiff Maria Florio, and he has lived at his current address in Upper Saddle River, New Jersey since 1996. (Ex. "Q" at p. 5, line 20 thru p. 6, line 8).

15

98.    Mr. Ruffolo, together with his family, has been a member of the Swim Club since 2004. (*Id.* at p. 27, line 21 thru p. 28, line 8 and p. 58, line 18 thru p. 59, line 6).

99.    Mr. Ruffolo is an avid runner, and one of his running loops takes him towards the Swim Club where in 2005 through 2007 he would observe "literally a stream of sewage going down into New Jersey." (*Id.* at p. 29, line 16 thru p. 30, line 18).

100.    Currently, when Mr. Ruffolo jogs by the Swim Club, there remains "a real stench . . . you've got about a 50-foot section where you're running and you can't hold your breath, but you limit your breathing, because it smells pretty bad, especially if the wind's coming towards you." (*Id.* at p. 33, line 18 thru p. 34, line 9).

101.    Mr. Ruffolo has seen "some photos of the overflow of sewage that would go into corner of the Swim Club . . . I didn't see the active flow of the sewage, but I've been there after, a couple of days afterward, to go and see the condition of the corner of the Swim Club, and it's that spongy, smelly area." (*Id.* at p. 35, line 10 thru p. 36, line 4).

102.    The athletic fields at Lions Park are adjacent to the Saddle River. (*Id.* at p. 18, lines 17 thru 19).

103.    Prior to 2007, Mr. Ruffolo did not personally notice smells of sewerage in Lions Park. (*Id.* at p. 16, line 22 thru p. 17, line 3). Since 2007, however, at Lions Park "the athletic fields . . . smell like a swamp. Smell like sewer." (*Id.* at p. 19, lines 21 thru 23).

104.    There have been times when coaches needed to call practices because the athletic fields have had a murky septic smell to them. (*Id.* at p. 19, lines 21 thru 23).

105.    Mr. Ruffolo recalls in or about 2007, while down by the Saddle River at Lions Park, observing what "looked to be like toilet paper" in the water. (*Id.* at p. 22, 5 thru 18).

106.    Mr. Ruffolo believes that the sewerage spills have adversely affected the value of his property "in the sense of a stigma in the Town." (*Id.* at p. 45, line 25 thru p. 47, line 7). (*See also* Ex. "FF" at interrogatory "5" and Ex. "HH" at interrogatory "5").

## Testimony of Plaintiff, Linda MacDonald

107.    Linda MacDonald is married with two children, a homemaker, and has lived her entire life at her Upper Saddle River, New Jersey home. (Ex. "S" at p. 5, lines 24 thru 25, p. 6, lines 2 thru 7, and p. 12, lines 14 thru 24).

108.    There is a brook in the back of Mrs. MacDonald's home, which is a part of the Saddle River. (*Id.* at p. 7, lines 16 thru 21).

109.    Growing up, Mrs. MacDonald would use and enjoy the Saddle River, inclusive of the brook behind her house and that portion of the Saddle River at Lions Park, for activities such as fishing for large carp and catfish, catching tadpoles, river walks and other recreational activities. (*Id.* at p. 16, lines 9 thru 17 and p. 32, line 25 thru p. 34, line 6).

110.    Mrs. MacDonald has not seen any carp, catfish or tadpoles in the brook since 2000. (*Id.* at p. 34, lines 7 thru 14).

111.    Though "usually a very calm brook", on Father's Day in 2008, Mrs. MacDonald was sitting outside in the back of her home by her pool with family members when she heard a loud noise and then observed the water rushing down the brook. The water became very, very dark or black in color and appeared mucky, and got wider due to the amount of this water flow. It appeared to her as a "big flush or a big rush", lasted approximately fifteen minutes. (*Id.* at p. 22, line 9 thru p. 24, line 17).

112.    In early January 2009, Mrs. MacDonald observed a "rush of water, enough to significantly raise the water level, you know, the flow of the water, and the color of the water." (*Id.* at p. 28, line 25 thru p. 29, line 16 and p. 30, line 25 thru p. 31, line 6).

113.    Mrs. MacDonald believes that these two above referenced incidents (Paragraphs 111 & 112) could have an adverse impact upon the value of her home. (*Id.* at p. 41, lines 16 thru 21).

114.    The Borough of Upper Saddle River maintains Lions Park. (*Id.* at p. 18, lines 7 thru 9).

115.    Growing up, Mrs. MacDonald fished in the Saddle River at Lions Park, but now has problems using Lions Park and for the same reason she has problems using the brook behind her home: "[f]ear of pollutants" – some of which are visible, including sewage, foam in the water, and a loss of clarity of the water in that on some days the Saddle River looks "dark, not as clear. It's not consistent. Some days it looks fine. Some days it does not." (*Id.* at p. 8, line 9 thru p. 9, line 16; p. 16, lines 5 thru 20, and p. 19, line 19 thru p. 20, line 8). (*See also* Ex. "FF" at interrogatory "6" and Ex. "HH" at interrogatory "6").

## Testimony of RCSD#1 Witness, Dianne Phillips

116.    Dianne Phillips is the Executive Director of the Rockland County Sewer District Number 1 ("RCSD#1") and her duties include overseeing the maintenance and operation of the wastewater treatment plant and the collection system. (Ex. "U" at p. 9, lines 5 thru 10 and p. 10, lines 17 thru 23).

117.    She began her employment with RCSD#1 in 1989 and has occupied, in the following order, the following titles: Engineer III (1989 to 2003), Assistant Director (2003 to

18

2004), and Executive Director (2003 to date). (*Id.* at p. 9, line 11 thru 17; p. 11, lines 7 thru 11; and p. 254, line 24 thru p. 255, line 24).

118.    The SRPS is owned by the RCSD#1. (*Id.* at p. 107, lines 18 thru 20).

119.    The SRPS was likely designed back in the 1980s, and its design (*i.e.*, dry well, wet well and pumps) is basically the same as other pump stations, including the Pine Brook Pump Station and the Twin Lakes Pump Station. (*Id.* at p. 77, lines 19 thru 21 and 17).

120.    As part of its sewer collection system, RCSD#1 has various interceptors that work their way toward the treatment facility in Orangeburg, including the Ramapo interceptor. (*Id.* at p. 100, line 14 thru p. 101, line 8).

121.    All of the interceptors operate via gravity (*i.e.*, they're pitched so that they flow down). (*Id.* at p. 101, lines 11 thru 15). When the interceptors are unable to be constructed in this manner, pumps are installed. (*Id.* at p. 101, lines 16 thru 19).

122.    With regard to pump stations along the border of New Jersey, the flow is headed towards New Jersey by means of gravity and then pumped back up by pumping stations. (*Id.* at p. 101, line 20 thru p. 102, line 2).

123.    When there is too much flow down towards New Jersey that cannot be handled by RCSD#1's pump stations – inclusive of extreme wet weather events, mechanical failures and electrical failures – Ms. Phillips has conceded that overflows of sewage can occur. (*Id.* at p. 102, lines 3 thru 25).

124.    The Ramapo interceptor begins at manhole 10019 and the force main from the Tallman Pump Station as well as the force main from the Twin Lakes Pump Station discharge at this point. (*Id.* at p. 285, line 8 thru p. 288, line 13; Ex. "LL" – a map of RCSD#1's existing sewer interceptors which includes a circle marking the location of manhole 10019 made by Ms.

19

Phillips together with her initials as well as the location of various pumping stations including Tallman, Twin Lakes, Cherry Lane and Saddle River, with the Saddle River Pump Station (hereafter "SRPS") located on the New York/New Jersey border).

125.    For at least ten years there had been capacity issues at the Ramapo interceptor, and this capacity issue was never reported to the DEC. (*Id.* at p. 317, line 10 thru p. 318, line 10 and p. 327, lines 9 thru 13).

126.    Although the towns maintain the eight-inch lines, once the flow enters the RCSD#1's interceptors goes to its pump stations, RCSD#1 is responsible to oversee and maintain the flow, inclusive of rags, and lines. (*Id.* at p. 299, line 9 thru p. 300, line 22).

127.    When the Twin Lakes Pump Station fails or overflows, it spills into a tributary of the Saddle River. (*Id.* at p. 290, lines 21 thru 25).

128.    When the Pine Brook Pump Station fails or overflows, there is a nearby water body that is probably a tributary of the Saddle River. (*Id.* at p. 291, lines 2 thru 9).

129.    SRPS is considered a "high head station" which refers to "the amount of water that has to be moved or the height it has to be moved…. a difference of 200 feet, 250 feet versus 40 feet." (*Id.* at p. 21, lines 4 thru 16).

130.    As a high head station, the SRPS's pumps have to work harder. They take more of a beating; and the pumps have to be replaced more frequently. (*Id.* at p. 20, lines 15 thru 23).

131.    The SRPS and the Twin Lakes Pump Station have been problematic stations, requiring more frequent upgrades, and spills occur here more often than at other pump stations. (*Id.* at p. 20, lines 9 thru 14 and lines 21 thru 24, and p. 76, line 22 thru 77, line 15).

132.    In 1996, the SRPS was upgraded from two pumps to three pumps. (*Id.* at p. 89, lines 3 thru 13).

133.    The upgrade was a reliability issue, although more spills were still occurring to the SRPS after the 1996 upgrade as opposed to other pump stations and the SRPS was still labeled a problematic pump station despite the 1996 upgrade. (*Id.* at p. 89, line 18 thru p. 90, line 12).

134.    The four-page report entitled "SEWER DISTRICT #1 - FOIL report sent to Peter Strasser July 20, 2005", setting forth sewage spills from February 11, 2000 through April 18, 2005, contains similar information as is contained in the spill reports maintained by the RCSD#1, including locations, dates, spillage in gallons (if available), manholes involved (if applicable), and whether any fresh water body is affected. (*Id.* at p. 140, line 16 thru p. 141, line 14; Ex. "KK" and identified as exhibit 3 during her deposition).

135.    RCSD#1 has provided a report listing the location and size of the sewage spills (February 11, 2000 through April 18, 2005). (Ex. "KK").

136.    The report identifies the Saddle River as a fresh water body affected by a spill thirteen separate times. (*Id.*)

137.    Ninety (90) separate sewage spills occurred during this five-year period with a known total spillage of approximately eight hundred thirty thousand four hundred (830,400) gallons. (*Id.*).

138.    On February 25, 2002, a spill occurred whereby sewerage flowed from a catch basin to a stream that leads to a pond at Candy Mountain Day Park, which ultimately flows to Lake Lucille and then the Hackensack River. (Ex. "II" and identified as exhibit 2 during her deposition).

139.    Ms. Phillips prepared a written report concerning the February 2002 spill dated March 4, 2002. (*Id.*).

21

140.    Fish that lived in the pond at Candy Mountain Day Park were killed as a result of the sewage being introduced to these waterways. (*Id.*; Ex. "U" at p. 44, line 10 thru p. 46, line 11).

141.    RCSD#1 took water samples and performed laboratory analysis, including readings regarding fecal coliform, and restocked the pond with fish. (Ex. "U" at p. 47, line 16 thru p. 50, line 23; p. 51, lines 14 thru 16). (*See also,* Ex. "II" at bates stamps 1170, 1171 and 1172).

142.    The New Jersey Department of Environmental Protection was not notified of this sewage spill that resulted in the death of fish upstream from a tributary that connects to Lake Lucille and the Hackensack River. (*Id.* at p. 65, line 9 thru p. 66, line 11).

143.    Ms. Phillips was personally involved in the discussions and negotiations between RCSD#1 and the DEC that eventually culminated in the May 10, 2006 Order on Consent. (*Id.* at p. 354, line 23 thru p. 356, line 8; Ex. "B").

144.    Enclosed with the letter dated February 22, 2006 from the DEC (Kelly R. Turturro, Assistant Regional Attorney) to the RCSD#1 (Dianne Phillips) (Ex. "JJ") was the DEC's draft Order on Consent in which the DEC offered "to resolve the violation(s) noted by the DEC staff" involving multiple RCSD#1 overflow sites. (*Id.* at bates stamp PLDW000337).

145.    The draft Order on Consent (Ex. "JJ"), recited (at paragraph "B") that between January 2, 2003 and December 16, 2005, the DEC documented violations by RCSD#1 at multiple sewer collection system sites; and that RCSD#1 "experienced approximately one hundred (100) sanitary sewer overflows ("SSO") events discharging untreated raw sewage and stormwater to the waters of the State." Paragraph "B" also listed specific dates, locations, spill

amounts and the number of gallons involved. (Ex. "U" at p. 357, line 22 thru p. 358, line 11; Ex. "JJ" at bates stamps PLDW000338-341).

146.    By contrast, paragraph "B" of the executed Order on Consent, which was accepted by RCSD#1, omits much of this information and simply states that there were multiple sewer overflows and attaches as Appendix A, a list of dry weather events and wet weather events. (Ex. "U" at p. 358, lines 13 thru 23; Ex. "B").

147.    The requirement in the draft Order on Consent that RCSD#1 "cease and desist from any and all future violations of the New York State Environmental Conservation Law and the rules and regulations enacted pursuant thereto" was not acceptable to RCSD#1, and did not become a part of the executed Order on Consent, because RCSD#1 could not comply with the NYS Environmental Conservation Law as the DEC had required in the draft Order on Consent. (Ex. "U" at p. 359, lines 16 thru p. 360, line 10; p. 360, line 11 thru p. 361, line 6; p. 367, lines 9 thru 19; and Ex. "JJ" at bates stamp PLWD000343).

148.    Two of the locations which the DEC considered to be a priority for corrective action included Saddle River Road and South Monsey Road. (*Id.* at p. 373, line 24 thru p. 374, line 12).

149.    A letter from the DEC (Manju Cherian, P.E.) dated September 18, 2007 (Ex. "WW") advised that the engineering report the RCSD#1 submitted pursuant to the Order on Consent was "not approvable." (*Id.* at p. 381, line 25 thru p. 382, line 12).

150.    Relative to the SRPS, according to the DEC the RCSD#1 was not in compliance with the Order on Consent in that the evaluation regarding this pump station should have been part of the RCSD#1's engineering report. (*Id.* at p. 383, line 13 thru p. 383, line 14) (*See also,* Ex. "WW" at page two, paragraph "4" with bates stamped no. RSHC00008137 which references

23

that "[s]anitary sewer overflows from [the Saddle River Pump Station] have resulted in lawsuits from bordering communities in NJ.").

151.    The spills recited in the Notice of Intent To Sue Letter, dated January 18, 2008, occurred. If they reached waters of the United States, RCSD#1's SPDES permit would not allow it to have those discharges. (Ex. "M"; Ex. "U" at p. 182, line 3 thru p. 183, line 23).

152.    RCSD#1's SPDES permit only allows for discharges from its treatment plant, and any other discharges (*e.g.*, from a manhole, a pump station) that entered a waterway would be a violation of the SPDES permit. (*Id.*).

153.    According to RCSD#1's SPDES permit, any such discharge of sewage into a water body, such as those as alleged in paragraph "34" of the Second Amended Complaint (Ex. "M") would be an unpermitted discharge. (*Id.* at p. 176, line 22 thru p. 177, line 6).

154.    The only time RCSD#1 asked for relief for spills (that violated its SPDES permit) after the Order on Consent was in a letter to Ms. Cherian of DEC dated December 23, 2007. (*Id.* at p. 217, line 13 thru p. 220, line 6).

155.    Spills have continued to occur since entering Order on Consent that did not result in violations from the DEC even though such spills were in violation of RCSD#1's SPDES permit. (*Id.* at p. 220, lines 11 thru 20).

156.    There is a manhole (identified as manhole 10019) right near Mr. Schneider's home on South Monsey Road, and there are problems with this manhole overflowing. (*Id.* at p. 97, line 14 p. 100, line 2; p. 132, line 21 thru p. 133, line 2; and p. 135, lines 5 thru 19).

157.    The tributary located near manhole 10019 likely flows into the Saddle River. (*Id.*) (*See also,* Ex. "SS" - and identified as exhibit 15 during her deposition, color photographs depicting overflows to manhole 10019).

24

158.    A locking mechanism was attached to manhole 10019, and thereafter the manhole cover 10019 was blown off due to the force of an eruption from the sewer main. (*Id.* at p. 398, line 12 thru p. 399, line 10 and p. 175, line 16 thru p. 176, line 6).

159.    The force at manhole 10019 was such that it blew the road apart. (*Id.* at p. 399, lines 5 thru 10).

160.    RCSD#1 did not perform any samplings of any water body that was affected by the sewage spills discussed in the "Spills 2008 File". (Ex. "OO"; *Id.* at p. 303, lines 10 thru 20).

161.    As of approximately January 2008, the three pumps at the SRPS were removed and new pumps installed. (*Id.* at p. 257, lines 7 thru 19; p. 267, lines 5 thru 20).

162.    The installation of the new pumps did not address the problem of sanitary sewer overflows at the SRPS. (*Id.* at p. 260, lines 6 thru 17).

163.    The installation of the new pumps at the SRPS did not stop the sewage overflow at the Swim Club on March 5, 2008, including an adjacent manhole. (*Id.* at p. 268, line 3 through p. 269, line 20; Ex. "PP", identified as exhibit 13 during her deposition).

164.    The DEC was concerned "especially in light of the additional work being performed in the collection system as part of [the] Order on Consent requirements" with possible inadequate spare parts inventory for the plant and collection system as well as reduced staffing levels at the RCSD#1 over the past few years. (*Id.* at p. 402, line 21 thru p. 404, line 7; Ex. "XX").

165.    When shown additional color photographs of the Swim Club and the adjacent manhole, Ms. Phillips identified these photographs as including the Swim Club and the manhole and described the manhole as a chamber that "overflows during wet weather events" (*Id.* at p. 168, line 13 thru p. 171, line 22; Ex. "RR" with bates 1476 - 1478).

166.    The manhole/chamber is a "strange chamber", and is not a typical manhole used by the RCSD#1; it is probably the only one of those chambers that the RCSD#1 has. (*Id.*)

167.    It is possible that the design of the chamber causes it to overflow more than other chambers in RCSD#1's system. (*Id.*).

168.    With regard to this manhole/chamber that is adjacent to the Swim Club, when overflows occur they run down toward the Saddle River, and that whatever is contained in the sewer system, "...the sewage and the toilet paper and everything that [RCSD#1] has, flows down into the [Saddle] River." (*Id.* at p. 30, line 23 thru p. 31, line 23; p. 32, lines 17 thru 23).

169.    RCSD#1 prepares reports that include estimates of the number of gallons that reach a water body, such as the Saddle River, when a spill or overflow occurs. (*Id.* at p. 32, line 24 thru p. 33, line 4).

170.    Locking mechanisms at the manholes located at or near the Swim Club (*i.e.*, manholes 10172 and 10174) would not work because the amount of force from the sewer main would "just blow the whole manhole top off." (*Id.* at p. 398, line 20 thru p. 399, line 4).

171.    The existence of the berm at the Swim Club directs the flow from sanitary sewer overflows from the manhole/chamber more directly into the Saddle River. (*Id.* at p. 125, line 7 thru p. 126, line 5).

172.    With regard to any spill or overflow by the RCSD#1 that reached and entered the Saddle River, RCSD#1 has never taken any water samples in order to analyze the level of pollutants that entered the water – despite the fact the Sewer District was capable of performing such tests. (*Id.* at p. 122, line 3 thru p. 123, line 25).

26

173.    From 1989 to date, there have been complaints of odors at the SRPS, and RCSD#1 has continuously used various products in an effort to combat the odors. (*Id.* at p. 323, line 7 thru 325, line 15).

174.    The DEC performed an inspection of the RCSD#1 facility on August 5, 2009 "for the purpose of evaluating compliance with the [SPDES] permit and Article 17 of the Environmental Conservation Law." (*Id.* at 446, lines 13 thru 19; Ex. "UU" – letter DEC (M. Cherian) to RCSD#1 (D. Phillips) dated August 10, 2009.)

175.    "CBOD" refers to biological oxygen levels and "TSS" refers to total suspended solids. (Ex. "U" at p. 447, line 19 thru p. 448, line 17).

176.    The August 10, 2009 letter indicates that RCSD#1, based upon a review of the facility's monthly discharge monitoring reports, violated its SPDES permit affluent limits for CBOD in March and June 2009 and for TSS limits in March 2009 – a total of three violations. The letter also identifies that RCSD#1 may also be in violation of the CBOD limit in July 2009. (Ex. "UU").

177.    The August 10, 2009 letter states that each of the three items constitutes a violation of Article 17 of the ECL and subjects RCSD#1 to potential penalty of "up to $37,500 per violation per day." (*Id.*).

178.    This Notice of Violation was not subsequently enforced, and the RCSD#1 was never fined by the DEC for these violations. (Ex. "U" at p. 448 at lines 7 thru 17).

179.    The incident that occurred on January 12, 2010 regarding the Twin Lakes Pump Station (where approximately 100,000 gallons of sewage was discharged into the Saddle River) referenced in the Notice of Violation letter addressed to her by the DEC (Manju Cherian, P.E.) dated January 19, 2010, violated the New York State Environmental Conservation Law, and

could also be in violation of the Clean Water Act. (Ex. "U" at p. 432, line 2 thru p. 434, line 25; Ex. "ZZ").

180.    The DEC found that RCSD#1 had "insufficient staffing to perform pump station operation and maintenance especially during wet weather events." (Ex. "U" at p. 439, lines 20 thru 24; Ex. "AAA"). The DEC noted that "[i]nsufficient staffing can directly affect a facility's ability to maintain SPDES compliance." (Ex. "AAA").

181.    RCSD#1's Addendum Dry Weather Sewer System Overflow Abatement Report dated March 19, 2010, and sent to the DEC per the technical compliance conference, was prepared by Ms. Phillips and Eugene T. Yetter, P.E. (Director of RCSD#1's Plant Facilities). (*Id.* at p. 435, lines 8 thru 17; Ex. "BBB").

182.    Dry weather SSOs occurred at the SRPS on July 25, 2000, August 16, 2000, December 6, 2000, August 27, 2001, August 14, 2003, November 30, 2005, March 2, 2007, April 15, 2007, April 16, 2007, April 17, 2007, October 12, 2007, December 23, 2007, March 5, 2008, September 6, 2008, April 26, 2009, May 20, 2009 and February 17, 2010. (Ex. "BBB").

183.    The list provided in the Notice of Violation letter addressed to Ms. Phillips by the DEC dated April 7, 2010, which identified a number of SSOs in the RCSD#1 collection system, including manholes 10172, 10174 and 10434, Saddle River Road near the SRPS for 4-26-2009, manholes 10172, 10174 and 10434, Saddle River Road near the SRPS for 5-20-2009, 10-25-2009 Twin Lakes Pump Station, 2-17-2010 on Saddle River Road near the SRPS, and 4-2-2010 Twin Lakes Pump Station, specifically stated that it did not include the "numerous wet weather overflows which occurred during [the DEC's] period of review from January 2009 thru [the] present." (*Id.* at p. 428, line 24 thru p. 429, line 4; Ex. "CCC").

184. RCSD#1 has never been fined for any of these overflows that occurred after the May 2006 Order on Consent. (*Id.* at p. 429, line 23 thru p. 430, line 18).

185. Ms. Phillips confirmed that with the exception of the $10,000.00 paid as part of the Order on Consent dated May 10, 2006, RCSD#1 has never paid any fines or penalties to the DEC for any sanitary sewer overflow. (*Id.* at p. 434, lines 18 thru 25 and p. 430, lines 12 thru 18).

186. On November 22, 2006, Manhole 19255A was overflowing, resulting in approximately 50 gallons of sewage. The sewage pooled in the area and seeped into the ground nearby. It did not appear to reach any storm drains or watercourses in the area. (Ex. "MM" at PLDW 000057).

187. On November 21, 2006, an estimated 1,500 gallons was discharged from Manhole 10118 into a tributary of the Saddle River. (Ex. "MM" at PLDW 000060).

188. On November 20, 2006, an estimated 32,000 gallons of sewage overflowed from Manholes 12003 and 12004 on Cherry Lane. (Ex. "MM" at PLDW 000058). The Cherry Brook flows into Lake Oratam and then into the West Branch of the Saddle River. (Ex. "MM" at PLDW000071).

189. On December 2, 2005, Manholes 10171 and 10172 overflowed, and a percentage of the overflow drained into the Saddle River. (Ex. "MM" at PLDW000088). The reported spill quantity was between 6,000 and 10,000 gallons. (*Id.*)

190. On December 23, 2007, there was a sewage overflow of approximately 800 gallons in the vicinity of the Saddle River Swim & Tennis Club, near the Districts' Saddle River Pump Station, at Manholes 10171 and 10172. (Ex. "NN" at PLDW000117-8). A portion of the sewage flowed to the Saddle River. (*Id.*)

29

191.    On April 16, 2007, Manholes 10172 and 10174 were found to be overflowing. An estimated 390,000 gallons were released, and the overflow ponded in the area and drained into the Saddle River. (Ex. "NN" at PLDW000121).

192.    On April 15, 2007, Manhole 10180 released approximately 12,000 gallons of sewage, which drained into a tributary of the Saddle River. (Ex. "NN" at PLDW000121).

193.    Beginning on April 16, 2007 and continuing intermittently until April 18, 2007, Manhole 10019 released approximately 100,000 gallons of dilute sewage, which may have drained into a tributary of the Saddle River. (Ex. "NN" at PLDW000121-2).

194.    On November 28, 2007, an estimated 3,000 gallons was discharged from Manhole 10118 drained into a tributary of the Saddle River. (Ex. "NN").

195.    On October 12, 2007, the Saddle River Pump Station failed and Manholes 10171 and 10172 released 500 to 1,000 gallons, which ponded nearby, seeped into the ground, and flowed into the Saddle River. (Ex. "NN" at PLDW000136).

196.    On March 2, 2007, Manholes 10171 and 10172 released approximately 14,000 gallons of sewage, a percentage of which drained into the Saddle River. (Ex. "NN" at PLDW000140).

197.    On March 5, 2008, approximately 3,000 gallons of sewage overflowed from Manholes 10171, 10172 and 10174 into the Saddle River. (Ex. "NN" at PLDW000175-6).

198.    On September 6-7, 2008, the failure of pump 3 at the Saddle River Pump Station caused approximately 15,000 gallons of sewage to be released and flow to the Saddle River. (Ex. "OO" at PLDW000197-8).

199.    On April 26, 2009, Manholes 10172 and 10174 released an estimated 78,000 gallons of sewage into the Saddle River. (Ex. "TT" at PLDW000206-7).

30

200.    On May 20, 2009, Manholes 10172 and 10174 released an estimated 5,000 gallons of sewage, though there was no evidence that it drained into the Saddle River.  (Ex. "TT" at PLDW000208-9).

201.    On March 14, 2010, Manholes 10172, 10174 and 10436 were overflowing, and the overflow drained into the Saddle River.  (Ex. "W" at PLDW000224).

202.    On March 22, 2010, there was an overflow on the District's Ramapo Interceptor in a wooded area of Monsey Glen County Park.  Manholes 10006 and 10007 had overflowed, and the area drains to a tributary of the Saddle River.  (Ex. "W" at PLDW000224-5).

203.    On January 12, 2010, there was an overflow at the Twin Lakes Pump Station, which resulted in an estimated 70,000 gallons of sewage that may have been discharged into a tributary of the Saddle River.  (Ex. "W" at PLDW000226-7).

204.    On March 29, 2010, Manholes 10172, 10174 and 10436 were found overflowing. The overflow drained to a tributary of the Saddle River.  (Ex. "W" at PLDW000233).

205.    On or about March 29, 2010, storm watch crews observed an overflow on the District's Ramapo Interceptor in a wooded area of Monsey Glen County Park, which drains to a tributary of the Saddle River.  (Ex. "W" at PLDW000233).

206.    On April 1, 2010, an overflow at the Twin Lakes Pump Station discharged an estimated 50,000 gallons of sewage into a tributary of the Saddle River.  (Ex. "W" at PLDW000237).

207.    On July 25, 2000, a spill at 754 Saddle River Road resulted in 1,200 gallons of sewage being discharged into the Saddle River.  (Ex. "KK").

208.    On August 16, 2000, a spill at 754 Saddle River Road resulted in 800 gallons of sewage being discharged into the Saddle River.  (Ex. "KK").

31

209.    On December 7, 2000, a spill at 754 Saddle River Road resulted in 5,000 gallons of sewage being discharged into the Saddle River. (Ex. "KK").

210.    On April 13, 2001, a spill at Twin Lanes Lane, Monsey, resulted in 30,000 gallons of sewage being discharged into the Saddle River. (Ex. "KK").

211.    On August 27, 2001, a spill at 754 Saddle River Road resulted in 2,000 gallons of sewage being discharged into the Saddle River. (Ex. "KK").

212.    On April 13, 2002, a spill at Twin Lanes Lane, Monsey, resulted in 30,000 gallons of sewage being discharged into the Saddle River. (Ex. "KK").

213.    On April 18, 2002, a spill at Twin Lanes Lane, Monsey, resulted in 30,000 gallons of sewage being discharged into the Saddle River. (Ex. "KK").

214.    On June 9, 2003, a spill at Hillside Avenue, Airmont (Manhole 10178) resulted in 1,000 gallons of sewage being discharged into the Saddle River. (Ex. "KK").

215.    On September 18, 2004, a spill at S. Monsey Road resulted in 4,000 gallons of sewage being discharged into the Saddle River. (Ex. "KK").

216.    On October 3, 2004, a spill at Cherry Lane, Airmont, resulted in 50,000 gallons of sewage being discharged into the Saddle River. (Ex. "KK").

217.    On April 3, 2005, a spill at South Monsey Road, Airmont (manhole 10019), resulted in 4,500 gallons of sewage being discharged into the Saddle River.

218.    On April 4, 2005, a spill at 754 Saddle River Road resulted in 5,000 gallons of sewage discharging into the Saddle River. (Ex. "KK").

219.    On April 4, 2005, a spill at Saddle River Road and Ramapo Lane resulted in 3,500 gallons of sewage discharging into the Saddle River. (Ex. "KK").

## Testimony of RCSD#1 Witness, Eugene Yetter, Jr.

220.    Mr. Yetter has been the Director of Plant Facilities with RCSD#1 for thirteen years; he works primarily at the Orangeburg plant, but does leave the plant to perform site inspections. (Ex. "V" at p. 8, lines 8 to 19; p. 9, lines 3 thru 8).

221.    As the Director of Plant Facilities, Mr. Yetter's duties include maintaining RCSD#1's collection system. His boss is Executive Director Dianne Phillips. (*Id.* at p. 10, lines 7 thru 13, p. 20, lines 7 thru 14).

222.    A "wet weather event" is "[g]enerally heavy rain, short period of time, usually something over two to three inches of rain in a 24-hour period...[which] could be less, depending on the situation, such as frozen ground, snow pack or ice melt or snow melt." (*Id.* at p. 23, lines 15 thru 22).

223.    When these "parameters are met" (*i.e.*, two to three inches of rain in a 24-hour period), RCSD#1 "[tends] to have overflows in the system." (*Id.* at p. 24, lines 11 thru 22).

224.    At certain locations, the resulting sanitary sewer overflows (referenced in paragraphs 186 through 219, above) reach water bodies. (*Id.* at p. 24, line 23 thru p. 25, line 2).

225.    "Dry weather events" that occur at pump stations and cause sanitary sewer overflows, and these overflows are generally caused by equipment failure and/or human error (*e.g.*, setting gauges too low, having a power switch shut off, etc.). (*Id.* at p. 28, line 16 thru p. 29, line 7).

226.    In contrast to a wet weather event, when a dry weather sanitary sewer overflow occurs, the sewage is less dilute. (*Id.* at p. 38, lines 5 thru 18).

33

227.    There is a higher concentration of sewage and pollutants in the overflow, and should this higher concentration of sewage and pollutants reach a water body, it could have greater environmental impact. (*Id.*).

228.    In terms of cleanup following a dry weather event that causes a sanitary sewer overflow that reaches a water body, RCSD#1 will inspect the area, collect "any visible solids from the area", rake and repair erosion as needed, and dispense lime to address odor issues. (*Id.* at p. 74, line 19 thru p. 75, line 10).

229.    No water samples were taken or lab reports prepared by RCSD#1 when a sanitary sewer overflow reached a water body, regardless of whether the overflow was a wet weather or dry weather event. (*Id.* at p. 39, lines 10 thru 24).

230.    RCSD#1 has its own in-house lab that was capable to perform such tests so as to determine the degree of pollutants that reached a water body, but they did not perform these tests. (*Id.* at p. 38, line 19 thru p. 40, line 3).

231.    During wet weather, the flow through the Ramapo interceptor exceeds the capacity of those pipes so as to cause a sewer overflow. (*Id.* at p. 23, lines 4 thru 14).

232.    Sanitary sewer overflows flowed "more than a few" times into water bodies that are used for drinking water, including the Hackensack River which is used for drinking water by some residents of Bergen County, New Jersey. (*Id.* at p. 40, line 22 thru p. 41, line 15).

233.    A pump station is not an authorized source under RCSD#1's SPDES permit for such a spill or overflow. (*Id.*).

234.    No testing is done to determine what the concentration of sewage or pollutants are before it discharges from a pump station in an overflow. (*Id.* at p. 95, lines 20 thru 24).

34

235.    The SRPS is one that is "higher head and higher capacity, which is unique in our system, and therefore does require a little more attention than some other stations." (*Id.* at p. 14, lines 12 thru 15).

236.    The design of the SRPS is "such that a problem at that station, the size of the wet well, the volume, the flow rate of the pump station is such that when there's a problem out there, by the time [RCSD#1] can respond to a problem out there, depending on the degree of the problem, there's a good chance that there will be an overflow related to loss of that pump station." (*Id.* at p. 15, line 16 thru p. 16, line 2).

237.    When an overflow at the SRPS occurs, it can reach a water body – the Saddle River or one of its tributaries. (*Id.* at p. 16, lines 7 thru 14).

238.    New pumps were installed at the SRPS in the "fall of [2007]." (*Id.* at p. 33, line 23 thru p. 34, line 2).

239.    The new pumps were the current version of the pumps being replaced, including the same manufacturer. (*Id.* at p. 70, lines 13 thru 22).

240.    RCSD#1 does not dispute the estimates of the spills contained in the 2008 and 2009 Spill Files. (*Id.* at p. 37, lines 12 thru 23; Ex. "OO"; Ex. "TT").

241.    The new pumps at the SRPS [after entry of the 2006 Order on Consent] have not addressed the issues of sanitary sewer overflows at this location. (*Id.* at p. 37, line 24 thru p. 38, line 4).

242.    Presently there are still capacity issues at the SRPS during wet weather events such that, under certain circumstances, this pump station continues to experience sanitary sewer overflows. (Ex. "V" at p. 61, lines 6 thru 18).

243.    A method to divert the flow from the SRPS to avoid sanitary sewer overflows can be done. (*Id.* at p. 59, line 9 thru p. 60, line 4).

244.    When a dry weather event occurs at the SRPS, nothing can be done during the event itself to divert the flow so as minimize the impact of the overflow; the priority is to get the pumps up and running and get back on line. (*Id.* at p. 93, line 19 thru p. 94, line 11).

245.    Large sanitary sewer overflows, during both dry and wet weather events, involving the Cherry Lake Pump Station have reached and entered a nearby tributary of the Saddle River. (*Id.* at p. 131, line 23 thru p. 132, line 17).

246.    The Cherry Lane Pump Station has the same design configuration as the SRPS. (*Id.* at p. 133, lines 6 thru 9).

247.    The manhole adjacent to the Swim Club was modified many years ago "in [an] effort to preclude backups from wet weather in the line to the Saddle River Pump Station, in an effort to stop backups going into the Swim and Tennis Club. This was designed as an overflow to overflow out this manhole, rather than flooding the [Swim Club]. It has since been redesigned, so as to not have that feature of ability to overflow" . . . the modification included the "addition of a wall and a plate and almost designed to act as a check valve, so as to allow sewage to come out this location, but rather then flood the front of the Swim and Tennis Club." (*Id.* at p. 75, line 11 thru p. 77, line 16; Ex. "RR").

248.    The modification (paragraph 247, above) did not address anything since, not only do sanitary sewer overflows still occur at this manhole adjacent to the Swim Club, they still occur to the two other manholes located in the Swim Club's parking lot. (*Id.* at p. 77, line 23 thru p. 79, line 18).

36

249.    This modification (paragraph 247, above) actually caused sanitary sewer overflow to flow down into the Saddle River as opposed to away from the river and towards the Swim Club's parking lot. (*Id.*).

250.    The manhole adjacent to the Swim Club underwent modifications some time ago, including adding a watertight cover so as to attempt to prevent the manhole from blowing (*i.e.*, overflowing). (*Id.* at p. 80, line 23 thru p. 81, line 21).

251.    Given the watertight cover, it takes pretty good amount of pressure to blow the cover and release the overflow. (*Id.* at p. 81, lines 22 thru 25).

252.    Despite the watertight cover, this manhole has continued to experience overflows that flow down into the Saddle River – whether during a dry weather or wet weather event. (*Id.* at p. 82, lines 5 thru 13).

253.    The photographs in Exhibit "PP", and one picture from Exhibit "SS", depict a trail of debris, inclusive of rags, from the manhole near the SRPS heading down towards the Saddle River. (*Id.* at p. 83, line 5 thru p. 84, line 7; p. 121, lines 18 thru 25).

254.    Rags build up as materials flow down the collection system, which, if in a large enough quantity, cause blockages. (*Id.* at p. 53, lines 10 thru 23).

255.    At the SRPS, a device known as a bar rack assembly is used to collect rags and other debris that might cause pump problems. (*Id.* at p. 53, line 24 thru p. 54, line 8).

256.    This bar rack assembly device consists of a series of stainless steel rods that is maintained daily. (*Id.*).

257.    Grinders are another mechanism employed in the industry to deal with rags, and do a better job of removing rags than the bar rack assembly. (*Id.* at p. 54, lines 9 thru 12; p. 63, line 8 thru p. 64, line 5).

258.    A study was performed by the RCSD#1 engineering department to address the possibility of installing grinders at the SRPS. (*Id.* at p. 66, lines 12 thru 21).

259.    Manhole 10019, which is located where David Schneider lives, has been identified as a problematic area. (*Id.* at p. 45, line 9 thru p. 46, line 12).

260.    The manhole is problematic in that it is "actually a low section of that particular line, and there have been times in wet weather, again, where sewage has overflowed from that particular manhole and into the area." (*Id.* at p. 45, line 9 thru p. 46, line 12). *See id.,* at p. 116, line 17 thru p. 117, line 20; p. 121, lines 10 thru 13, where Mr. Yetter identified various color photographs of Ex. "SS" as this problematic area).

261.    There have been staffing issues within the RCSD#1 for the past few years, including maintenance personnel. (*Id.* at p. 29, lines 8 thru 14).

262.    Manpower has been down twenty percent (20%) for the past seven years and, the RCSD#1 is understaffed. (*Id.* at p. 29, line 15 thru p. 30, line 9).

263.    In light of this understaffing, RCSD#1 response time and ability to address sanitary sewer overflows has been impacted. (*Id.* at p. 31, line 23 thru p. 32, line 4).

264.    The DEC has admonished RCSD#1 in the past to address the understaffing. (*Id.* at p. 90, lines 15 thru 23).

## EXPERT WITNESS INFORMATION & TESTIMONY

### Testimony of Plaintiffs' Expert, Dennis Lindsay, P.E.

265.    Dennis Lindsay, P.E. was retained as an expert by plaintiffs and a copy of his original report and his resume are set forth, respectively, as Ex. "GGG" and "HHH". (Ex. "Y" at p. 38, line 21 thru p. 39, line 10 and p. 7, lines 4 thru 11). Mr. Lindsay also prepared a

38

supplemental report dated September 26, 2012 and a copy of same is set forth at Ex. "III". (*Id.* at p. 55, lines 7 thru 20).

266. Mr. Lindsay has a New York State Grade 4A wastewater treatment plant operator's license and has taken a number of courses regarding this license as well as in connection with his professional license, including operations of wastewater treatment plants and the design of wastewater collection systems. (*Id.* at p. 8, line 16 thru p. 10, line 20).

267. Before becoming a licensed sewage treatment operator Grade 4A, Mr. Lindsay's experience includes designing pump stations, pipelines and treatment facilities for several municipalities including the Village of Suffern. (*Id.* at p. 11, lines 2 thru 21).

268. The Saddle River is a trout stream. (*Id.* at p. 101, line 10 thru p. 103, line 14; Ex. "GGG" as part of the attachment entitled "New Jersey Freshwater Fishing Digest" for January 2010).

269. A dry weather sanitary sewer overflow "has a more significant impact on the stream as opposed to wet weather [SSO] when the stream is swollen." (*Id.* at p. 60, line 20 thru p. 61, line 18).

270. Both dry and wet weather have impacts, but in dry weather it would be greater...[b]ecause there is less dilution and ...less assimilative capacity in the stream to absorb and to accept the waste load." (*Id.* at p. 60, line 20 thru p. 61, line 18).

271. Mr. Lindsay prepared a document entitled "New York State DEC Spill File, List of actions & Resident Records Rockland County Sewer District No. 1", which is attached to his original report (Ex. "GGG"), which contains a list reciting multiple sanitary sewer overflow events beginning on 2-11-2000 through 9-8-2011, describing the various locations of such events, including the Swim Club, the SRPS, Saddle River Road, the Twin Lakes Pump Station,

39

South Monsey Road, the Ramapo interceptor, Cherry Lane, Hillside Avenue, and manholes 10171, 10172, and 10019, and identifying the water body affected, if any, including various references to the Saddle River. The document sets forth that the average sanitary sewer overflow measures 12,000.00 gallons. (*Id.* at p. 38, line 21 thru p. 39, line 10 and p. 39, line 23 thru p. 40, line 6; Ex. "GGG").

272.   Mr. Lindsay describes the list as "a list of spill events in chronological order that [his office] received from a number of sources". Such sources including reports generated by RCSD#1 and the DEC's spill database. (*Id.* at p. 40, line 7 thru p. 41, line 10).

273.   When a sanitary sewer overflow occurs, the permit holder is to notify the DEC as soon as possible, usually with a phone call. (*Id.* at p. 41, line 16 thru p. 42, line 2).

274.   The DEC, in turn, gives the overflow a spill number and the event is put on the DEC's spill database. (*Id.* at p. 41, lines 11 thru 15).

275.   The permit holder is also required to provide "follow-up written notification" to the DEC, with the report to generally provide "the spill date, the time, the location, the amount of the spill if you know and what remedial action was taken. . . ." (*Id.* at p. 42, line 16 thru p. 44, line 12).

276.   The list, attached to the Lindsay report, shows that there were spills that took place and the number of spills, many events took place prior to the Order [on Consent] and that the events were continuing after the Order [on Consent] and that was it. (*Id.* at p. 46, lines 7 thru 23).

277.   "[T]here was [sic] spills that occurred before the Order [on Consent] and spills that occurred after the Order [on Consent] and spills that occurred after the schedule for the Consent Order was to be complied with . . . [t]hat was to show that there were spills that

40

occurred and that they were just continuing . . . [j]ust to show that there was a continuing - -
continuous spills. . . ." (*Id.* at p. 80, line 19 thru p. 81, line 25).

278.    Mr. Lindsay's initial report includes a separate table that sets forth a "Spill
History" at page two.  His report notes that "[o]bviously untreated discharges at unregulated
points along the collection system is a violation of the SPDES permit", and such discharges are
also a violation of section 301 Rockland County's Sewer Use Law. (*Id.* at p. 111, line 16 thru p.
112, line 3).

279.    Despite some improvement made by RCSD#1 per the Order on Consent related
to sanitary sewer overflows, sanitary sewer overflows continue "both under dry and wet weather
conditions." (Ex. "GGG").

280.    "There was one [2012 spill] that was reported".  (*Id.* at p. 111, line 16 thru p.
112, line 3, referencing that this 2012 spill was contained in the report of the defendant's expert,
Dr. Bruce A. Bell.)

281.    Mr. Lindsay prepared a supplemental report dated September 26, 2012  (Ex.
"III") after reviewing the report of defendant's expert, Dr. Bruce A. Bell, dated July 23, 2012, for
purposes of clarifying various items. (Ex. "DDD"). (*Id.* at p. 55, lines 7 thru 20).

282.    The list in Mr. Lindsay's supplemental report focuses on sanitary sewer
overflows involving the Saddle River or one of its tributaries – "looking at spills that occurred in
the Saddle River that would have impacted the Saddle River." (*Id.* at p. 56, line 16 thru p. 57,
line 10).

283.    When asked in what manner his supplemental report list of spills differed from
the list in his original report, Mr. Lindsay stated, "in general we changed a few dates, because we
had the reported date as opposed to the actual date of the spill.  It usually changed by one or two

41

days. We put some additional information regarding the volume of spill from the [RCSD#1] letters. That's basically it." (*Id.* at p. 58, lines 7 thru 18).

284.    The focus of the opinions contained in Mr. Lindsay's supplemental report involve two specific sanitary sewer overflows that reached the Saddle River: one occurred on April 26, 2009 and the other January 10, 2010. (*Id.* at p. 64, line 18 thru p. 65, line 5).

285.    Streamflow data as opposed to rainfall data is "much more important because that's actually what's in the stream and that's what is the dilutional impact." (*Id.* at p. 66, lines 6 thru 16).

286.    The April 26, 2009 sanitary sewer overflow occurred at the SRPS where 78,000 gallons was spilled. (*Id.* at p. 64, lines 18 thru 22).

287.    Mr. Lindsay did not note any rainfall that day. (*Id.* at p. 65, lines 6 thru 11).

288.    Mr. Lindsay visited the location of this spill and examined the path of the discharge. (*Id.* at p. 67, lines 21 thru 23).

289.    "At the Saddle River Pump Station from manhole 10174 it discharges directly onto a graveled roadway which is used as access by United Water. It's a packed roadway and wastewater would flow directly down that to the river, not going through a vegetated strip, if you will, just going along a graveled roadway." (*Id.* at p. 67, lines 21 thru p. 68, line 15).

290.    Photos of the discharges show how it flows down that and it stays within that roadway area. There is not any appreciable reduction in microbiology or bacteria along that path. (*Id.* at p. 67, lines 21 thru p. 68, line 15).

291.    The SRPS has an average dry weather flow of 1.78 MGD (*i.e.*, million gallons per day). "If you look at the 1,780,000 gallons it would see in a normal day and you divide it by 24 hours, just taking an average rate, all right...the average flow of the [SRPS] would be about

140,000 gallons plus, and that's just on an average flow." (*Id.* at p. 73, line 12 thru p. 74, line 10).

292.     Referring to RCSD#1's own report (Ex. "JJJ"), the SRPS was out of service as of approximately 5:15 pm – when you would typically have "high flows in a system" – and the overflow ended by 7:50 pm. (*Id.*; Ex. "JJJ").

293.     The estimated 78,000 gallons appeared to Mr. Lindsay to be "very low." (*Id.* at p. lines 11 thru 21 and p. 98, line 14 thru p. 99, line 17).

294.     The 78,000 gallons going into the Saddle River would have "very little opportunity for ponding" before reaching the Saddle River. (*Id.* at p. 73, line 12 thru p. 74, line 21 and p. 98, line 14 thru p. 99, line 17).

295.     The January 12, 2010 sanitary sewer overflow occurred at the Twin Lakes Pump Station and involved the Saddle River. (*Id.* at p. 64, line 23 thru p. 65, line 5 and p. 57, lines 7 thru 10). According to RCSD#1's own documents, the spill was 100,000 gallons whereas the DEC reported the spill as 70,000. (*Id.*).

296.     At the Twin Lakes Pump Station there is a manhole that's right outside the Twin Lakes Pump Station right at the gate where you enter. (*Id.* at p. 68, line 16 thru p. 69, line 6).

297.     When it discharges the sewage flows right over a roadway about 15 to 18 feet, enter a drainage pipe and discharge directly into the tributary of the Saddle River. (*Id.* at p. 68, line 16 thru p. 69, line 6).

298.     Mr. Lindsay's supplemental report addresses the bacterial pollution of the Saddle River using both the New York State standard (*i.e.*, fecal coliform) and the New Jersey standard (*i.e.*, E.coli). (*Id.* at p. 91, line 18 thru p. 97, line 15; Ex. "III" at Table 2A on page 3 and bacterial standards set forth on pages 4-5).

43

299. Sanitary sewer overflow from RCSD#1's collection system have impacted the Saddle River in that the bacterial quality of the river – whether measured by the fecal coliform or the E.coli standard – has caused the river to be polluted in excess of state standards. (Ex. "III").

300. The sanitary sewer spills of April 26, 2009 and January 12, 2010 violated the water quality standards in New Jersey. (*Id.* at p. 86, line 23 thru p. 87, line 11).

301. These two spills exceeded the standards at Lions Park and they exceeded the standards at the location of the spills. (*Id.* at p. 89, line 23 thru p. 90, line 6).

302. Mr. Lindsay described "comminutors" as "basically it's a grinder. Two opposing sets of teeth move opposite each other and chop up materials that they come into contact with.... They chop up everything from rags to tampons, applicators, actually 2X4's I've seen go through them, so they're pretty strong devices." (Id. at p. 114, lines 3 thru 18).

303. The term "rags", as used in the wastewater industry, can be various different items, such as wipes; "they can be toilet paper, they can be just products that come down and are not biodegradable or not the typical the biodegradable waste from people, or liquid." (*Id.* at p. 114, line 19 thru p. 115, line 3).

304. Typically, a comminutor is part of a wet well; wastewater comes into the comminutors, it chops up pieces/solids that enter and they fall into the wet well; and the pieces then get pumped out up at the pump station. (*Id.* at p. 117, lines 9 thru 19).

305. RCSD#1 could install comminutors to deal with what he terms a rag problem. (*Id.* at p. 119, line 13 thru p. 120, line 11).

306. Comminutors would solve rag problems at RSCD#1's pump stations. (*Id.* at p. 119, line 13 thru p. 121, line 22).

## Testimony of RCSD#1's Expert, Dr. Bruce A. Bell

307.    Dr. Bruce A. Bell was retained as an expert by RCSD#1 in this action in late 2007. (Ex. "X" at p. 4, lines 21 thru 23 and p. 115, lines 17 thru 21).

308.    He prepared a report dated July 23, 2012, which includes his curriculum vitae, and a copy of same is set forth at Ex. "DDD". (*Id.* at p. 5, lines 21 thru 25; Ex. "DDD"). Dr. Bell also prepared a supplemental report dated October 1, 2010 and a copy of same is set forth at Ex. "EEE". (*Id.* at p. 35, line 23 thru p. 36, line 2; Ex. "EEE").

309.    Dr. Bell admits that all sanitary sewer overflows are violations of a SPDES permit. (*Id.* at p. 31, lines 3 thru 6).

310.    The following items are flushed into a sanitary sewer system: sewage; feminine products, some with plastic applicators; wipes; condoms; and pharmaceuticals. (Ex. "X" at p. 18, line 17 thru p. 19, line 21).

311.    These items would enter into the system's pipes and, hopefully, make their way into the treatment plant. (*Id.* at p. 19, line 25 thru p. 20, line 3). If these items do not make it to the treatment plant, there could be a sanitary sewer overflow. (*Id.* at p. 20, lines 4 thru 7).

312.    When such a sanitary sewer overflow occurs, the materials that were flushed down people's toilets could flow down and into a water body such as a river depending upon how the overflow is occurring. (*Id.* at p. 20, line 8 thru 22). Some of the factors to consider include velocity of the flow, the slope of the land, and the distance of the flow. (*Id.*).

313.    Paper takes a long time to biodegrade. (*Id.* at p. 22, lines 10 thru 13).

314.    With the exception of some of the newer biodegradable plastics, most plastics take a long time to biodegrade. (*Id.* at p. 22, lines 14 thru 17).

315. The rate of plastic degradation depends on the plastic composition and the exposure to UV light; they do not biodegrade." (*Id.* at p. 22, line 18 thru p. 23, line 2). In general terms, "traditional plastics take a long time in the environment" to degrade; certainly "more than months" and, for some plastics, years. (*Id.* at p. 23, lines 3 thru 17).

316. Relative to water quality, the State of New York uses fecal coliform as the standard and the State of New Jersey uses E.coli. (*Id.* at p. 92, lines 10 thru 16).

317. Each state uses a different bacteria to test water quality, but "[t]he procedure they use to set those standards are [sic] the same." (*Id.* at p. 93, line 25 thru p. 94, line 2).

318. If a sanitary sewer overflow entered a water body in sufficient concentrations, Dr. Bell concedes that such a spill could cause damage to the affected water body. (*Id.* at p. 98, lines 6 thru 12).

319. Bacteria within the sewage overflow (*e.g.*, fecal coliform, E.coli) causes harm to a water body, such as a river. (*Id.* at p. 98, line 24 thru p. 99, line 21; p. 83, lines 5 thru 12). At the point where a flow reaches a water body, such as the Saddle River during a dry weather event, the harm is instantaneous at this mixing point. (*Id.* at p. 82, lines 7 thru 15).

320. RCSD#1 proposed what is referred to as a "design storm": three inches of rain within 24 hours. (*Id.* at p. 33, lines 9 thru 15).

321. The term design storm is "a synthetic storm, it's not meant to be a real storm, that combines the two", and a sanitary sewer overflow within RCSD#1's collection system during an event that was less than the design storm would be a violation of RCSD#1's SPDES permit. (*Id.* at p. 34, line 3 thru p. 35, line 18).

322. Dr. Bell's initial report (Ex. "DDD") includes as "Figure 3-1" a map that depicts, among other things, the location of two USGS gauges: gauge #01390450 (which Dr.

46

Bell used) and gauge #01390250 (which plaintiffs' expert, Dennis Lindsay, used). (Ex. "X" at p. 87, lines 12 thru 20). Dr. Bell concedes that he never actually went to gauge #01390250. (*Id.* at p. 92, lines 2 thru 3).

323. All sanitary sewer overflows that occurred after May 10, 2006 (*i.e.*, the date of the Order on Consent) within RCSD#1's collection system would not be permitted under RCSD#1's SPDES permit. (*Id.* at p. 97, line 16 thru p. 98, line 12).

324. Dr. Bell prepared a supplemental report (Ex. "EEE"), and the attached "Table A" which references multiple dry and wet weather sanitary sewer overflows from August 28, 2006 through December 29, 2011 at various locations including Cherry Lane, South Monsey Road, Saddle River Road, Hillside Avenue, Twin Lakes Pump Station, East Saddle River Road, the SRPS, and manholes including 10172 and 10174. (*Id.* at p. 36, lines 6 thru 10; Ex. "EEE" at Table A). All of these spills occurred after the Order on Consent dated May 10, 2006. (*Id.* at p. 36, lines 11 thru 25).

325. With the exception of the entry for 8-29-2011, the remaining thirty-three (33) overflows did not exceed a rainfall total of three inches "The Design Storm". (*Id.* at p. 37, line 2 thru p. 39, line 20).

326. RCSD#1 prepares spill reports for the DEC and that it is required, when able, to estimate the volume of the spill. (*Id.* at p. 40, lines 6 thru 8 and p. 42, lines 14 thru 23). The DEC also maintains reports regarding spills. (*Id.* at p. 40, lines 9 thru 11).

327. Just about one-half of the events list the Saddle River as a water source affected by an overflow. (*Id.* at p. 41, line 16 thru p. 44, line 5; p. 48, line 21 thru p. 65, line 10; p. 76, line 18 thru p. 77, line 18).

47

328.     It is more than likely that a dry weather sanitary sewer overflow, when compared to a wet weather event, would have a higher degree of fecal coliform and E.coli in the spill. (*Id.* at p. 80, lines 14 thru 22). In such a dry weather event, "[t]he bacteria will be higher." (*Id.* at p. 81, lines 8 thru 23).

329.     There is a flow depicted in the photographs (Ex. "FFF" - and identified as exhibit 4 during his deposition) that enters the Saddle River, and that it appears cloudy. (*Id.* at p. 73, lines 16 thru 24; p. 74, lines 4 thru 15; Ex. "FFF").

330.     Lions Park is approximately a mile and a quarter from the Swim Club and this park is in close proximity to the gauging station Dr. Bell used (*i.e.*, gauge #01390450). (*Id.* at p. 86, lines 2 thru 10).

331.     Should a sanitary sewer overflow from the manhole adjacent to the Swim Club enter the Saddle River, and flow downstream to Lions Park, Dr. Bell concedes that ninety percent (90%) of the bacteria that originally entered the Saddle River would not have yet died off when the flow reached Lions Park. (*Id.* at p. 85, line 17 thru 21 and p. 86, lines 11 thru 20).

332.     The property of plaintiff, Roy Ostrom, is closer to gauging station #01390250 (*i.e.*, the station used by plaintiffs' expert, Dennis Lindsay) than to the gauging station Dr. Bell used. (*Id.* at p. 87, line 12 thru p. 88, line 6). Dr. Bell did not examine Mr. Ostrom's, property to see the flow of the Saddle River at this location. (*Id.* at p. 88, lines 7 thru 9). In fact, Dr. Bell did not know if the Saddle River flowed by and/or abutted Mr. Ostrom's property. (*Id.* at p. 88, lines 10 thru 12).

333.     Concerning a sanitary sewer overflow that occurred on April 26, 2009 at the SRPS where the overflow entered the Saddle River, the concentration of bacteria levels would be

48

higher at that portion of the river that flowed through Mr. Ostrom's property than when the overflow reached the gauging station that Dr. Bell used. (*Id.* at p. 88, line 20 thru p. 89, line 16).

334.    All sanitary sewer overflows within RCSD#1's collection system that occurred **before or after** May 10, 2006 (*i.e.,* date of the Order on Consent), each such spill would not be permitted since they would not be pursuant to or in compliance with RCSD#1's SPDES permit. (*Id.*, at p. 97, line 16 thru p. 98, line 12, and p. 109, line 23 thru p. 110, line 4).

335.    All sanitary sewer overflows within RCSD#1's collection system that occurred **before or after** May 10, 2006 (*i.e.*, date of the Order on Consent) and reached a water body of the United States, each such spill would be prohibited by the Clean Water Act. (*Id.* at p. 109, line 23 thru p. 110, line 9).

336.    The Saddle River is a water body of the United States. (*Id.* at p. 110, lines 10 thru 14).

337.    Thirty-three (33) of the thirty-four (34) SSOs after the May 2006 Order on Consent would not be covered by the Order because the rainfall did not exceed the design storm of 3 inches in a 24 hour period. (*Id.* at p. 30, line 18 to p. 35, line 18).

338.    When asked about Rockland County's Sewer Use Law, which was referenced in Dennis Lindsay's initial report (Ex. "GGG"), Dr. Bell stated he was not familiar with this law nor did he go look at it after reviewing Mr. Lindsay's report. (*Id.* at p. 99, line 22 thru p. 100, line 15).

339.    After a portion of the law was read to him, and assuming that RCSD#1 is a 'person' under this law and that this law existed prior to the Order on Consent, Dr. Bell opined that RCSD#1 violated this sewer law both before and after the Order on Consent since RCSD#1 "did things that are contrary to this law." (*Id.* at p. 100, line 16 thru p. 102, line 14).

49

340.    The phrase "response time", per Dr. Bell, "in the industry is getting out there and starting to address the spill. Depending on what you find when you get there, you can sometimes fix it immediately, sometimes it's going to take you six hours to fix the problem. The only thing you really have control over is the response time." (*Id.* at p. 44, lines 6 thru 13).

341.    Response time is controlled "[b]y staffing and chain of command to get people out." (*Id.* at p. 44, lines 14 thru 17).

342.    At the time of Dr. Bell's deposition, he did not know if the staffing issue referenced in the letter from the DEC (Manju Cherian, P.E.) to RCSD#1 (Dianne Phillips) dated February 2, 2010 (Ex. "AAA", and marked as exhibit 3 during his deposition) had been addressed by Rockland County. (*Id.* at p. 47, lines 7 thru 14).

343.    Given his experience, Dr. Bell has heard complaints of foul odors and smells from people who live near sanitary sewer overflows, as well as complaints from people that they don't use a water body, such as a river, anymore due to spills entering the water body. (*Id.* at p. 105, line 16 thru p. 107, line 15).

Dated: May 22, 2013
       Goshen, New York

*Michael K. Burke*

Michael K. Burke (7554)
Burke, Miele & Golden, LLP
*Attorneys for Plaintiffs*
40 Matthews Street, Suite 209
Post Office Box 216
Goshen, New York 10924
(845) 294-4080