UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 3/31/2014

BOROUGH OF UPPER SADDLE RIVER, NEW
JERSEY, KAREN MILLER, ROY OSTROM,
MARIA FLORIO, MARK RUFFOLO, and LINDA
MACDONALD,

                              Plaintiffs,

           - against -

ROCKLAND COUNTY SEWER DISTRICT #1,

                              Defendant.

**OPINION AND ORDER**

07 Civ. 00109 (ER)

Appearances:

Michael Kennedy Burke
Burke, Miele & Golden, LLP
Suffern, NY
*Attorney for Plaintiffs*

Thomas R. Gonnella
Pannone Lopes Devereaux & West LLC
Providence, RI
*Attorney for Defendant Rockland County Sewer District # 1*

Peter Adelman
The Law Offices of Peter Adelman
Brooklyn, NY
*Special Counsel to Attorney for Defendant Rockland County Sewer District # 1*

Ramos, D.J.:

        This is a citizens' suit brought by the Borough of Upper Saddle River, New Jersey

("Upper Saddle River"), Karen Miller ("Miller"), Roy Ostrom ("Ostrom"), Maria Florio

("Florio"), Mark Ruffolo ("Ruffolo"), and Linda MacDonald ("MacDonald") (collectively, the

"Plaintiffs") under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1376 (2006) (the

"Clean Water Act" or "Act") and state common law, alleging that, in the course of operating a

sewage treatment facility, Rockland County Sewer District # 1 (the "Sewer District" or "Defendant") has polluted—and will likely continue to pollute—the Saddle River.  Second Am. Compl. ("SAC") ¶¶ 1, 9-13, 41, Doc. 64.  Plaintiffs bring four causes of action:  continuing violations under section 301 of the Clean Water Act (First Claim); and private nuisance, public nuisance and trespass claims under state common law (Second, Third and Fourth Claims, respectively).[1]  *Id.* ¶¶ 37-53.  Plaintiffs seek civil penalties, injunctive and declaratory relief and assert that, in the absence of judicial intervention, the "degradation of the Saddle River will destroy [Upper Saddle River]'s quiet beauty, its bucolic serenity and its healthy, quiet, placid character."  *Id.* ¶ 11.

Pending before the Court are the parties' cross-motions for summary judgment on all claims, pursuant to Federal Rule of Civil Procedure 56.  Docs. 102, 106.  For the reasons set forth below, both motions are GRANTED in part and DENIED in part.

## I.  Background

### A.  Statutory Framework

The stated mission of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  Consistent with this goal, section 301 of the Act generally prohibits the discharge of any pollutant[2] from a "point source"[3] into navigable waters of the United States.  *Id.* §§ 1311, 1362(6), (7), (12).  However,

---

[1] Plaintiffs have indicated that they are voluntarily withdrawing their Fifth and Sixth Claims, brought under the Upper Saddle River Code.  Doc. 126 at 1.  Accordingly, such claims are hereby dismissed.

[2] Under the Act, "pollutants" include:  "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6).  The term "pollution" means "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water."  *Id.* § 1362(19).

[3] A "point source" is "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or floating craft, from which pollutants are or may be discharged."  *Id.* § 1362(14).

the Act's pollution prohibition is "tempered … by a self-referential host of exceptions that allow the discharge of many pollutants once a polluter has complied with the [Act's] regulatory program." *Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 12 F.3d 353, 357 (2d Cir. 1993).  Of particular relevance here, section 402 of the Act establishes a discharge permit program called the National Pollutant Discharge Elimination System ("NPDES"), 33 U.S.C. § 1342, which enables the Environmental Protection Agency ("EPA") to issue permits authorizing the discharge of pollutants into waterways in accordance with certain specified conditions.  *Id.* §§ 1319, 1342(b)(7).  The Act also allows the states to implement NPDES through their own permit programs as long as such programs conform to federally approved guidelines.  *Id.* §§ 1342(b), (c)(1).  In New York, the Department of Environmental Conservation ("DEC") is responsible for issuing these permits under the State Pollutant Discharge Elimination System ("SPDES").  *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 486 (2d Cir. 2001), *adhered to on reconsideration*, 451 F.3d 77 (2d Cir. 2006).

The Clean Water Act deems compliance with an SPDES permit to be compliance for enforcement purposes, 33 U.S.C. § 1342, and conversely, noncompliance with a permit violates the Act itself and constitutes grounds for liability.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000); *see also* 40 C.F.R. § 122.41(a) (requiring that the permittee comply "with *all* conditions of this permit … [a]ny permit noncompliance constitutes a violation of the Clean Water Act" (emphasis added)); *Humane Soc. of U.S. v. HVFG, LLC*, No. 06 Civ. 6829 (HB), 2010 WL 1837785, at *11 (S.D.N.Y. May 18, 2010) (finding liability for failure to satisfy reporting requirements of SPDES permit).

The Act creates two avenues for enforcement of permit violations:  actions brought by the government and citizen suits.  *See, e.g.*, *HVFG*, 2010 WL 1837785, at *2.  The EPA or the DEC

may enforce the Act's permit requirements through administrative, civil, and criminal sanctions. 33 U.S.C. § 1319.  In the absence of such governmental enforcement, the Act allows "citizens" to bring civil enforcement actions seeking penalties or equitable relief "against any person alleged to be in violation of the conditions of either a federal or state NPDES permit."  33 U.S.C. § 1365(a); *see also id.* §§ 1342(b) and 1365(f); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 53 (1987).

The Act defines a "citizen" as "a person or persons having an interest which is or may be adversely affected."  33 U.S.C. § 1365(g).  However, in recognition of the "obvious danger that unlimited public actions might disrupt the implementation of the Act and overburden the courts," Congress placed certain limits on the scope of citizen suits.  *Friends of the Earth v. Consol. Rail Corp.*, 768 F.2d 57, 63 (2d Cir. 1985) (citation omitted).  Before filing suit, a citizen must provide 60 days' notice to:  (i) the EPA Administrator; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator.  33 U.S.C. § 1365(b)(1)(A).  The purpose of the notice provision "is to give [the alleged violator] an opportunity to bring itself into complete compliance with the [Act] and thus … render unnecessary a citizen suit."  *Gwaltney*, 484 U.S. at 60.  If neither the EPA nor DEC commences an action within that sixty-day notice period, the citizens may bring a suit in District Court seeking civil penalties and/or equitable relief.  *Atl. States Legal Found. v. Eastman Kodak*, 933 F.2d 124, 127 (2d Cir. 1991); *HVFG*, 2010 WL 1837785, at *2.  A prevailing citizen-plaintiff may also be entitled to expenses and attorney's fees.  33 U.S.C. § 1365(d); *Laidlaw*, 528 U.S. at 175.

Citizen suits "play an important role in the Act's enforcement scheme," as "[t]he citizen suit provisions were designed not only to 'motivate government agencies' to take action … but also to make citizens partners in the enforcement of the Act's provisions."  *Riverkeeper, Inc. v.*

*Mirant Lovett, LLC*, 675 F. Supp. 2d 337, 343 (S.D.N.Y. 2009) (quoting *Weiler v. Chatham Forest Prods.*, 392 F.3d 532, 536 (2d Cir. 2004) (quoting *Wilder v. Thomas*, 854 F.2d 605, 613 (2d Cir. 1988))).  Congress clearly indicated that citizen groups are not to be treated as pariahs, "but rather as welcomed participants in the vindication of environmental interests."  *Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2d Cir. 1976).  However, because citizen-suits are "meant to supplement rather than to supplant" government enforcement actions, the relief available through a citizen-suit may be limited unless the plaintiffs can show that their suit arises from "ongoing" violations of the Act that have not been diligently prosecuted by the government.  33 U.S.C. § 1319(g)(6); *Gwaltney*, 484 U.S. at 60.

### B.  Factual Background[4]

Unless otherwise noted, the following facts, taken from the parties' Local Rule 56.1 statements and documents filed in support thereof, are undisputed.[5]

---

[4] The Court shall refer to the parties' briefing papers as follows:  Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 103 ("Def.'s Opening Br."); Plaintiffs' Amended Memorandum of Law in Support of their Motion for Summary Judgment, Doc. 118 ("Pls.' Opening Br."); Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, Doc. 126 ("Def.'s Opp. Br."); Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Doc. 125 ("Pls.' Opp. Br."); Defendant's Reply Memorandum of Law in Further Support of its Motion for Summary Judgment, Doc. 127 ("Def.'s Reply Br."); and Plaintiffs' Memorandum of Law in Further Support of its Motion for Summary Judgment, Doc. 128 ("Pls.' Reply Br.").

[5] Under Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment must submit a "separate, *short and concise* statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local R. 56.1(a) (emphasis added).  In answering a motion for summary judgment, litigants in this District are required to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record.  Local R. 56.1(b), (d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact).  On March 29, 2013, Plaintiffs submitted a sixty-six page Rule 56.1 Statement (Doc. 115) rife with legal conclusions, irrelevant material, characterization of deposition testimony and single paragraphs containing multiple factual assertions.  The Court granted Plaintiffs leave to file an Amended Rule 56.1 Statement on April 24, 2013.  Plaintiffs' Amended Rule 56.1 Statement (Doc. 117), while an improvement on their first attempt, nonetheless contains 343 paragraphs and occupies fifty pages, and persists in including legal conclusions and irrelevant information.

Moreover, Plaintiffs did not file a declaration in connection with the exhibits marked A-JJJ, ostensibly filed in support of their moving papers.  *See* Docs. 106-115, 117.  Rather, Plaintiffs identify these exhibits through references in their Rule 56.1 Statement.  The Court will refer to such exhibits simply as "Pls.' Ex. __."  (The

### i. The Parties

The Saddle River flows through Rockland County, New York, and south into Plaintiff Upper Saddle River, a municipality in northern New Jersey.  Pls.' Am. 56.1 Stmt. ¶¶ 1-2; *see also* Gonnella Decl. Ex. 8 (map), Doc. 105-11.  Plaintiffs Miller, Ostrom, Florio, Ruffolo, and MacDonald (together, "Individual Plaintiffs") reside in Upper Saddle River near the Saddle River and its tributaries.  Pls.' Am. 56.1 Stmt. ¶¶ 3-8.  Part of Upper Saddle River's northern boundary abuts a sanitary sewer system (the "System") operated by Defendant Sewer District.  *Id.* ¶ 2; Def.'s Opening Br. 3.

Defendant's System processes sanitary sewage "for residential, municipal and industrial users throughout much of Rockland County," and its service area covers approximately 73 square miles.  Pls.' Am. 56.1 Stmt. ¶¶ 9-10; Gonnella Decl. Ex. 3 (hereinafter "Engineering Report"), Docs. 105-3 to 105-6.  The System collects sanitary sewage then conveys it to Defendant's wastewater treatment plant in Orangeburg, New York, which treats and discharges the sewage water into the Hudson River.  Engineering Report at 1-2.  As of January 2008, Defendant estimated that its wastewater treatment plant processed 28.9 million gallons of wastewater per day.  *Id.*  In addition to the Orangeburg plant, Defendant operates more than 17,000 manholes and more than twenty pump stations throughout its service area.  Engineering Report Sec. C, 6-6; *id.* at Figure 1-4: RCSD Pump Stations.

---

exhibits to Plaintiffs' opposition to Defendant's cross-motion, and reply in support of their own motion, include affirmations from Mr. Burke and do not suffer from this defect.)

Finally, both parties object to the admissibility of certain documents presented by their adversary.  Plaintiffs seek to strike the Affidavit of Dianne Philipps ("Philipps Aff.," Doc. 104) and certain publicly available documents identified by the Opposing Declaration of Thomas R. Gonnella ("Gonnella Opp. Decl.," Doc. 120).  Pls.' Opp. Br. 21-25; Burke Reply Aff. ¶¶ 4-9, Doc. 129.  Defendant argues that certain unauthenticated materials relied upon by Plaintiffs' expert, and filed in support of their motion, lack the requisite foundation for admission.  *See, e.g.*, Def.'s Reply Br. 1 n.1.  It is well-established that "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).  The Court will address these issues *infra*.

Dianne Philipps is the Executive Director of the Sewer District.  Philipps Aff. ¶ 1, Doc.

104.  She has been employed by the Sewer District since 1989 and became Executive Director in

approximately March 2004.  Pls.' Ex. U (Philipps Dep. 9:5 – 9:24).  From January 1998 to at

least January 2011, Eugene Yetter served as the Sewer District's Director of Plant Operations.

Pls.' Ex. V (Yetter Dep. 8:8 – 8:19).  Mr. Yetter primarily worked at Defendant's waste water

treatment plant in Orangeburg.  *Id.* (9:3 – 9:5, 74:16 – 74:18).  Ms. Philipps was Mr. Yetter's

boss.  *Id.* (10:11 – 10:13).  Mr. Yetter no longer works for Defendant.  Def.'s Resp. Pls.' 56.1

Stmt. ¶ 221, Doc. 121.

## ii.  Defendant's SPDES Permit

A permit issued by the DEC governs Defendant's operation of the System.  *See* Pls.' Am.

56.1 Stmt. ¶¶ 10-11.[6]  While Defendant's SPDES Permit enables it to discharge wastewater, it

restricts the allowable location, concentration and volume of discharge.  1999-2008 Permit;

2008-2013 Permit.  Defendant's SPDES Permit only authorizes the discharge of wastewater

from one location—the wastewater treatment plant in Orangeburg—and only into one waterway:

the Hudson River (and its tributary, Sparkill Creek).  2008-2013 Permit at 4; 1999-2008 Permit;

*see also* Engineering Report at Sec. 1.3.  The SPDES Permit does not allow Defendant to

discharge sewage from sites outside of the treatment plant, such as pump stations or manholes, or

---

[6] The Court's analysis of the scope of Defendant's SPDES Permit is limited by the fact that Defendant has only provided the Court with a copy of the SPDES Permit effective from 2008 to 2013, and Plaintiffs have furnished only "select pages" from the SPDES Permit covering the years 1999 to 2008.  *See* Burke Aff. Opp. Mot. Summ. J. ("Burke Aff.") Ex. D (pages from SPDES Discharge Permit No. 0031895, effective Jan. 11, 1999 through Dec. 1, 2003, and renewal effective Dec. 1, 2003 through Dec. 1, 2008, hereinafter "1999-2008 Permit"), Doc. 124; Gonnella Decl. and Req. for Judicial Notice (hereinafter "Gonnella Decl.") Ex. 1 (SPDES Discharge Permit No. 0031895, effective Dec. 1, 2008 through Nov. 30, 2013, hereinafter "2008-2013 Permit"), Doc. 105.

Based on the Court's review, the primary difference between the effluent restrictions and water quality measurements imposed by the 1999-2008 Permit versus the 2008-2013 Permit seems to be that the newer permit imposes lower "effluent vs. influent value" percentage restrictions for two pollutants, BOD (biochemical oxygen demand) and TSS (total suspended solids).  For the purposes of this motion, however, the difference between the permits is immaterial.

into other waterways.  Pls.' Am. 56.1 Stmt. ¶¶ 35, 233; Pls.' Ex. U (Philipps Dep. 177:3 – 177:6, 182:3-183:23).

Defendant's SPDES Permit details effluent limitations and monitoring requirements for parameters including, but not limited to, pH, temperature, volume of suspended and settleable solids, fecal coliform, total residual chlorine ("TRC"), biochemical oxygen demand ("BOD"), and carbonaceous biochemical oxygen demand ("CBOD").[7]  ("Permit Limits, Levels, and Monitoring Definitions" in the 2008-2013 Permit; "Final Effluent Limitations and Monitoring Requirements" in the 1999-2008 Permit).  The permit expressly prohibits Defendant from discharging water that contains the listed parameters "at levels which may cause or contribute to a violation of water quality standards."  2008-2013 Permit at 2.

Defendant's SPDES Permit also imposes monitoring, reporting and recordkeeping obligations, including a requirement that Defendant must orally report any noncompliance with the terms of the SPDES Permit "which may endanger health or the environment" within 24 hours, and submit a written noncompliance report detailing the cause, duration and description of the noncompliance within five days.  1999-2008 Permit; 2008-2013 Permit.  The 2008-2013 SPDES Permit lists Ms. Philipps as the "Responsible Agent or Official" for Defendant's discharge monitoring reports, whereas the 1999-2008 SPDES Permit names Ronald Delo, her predecessor.  *Id.*; *see also* Pls.' Ex. U (Philipps Dep. 9:18 – 9:19).

---

[7] The Act defines an effluent limitation as any restriction by the state or EPA Administrator on "quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, including schedules of compliance."  33 U.S.C. § 1362(11).  SPDES permits restrict the volume and concentration of discharge through certain designated "parameters," meaning, attributes such as specific pollutants, discharge characteristics, or water quality indicators.  *HVFG*, 2010 WL 1837785, at *3 n.6 (citing *Pub. Int. Research Grp. of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1242 (3d Cir. 1995)).

### iii.   Sanitary Sewage Spills

Sanitary sewage overflows ("SSOs") are sewage spills into the surrounding environment from points not authorized by a discharge permit.  Engineering Report at 3.  According to Defendant, "[l]ike all separate sanitary sewer systems," its System "suffers from a certain amount of intrusion of unwanted water from sources such as groundwater, surface water entering through manhole cover vents, illegally connected roof leaders … sump pumps, and storm drains."  Def.'s Opening Br. 4 (citing Engineering Report at 1-6 – 1-8).  One potential effect of this "extraneous flow" is that it can overload the System's processing capacity and cause SSOs. *Id.*

Plaintiffs primarily complain of SSOs related to the Saddle River Pump Station, which is located on the New York side of the New York-New Jersey border.  Engineering Report Sec. C, 6-6; *id.* at Figure 1-4: RCSD Pump Stations.  The Saddle River Valley Swim and Tennis Club (the "Swim Club") is next to the Saddle River Pump Station on Saddle River Road, in New York.  Pls.' Am. 56.1 Stmt. ¶¶ 28, 54.  Plaintiffs Florio and Ruffolo are members of the Swim Club.  *Id.* ¶¶ 88, 98.  Plaintiff Ostrom lives in New Jersey, across the border from the Saddle River Pump Station, downstream from the Swim Club.  *Id.* ¶ 78; Gonnella Decl. Ex. 8 (map).  Ms. Philipps testified that the water flow near the New York-New Jersey border is such that the flow heads to New Jersey by means of gravity and is then pumped back toward New York by pumping stations.  Pls.' Am. 56.1 Stmt. ¶ 122.  Ms. Philipps testified that the Saddle River Pump Station is "problematic" in that it is a "high head" station, which means that its pumps "take more of a beating" due to vibration from high head conditions, and thus have to be replaced more frequently.[8]  Pls.' Ex. U (Philipps Dep. 20:9 – 22:23); Def.'s Resp. Pls.' 56.1 Stmt. ¶¶ 129-30.

---

[8] According to Ms. Philipps, "high head" signifies "the amount of water that has to be moved or the height it has to be moved … [i]t [is] harder to pump at a higher height than a lower height."  Pls.' Am. 56.1 Stmt. ¶ 62.  She further

Ms. Philipps testified Defendant has had more mechanical failures at the Saddle River Pump Station relative to other stations as a result of its high head design. *Id.* at 77:3 – 77:20. She further testified that, as of her January 2011 deposition, Defendant had not made any design changes "to correct the high head situation," and that a new pump station, which she estimated would cost six million dollars, would be required to fix the problem. *Id.* at 77:16 – 77:25; 78:1 – 78:2. Plaintiffs also complain about SSOs from the Twin Lakes Pump Station, which Ms. Philipps testified has the same design as the Saddle River Pump Station. *Id.* at 78:13 – 79:2.

Plaintiffs claim that they have personally witnessed sewage spills in their community and have submitted photographs of several sewage spills at the Swim Club in support of their motion. Pls.' Exs. QQ-SS; Pls.' Am. 56.1 Stmt. ¶¶ 67, 90. Plaintiff Florio testified that, one "perfectly fine day, not during a rainstorm and not after a rainstorm," she witnessed a fountain of sewage flow out of a manhole near the Swim Club. Pls.' Am. 56.1 Stmt. ¶¶ 90-92. Thereafter, she testified that she witnessed sewage rush down the Swim Club's driveway, and cover its lawn with "pieces of toilet paper, used, bloated, tampons, [and] paper." *Id.* ¶¶ 92-93. Plaintiff Ruffolo testified that athletic fields in Lions Park, which is adjacent to the Saddle River, "smell like sewer." *Id.* ¶¶ 102-103. Mr. Ruffolo also claims to have observed what "looked to be like toilet paper" in the Saddle River. *Id.* ¶ 105. Plaintiff Ostrom claims that he has witnessed "squished up toilet paper" and excrement in the portion of the Saddle River behind his backyard. *Id.* ¶ 77. Plaintiff Ostrom claims that he and his wife have not used their backyard in the past fifteen years, and do not cook outdoors, due to odors of sewage emanating from the river. *Id.* ¶ 80. As

---

testified that a high head station, like the Saddle River Pump Station, "would be a difference of 200 feet, 250 feet versus 40 feet." Pls.' Ex. U (Philipps Dep. 21:4 – 21:23).

part of a volunteer "River Assessment Team," Plaintiff Miller claims to have taken water samples from the Saddle River that test positive for fecal coliform bacteria. *Id.* ¶¶ 68-70.[9]

Based upon Defendant's own spill reports, sworn testimony and their expert's reports, Plaintiffs assert that since November 8, 2001, Defendant has caused 135 SSOs, impacting a wide range of locations from the Saddle, Mahwah and Hackensack Rivers to the Swim Club lawn. Pls.' Opening Br. 1, 12-17, 24 (citing Pls.' Exs. GGG, III). While Plaintiffs acknowledge that Defendant and the DEC entered consent orders in 2006 and 2012 with respect to some of these violations, they seek to hold Defendant liable for sewage spills discharged into the Saddle River that were not covered by those consent orders.[10] Pls.' Opening Br. 18; Pls.' Opp. Br. 15.

### iv.   The 2006 Consent Order

On February 22, 2006, the DEC sent a letter to Ms. Philipps explaining that Defendant had violated the terms of its SPDES Permit and enclosing a copy of a proposed, unsigned consent order. Def.'s Resp. Pls.' 56.1 Stmt. ¶¶ 144-145. The unsigned consent order identified forty dates on which "[SSO] events discharging untreated raw sewage and stormwater to waters of the State" occurred, during the time period from January 2, 2003 to December 16, 2005. Pls.' Ex. JJ (the "February 22, 2006 Letter"). At her deposition, Ms. Philipps testified that Defendant reviewed and modified certain terms of the consent order attached to the February 22, 2006 Letter. Pls.' Ex. U (Philipps Dep. 356:1 – 374:5); Def.'s Resp. Pls.' 56.1 Stmt. ¶¶ 146-47. In particular, Ms. Philipps testified that the Sewer District rejected a clause proposed by the DEC that would have required the Sewer District to immediately "cease and desist from any and all

---

[9] Plaintiffs argue that one test, concerning a sample taken on March 5, 2008, showed fecal coliform measuring 8,200 cfu/100ml. Pls.' Am. 56.1 Stmt. ¶ 70 (citing Pls.' Ex. GG, an "Analytical Results Summary" laboratory report signed by "Brian Wood"). Defendant disputes the admissibility of this evidence. Def.'s Resp. Pls.' 56.1 Stmt. ¶ 70.

[10] The Court restricts its recitation of the facts to sewage spills (1) during the years 2006-2011 and (2) that Plaintiffs claim were discharged into the Saddle River, because these are the only events for which Plaintiffs seek to hold Defendant liable. *See* Compl. ¶26; SAC ¶ 34; Pls.' Opening Br. 1-2, 9; Pls.' Exs. GGG, III (Lindsay Rpt. and Supp. Rpt., respectively).

future violations" because the Sewer District would not be able to comply with such a provision. Pls.' Ex. U (Philipps Dep. 359:16 – 361:6); Def.'s Resp. Pls.' 56.1 Stmt. ¶ 147.

On May 10, 2006, Defendant formally executed a consent order with the DEC. Gonnella Decl. Ex. 2 (the "2006 Consent Order"), Doc. 105-2. The 2006 Consent Order provides:

> Between January 2, 2003 and December 16, 2005, the [DEC] documented violations by Rockland County Sewer District #1 … at multiple [of its] sewer collection system sites, which are located at multiple Town and Street locations…[s]pecifically: [Defendant] violated [New York Environmental Conservation Law] section 17-0803, which makes it unlawful to discharge pollutants to the waters of the state from any outlet source in a manner other than as prescribed by SPDES permit, when Respondent's sewer collection system experienced multiple sanitary sewer overflow … events discharging untreated raw sewage and stormwater to the waters of the State. These violations are set forth in Appendix A to this Order, which is hereby incorporated into this Order in its entirety and shall be fully enforceable as part of this Order.
>
> …[Defendant] consents to the entering and issuing of this Order, and agrees to be bound by the terms and conditions of this Order, including the attached Compliance Schedule.

2006 Consent Order at 1. "Appendix A" identifies sixty-seven overflows on forty dates, three of which occurred at or near the Saddle River Pump Station: (1) an SSO of 400 gallons, at Manhole 10172, on August 14, 2003 that occurred after a power outage (A-2); (2) an SSO of 8,500 gallons, from Manholes 10172, 10174, and 10434, on April 4, 2005 (cause unknown) (A-5); and (3) an SSO of 10,000 gallons at the Saddle River Pump Station on November 30, 2005, after an "uninterruptible power supply" failure (A-6). *Id.* at Appendix A.

In total, the DEC imposed civil penalties of $20,000 on Defendant—$10,000 of which was to be paid immediately, and $10,000 suspended subject to Defendant's compliance with the Order. *Id.* at 1. Importantly, the executed Order did *not* include the "cease and desist" provision that the DEC had proposed in February 2006. The 2006 Consent Order's "Compliance Schedule" required Defendant to "certify completion of the work required under this schedule[]

to the [DEC] within five (5) days of its completion." *Id.* at 2.  Additionally, the Order required

Defendant to:  (1) "[i]mmediately … continue to report" any SSOs to the DEC, as required by its

SPDES Permit; (2) submit a Dry Weather SSO Abatement Report to the DEC by December 29,

2006; and (3) submit an Engineering Report to the DEC by July 2, 2007.  *Id.* at 4.

- DEC required that the **Dry Weather Abatement SSO Abatement Report** include:  (1)
  "[a] description of [Defendant's] SSO abatement program for the Dry Weather SSO
  Events[11] at the locations listed in Appendix A" and (2) a description of Defendant's
  Operation and Maintenance Program with recommended improvements to help reduce
  dry weather SSOs.  *Id.*

- The **Engineering Report** was to address "all wet and dry weather SSOs listed in
  Appendix A," and include:  (1) an evaluation of flow data for the collection system,
  including collection system capacities, interceptors and pumping stations; (2) a
  description of the SSO abatement program for "the locations listed in Appendix A"; (3)
  proposed design upgrades for the SSO abatement program; and (4) a final design and
  implementation schedule "with specific tasks, durations and milestone dates."  *Id.* at 4-5.

The deadlines for the two reports are the only concrete deadlines set forth in the Order.

However, it provided that, once approved by the DEC, the implementation schedules proposed in

Defendant's reports would become enforceable parts of the 2006 Consent Order.  *Id.* at 5.

### v.  Compliance with the 2006 Consent Order

On December 29, 2006, Defendant submitted its initial Dry Weather Abatement Report

to the DEC.  Gonnella Decl. Ex. 4 (hereinafter "Dry Weather Report"), Doc. 105-7.  The Report

---

[11] As their names suggest, "dry weather SSOs" occur during relatively dry weather, whereas a "wet weather SSO" occurs during wet weather, such as a rainstorm that causes multiple inches of rain over a 24-hour period. Pls.' Am. 56.1 Stmt. ¶ 222; Pls.' Ex. V (Yetter Dep. 23:15 – 23:22). Mr. Yetter testified that dry weather SSOs are normally caused at a pump station by equipment failure or human error. *Id.* at 28:20 – 29:7. Mr. Yetter also testified that the sewage is more dilute in a wet weather spill as compared with a dry weather spill. *Id.* at 38:5 – 38:18.

concluded that Defendant experienced 25 dry weather SSO events between 2003 and 2005, primarily caused by "blockages or mechanical failures." *See id.* at 5-6 and Appendix A. The Report chiefly attributed the blockages to grease buildup, and identified operator error, equipment failure, and vandalism as additional causes of SSOs. *Id.* at 5-7. The Report also recommended equipment upgrades, a preventative flushing program, repairs to the collection system, and an educational outreach program for food service professionals on the perils posed by grease to the sewage system. *Id.* at 8-11.

On July 2, 2007, Defendant submitted its initial Engineering Report to the DEC. Gonnella Decl. Ex. 3 (Letter from D. Philipps to DEC dated January 16, 2008 (hereinafter "Jan. 16, 2008 Letter") at 1), Doc. 105-3. The Engineering Report concluded that "wet weather inflow" was the major cause of the SSOs identified in the 2006 Consent Order. *Id.* To resolve this problem, the Engineering Report proposed that Defendant locate and eliminate wet weather inflow sources ("leaky manholes, illegal roof leader connections, cross-connections with storm sewers"). *Id.*

On September 18, 2007, the DEC sent Defendant a letter critiquing the Engineering Report, particularly the inadequacy of its proposed schedule for completion, which did not require Defendant to begin eliminating inflow sources until January 2009. Pls.' Ex. WW at RSHC00008136. The DEC also directed Defendant to revise its report to include an evaluation of the Saddle River Pump Station, which "should have been part of this Engineering Report" because "[s]anitary sewer overflows from this pump station have resulted in a lawsuit from a bordering community in NJ."[12]  Jan. 16, 2008 Letter at 6. A letter from the DEC dated November 20, 2007 submitted additional remarks to Defendant and indicated that the DEC

---

[12] As discussed *infra*, the instant lawsuit, to which the letter presumably refers, was filed on January 5, 2007.

would not be approving the Report at that time.  Gonnella Decl. Ex. 5 ("Nov. 20, 2007 Letter"), Doc. 105-8.[13]

Defendant issued a revised Engineering Report in January 2008.[14]  The January 2008 Report proposed a more expedited implementation schedule, wherein all planned improvements to "priority one" Consent Order locations were to be completed by December 2009, and the remainder of improvements would be completed by December 2011.  Jan. 16, 2008 Letter; Engineering Report at Table 6-5:  Implementation Schedule.  In its January 16, 2008 Letter to the DEC accompanying the revised Engineering Report, Defendant stated as follows regarding the Saddle River Pump Station:

> The Order did not require a detailed evaluation of any specific pumping station. The District has been aware of sporadic pump control malfunctions in recent years at the Saddle River Pumping Station.  Concerns regarding the peak wet weather flow conveyance at the Saddle River Pumping Station were identified as part of the study's flow metering program.  Since the initial report was submitted, a more detailed in-house evaluation of the pumping station hydraulics and pump controls has been completed.  The District has prepared contract documents for the replacement of pumps and controls.   This work is currently under construction.

---

[13] A "design storm" is a rain event used to model and design upgrades to the collection system to target wet weather SSOs that occur in any storm event "up to and including the design storm."  Def.'s Opening Br. 5 n.3 (citing Engineering Report at 1).  In its November 20, 2007 Letter, the DEC noted that the Engineering Report selected a design storm event that assumed three inches of rainfall over a 24-hour period "to eliminate [SSOs] in the collection system," but did not "provide sufficient justification for the selection of this event" because "SSOs still occur during a storm event of this size."  Nov. 20, 2007 Letter.  Defendant cites the November 20, 2007 Letter—and the final Engineering Report itself—to support its contention that "[u]ltimately, the DEC required the District to implement remedial measures to address all SSOs within a design storm of 3 inches of wet weather in a 24 hour period."  Def.'s Opening Br. 5 n.4.  Neither of these documents indicates final approval from the DEC, however.

[14] The documents filed by Defendant in support of its motion only include the Revised January 2008 edition of the Engineering Report.  On its face, it specifies that it was also revised in November 2007.  *See* Engineering Report.

Jan. 16, 2008 Letter at 6.  The record is unclear as to when and under what circumstances the DEC formally approved Defendant's proposals,[15] but both parties' experts accept the schedule set forth in the January 2008 Engineering Report as final.  *See* Pls.' Ex. III (Lindsay Rpt. at ¶ 4).

In February 2010, the DEC sent a letter to Defendant requesting that it prepare an addendum to the Dry Weather Abatement Report describing Defendant's pump stations, including metrics such as "location, capacity, number of pumps, age of equipment, last major upgrade/repair/replacement, emergency power, overflow history, overflow location in the event of a problem, and nearest receiving water which would be affected by an overflow incident." Pls.' Ex. AAA.  The impetus for this request was a "technical compliance conference" regarding a sewage overflow at the Twin Lakes Pump Station on January 22, 2010 that reportedly discharged 100,000 gallons into the Saddle River.  Pls.' Ex. ZZ.  The letter also directed Defendant to identify "priority stations" based on conditions such as capacity and maintenance history.  Pls.' Ex. AAA.  Defendant submitted the requested addendum, authored by Ms. Philipps and Mr. Yetter on March 19, 2010.  Def.'s Resp. Pls.' Am. 56.1 Stmt. ¶ 181; Pls.' Ex. BBB.  It represents that the Saddle River Pump Station "was refitted with three new raw sewage pumps," and that additional upgrades were planned under "[a] current capital improvement project."  Pls.' Ex. BBB at 5.  The report did not specify a deadline for these planned upgrades.  *Id.*

At her deposition in January 2011, Ms. Philipps testified that the replacement of the Saddle River Pump Station pumps occurred in January 2008.  Ms. Philipps testified that it is "fair to say" that the replacement of pumps at the Saddle River Pump Station did not "address the problem of the SSOs at the Saddle River Pump Station," and that SSOs continued to occur after

---

[15] Citing letters from the DEC not attached to his report or otherwise part of the record, Defendant's expert, Bruce A. Bell, represents that the DEC approved Defendant's reports on February 1, 2008 (Engineering Report) and February 26, 2008 (Dry Weather Report).  Pls.' Ex. DDD (Bell Rpt. at 3 n.3-4).

January 2008.  Pls.' Ex. U (Philipps Dep. 255:25 – 274:23).  For example, the installation of new pumps did not stop sewage from overflowing out of a manhole nearby the Swim Club on March 5, 2008.  Def.'s Resp. Pls.' 56.1 Stmt. ¶ 163.

Defendant proffers as proof of its compliance with the 2006 Consent Order the Philipps Affidavit[16] and the reports prepared pursuant to the Order.  *See generally* Def.'s 56.1 Stmt., Doc. 101.  In her Affidavit, Ms. Philipps attests that the District spent approximately $12 million improving its System in response to the 2006 Consent Order and an additional $18.5 million in other improvements (of its own volition).  Philipps Aff. ¶ 6.  Ms. Philipps avers that Defendant undertook efforts to eliminate SSOs by "removing major sources of inflow in the system, modifying and/or repairing manholes and manhole covers in connection with that work, rerouting certain flow through capital improvement[s], installing new pumps[,] … upgrading certain pump facilities, and installing new computerized telemetry systems," and represents that such efforts succeeded.  Def.'s 56.1 Stmt. ¶ 6 (citing Philipps Aff. ¶¶ 5, 9).  Defendant argues that sewage spills in violation of the Clean Water Act have not been reported in the areas tributary to the Saddle River "since the completion of [the implementation of the 2006 Consent Order] at the end of 2011."  Def.'s Opening Br. 7.[17]  Defendant acknowledges one SSO in the area near the Saddle River in 2012, but claims that this solitary discharge only affected soil, and

---

[16] While Plaintiffs move to strike the Philipps Affidavit (Pls.' Opp. Br. 21-25) based upon Ms. Philipps' purported lack of personal knowledge of the events described therein, given her role as Executive Director of the Sewer District and deposition testimony with respect to her involvement in its operation, the Court will not preclude the Affidavit on that basis.  To the extent that Plaintiffs complain that some of Ms. Philipps' averments are conclusory or appear to contradict prior testimony, and that Defendant attempts to use the Affidavit to circumvent the requirements of Local Rule 56.1, the Court notes that *both* parties inject conclusory statements into in their Rule 56.1 Statements, and views all such statements as argument, not evidence.

[17] According to Defendant's expert, "the District completed all requirements of the Order on Consent by December 31, 2011, as required by the implementation schedule."  Pls.' Ex. DDD (Bell Rpt. at 13).  However, the Bell Report does not cite an underlying source for this assertion.

did not reach any watercourse. *Id.* at n.6; Gonnella Decl. Ex. 12 (Bell Supp. Rpt. at 2-3), Doc. 105-16.

Plaintiffs dispute that Defendant has submitted any evidence, aside from its own "hollow assertions," indicating that it actually completed implementation of remedial measures and fully complied with the 2006 Consent Order.[18]  Pls.' Reply Br. 9.  At his deposition in January 2011, Mr. Yetter testified that the staffing of the Maintenance Department, which services Defendant's plants and pump stations, has been down over twenty percent for "probably seven years," Pls.' Ex. V (Yetter Dep. 29:8 – 31:21), and that staffing impacts the Sewer District's ability to address sewer overflows when they occur. *Id.* at 31:22 – 32:4.  He also testified that he believed that the DEC "admonished" the Sewer District for staffing issues during the Consent Order review process. *Id.* at 90:15 – 90:19.  With respect to improvements to the Saddle River Pump Station and in particular, manholes near the Swim Club, as of January 2011, Mr. Yetter testified that, notwithstanding the replacement of equipment and design changes, "overflow has continued to flow down into the Saddle River" from the manholes near the Saddle River Pump Station, during both dry and wet weather events, "[w]henever the Saddle River Pump Station either can't keep up with the flow or fails." *Id.* at 76:3 – 82:19.

### vi.  The 2012 Consent Order

On or about April 7, 2010, the DEC sent a notice of violation to Defendant concerning certain sewage spills that occurred during 2009 and 2010.  Pls.' Ex. CCC.  More than two years

---

[18] According to Plaintiffs, Defendant did not produce "all supporting documents and correspondence regarding any approvals, development of schedule, implementation and completion" as part of supplemental discovery required under Rule 26(e)(1)(A) of the Federal Rules of Civil Procedure.  *See* Pls.' Resp. Def.'s 56.1 Stmt. ¶ 5, Doc. 121; *see also id.* ¶¶ 7-8.  However, Plaintiffs' expert report, dated April 2012, takes the position that "[Defendant] has completed a number of the requirements of the consent order and, from the work schedule and pretrial examination of [Defendant's] officials, all improvements related to the collection system in the area of the Saddle River designed to prevent SSOs have been completed."  Gonnella Decl. Ex. 9 (Lindsay Rpt. at E), Doc. 105-12.  Notwithstanding completion of the planned improvements, however, Plaintiffs' expert asserts that "SSOs have continued to occur under both dry and wet weather conditions." *Id.*

later, on November 29, 2012, Defendant and the DEC entered into a Consent Order (the "2012 Consent Order") addressing these sewage spills.[19]  Philipps Aff. ¶ 7; Gonnella Decl. Ex. 7 (2012 Consent Order at 1-4), Doc. 105-10.  The DEC charged that Defendant violated the effluent limits of its SPDES permit by discharging sewage into the waters of the State eleven times between April 2, 2009 and April 1, 2010.[20]  2012 Consent Order at 1-3.  The 2012 Consent Order does not mention the 2006 Consent Order.  Def.'s Resp. Pls.' 56.1 Stmt. ¶ 45.  While the 2012 Consent Order primarily focuses on violations at facilities not at issue here, several of the overflows identified in the 2012 Consent Order emanated from locations related to the Saddle River Pump Station:  Manholes 10171, 10172, and 10174.  2012 Consent Order ¶¶ 5c, 5d, 5h.  Two of these manholes, 10172, 10174 were sites of overflows listed in the 2006 Consent Order.  2006 Consent Order at Appendix A.  Both Consent Orders also mention Manhole 10434 on Ramapo Lane.  *Id.*; 2012 Consent Order ¶ 5c.

The 2012 Consent Order imposed a total civil penalty of $75,000 for Defendant's violations, $25,000 of which was to be paid immediately, and $50,000 suspended.  2012 Consent Order at 4.[21]  In addition, the 2012 Consent Order required Defendant to develop an Asset Management Plan and a Capital Improvement Plan to improve their Lincoln Street plant (not at issue here).  *Id.* at 17.

Defendant claims that the SSOs underlying the 2012 Consent Order "were all related to unpredictable, errant mechanical failures and operator error."  Def.'s Opening Br. 6 n.5 (citing

---

[19] Defendant entered the 2012 Consent Order eleven months after the close of fact discovery in this matter.  Def.'s Resp. Pls.' 56.1 Stmt. ¶ 43.

[20] The 2012 Consent Order states that "[s]pecifically, RCSD #1 [Defendant] discharged sewage on April 2, 2009, April 25, 2009, April 26, 2009, May 20, 2009, July 30, 2009, September 15, 2009, January 12, 2010, February 17, 2010, February 28, 2010, and twice on April 1, 2010 [into the waters of the State.]"  2012 Consent Order ¶ 5.

[21] The DEC received a check for $25,000.00 from Defendant on November 27, 2012.  Gonnella Decl. Ex. 7.

Philipps Aff. ¶¶ 7-9).  Ms. Philipps attests, and Plaintiffs dispute, that the purpose of the 2012 Consent Order was for the DEC to ensure that Defendant followed through on its efforts to develop an Asset Management and Capital Improvement Plan, which were already underway at the time of the execution of the 2012 Consent Order.  Philipps Aff. ¶ 7.  Defendant represents, and Plaintiffs contest, that the Sewer District has fully complied with the 2012 Consent Order. *Id.* ¶¶ 10-11.

### vii.  The Instant Action

On October 6, 2006, Upper Saddle River sent a letter of intent to file suit to Defendant, the DEC, the DEP, and the EPA, asserting that the 2006 Consent Order, which had been executed four months prior, failed to provide a remedy for Defendant's sewage spills, which continued to flow into the Saddle River unabated.  Pls.' Ex. C.  On January 5, 2007, Upper Saddle River commenced the instant citizen suit (Compl., Doc. 1), and the Individual Plaintiffs joined the case on April 11, 2007.  Am. Compl., Doc. 15.[22]  Plaintiffs filed a Second Amended Complaint (the "SAC") on May 17, 2010.

Plaintiffs' First Claim for relief is "violation of the Clean Water Act by specific illegal discharges to waters of the United States."  SAC ¶¶ 28-41.  Plaintiffs allege that, after the entry of the 2006 Consent Order, Defendant persisted in violating the terms of its SPDES Permit—and thus the Clean Water Act—by discharging raw sewage containing pollutants:  (1) from locations not authorized by its SPDES Permit, such as manholes, pipes and/or point sources at or adjacent to Cherry Lane, South Monsey Road, and in the vicinity of the Swim Club; and (2) into the

---

[22] In light of concerns raised about strict compliance with the notice requirements of 33 U.S.C. § 1365(b)(1)(A), Plaintiffs thereafter gave notice of violations of the Act and each Plaintiff's intent to file suit against the Sewer District to the EPA, the DEC, the DEP, and the Sewer District.  Plaintiffs provided such notices on January 18, 2008, April 4, 2008, and April 7, 2008.  Pls.' Exs. H, I.

Saddle River and its tributaries.  *Id.* ¶¶ 31-32, 37.  The Second through Fourth Claims assert state common law claims for trespass, public and private nuisance.  *Id.* ¶¶ 42-53.

Like the original complaint (*see* Compl. ¶ 26), the SAC alleges that Defendant is responsible for "unpermitted discharges" of waste water into navigable waters on dates including, but not limited to:  every day from August 23 – September 3, 2006; October 31, 2006; November 6, 2006; November 8, 2006; "on or about" March 2, 2007; and "upon information and belief," additional spills from August 23, 2006 to the present.  SAC ¶ 34.

Plaintiffs contend that since November 8, 2001, Defendant caused approximately 135 SSOs that violated the terms of its SPDES Permit.  Pls.' Opening Br. 24; Pls.' Am. 56.1 Stmt. ¶¶ 135-37, 187-219.  Indeed, Defendant's own records document the existence of many of these spills.  Pls.' Exs. MM – OO, TT, VV (Defendant's "Spills Files" for 2006-2010).  Nevertheless, Plaintiffs only seek relief under the Clean Water Act for spills affecting the Saddle River, and only seek to hold Defendant liable for spills occurring *after* those identified in the 2006 Consent Order (i.e., after December 16, 2005).  SAC ¶¶ 28-41; Pls.' Opening Br. 1-17; Pls.' Opp. Br. 15.

### viii.   Sewage Spills from December 16, 2005 – 2011

In total, based upon a table prepared by their expert, Plaintiffs argue that Defendant discharged sewage in close proximity to, if not directly into, the Saddle River on at least 33 occasions[23] between 2006 and 2011.  Pls.' Opening Br. 1; Pls.' Ex. III (Table 1).  However, as Plaintiffs' expert himself notes, not all of those spills necessarily "affected," i.e., discharged into,

---

[23] Specifically, on:  8/28/2006; 11/6/2006; 11/8/2006; 3/2/2007; 4/15/2007 – 4/18/2007; 5/6/2007; 10/12/2007 (two spills); 11/28/2007; 12/23/2007; 3/5/2008 (two spills); 5/28/2008; 9/8/2008; 11/15/2008; 4/26/2009; 5/20/2009; 10/25/2009; 1/12/2010; 2/17/2010; 3/14/2010; 3/29/2010; 4/2/2010; 3/11/2011; 4/23/2011; 7/28/2011; 8/29/2011; 9/8/2011 (two spills); 11/2/2011; and 12/29/2011.  *See* Pls.' Ex. III (Table 1); Pls.' Br. at 12-17; Pls.' Am. 56.1 Stmt. ¶ 204.

the Saddle River.  Pls.' Ex. III (Table 1); Pls.' Ex. Y (Lindsay Dep. 56:16 – 58:6).[24]  Plaintiffs'

briefing identifies approximately eighteen spills that actually affected the Saddle River and its

tributaries.  Pls.' Opening Br. 12-17.  Of those eighteen spills, Defendant does not dispute that

after December 16, 2005, it discharged sewage into the Saddle River and its tributaries on the

following twelve dates:

- **11/21/2006:**  Manhole 10118 discharged approximately 1,500 gallons of sewage into a
  tributary of the Saddle River.  Def.'s Resp. Pls.' 56.1 Stmt. ¶ 187.[25]

- **3/2/2007:**  A sewage overflow from Manholes 10171 and 10172, due to the failure of the
  Saddle River Pump Station, caused a portion of sewage to overflow into the Saddle
  River.  *Id.* ¶ 196 (Defendant only disputes spill quantity).

- **4/15/2007:**  Manhole 10180 released approximately 12,000 gallons of sewage, which
  drained into a tributary of the Saddle River.  *Id.* ¶ 192.

- **4/16/2007:**  Manholes 10172 and 10174 released approximately 390,000 gallons of
  sewage, which ponded in the area and drained into the Saddle River.  *Id.* ¶ 191
  (Defendant only disputes spill quantity).

---

[24] Plaintiffs purport to base their claim of 33 spills on "Table 1" to their expert's supplemental report.  Pls.' Opening Br. 12-17; Pls.' Ex. III.  Mr. Lindsay, Plaintiffs' expert, testified that Table 1 (Pls.' Ex. III) includes some spills that only went to the soil, and did not reach the river, and that he "did [not] analyze them for impacts on the stream, but … just made the list as complete as [he] could."  Pls.' Ex. Y (Lindsay Dep. 57:11 – 57:21).  Mr. Lindsay further stated that he "did not give opinions" on such spills, and only "gave opinions on two specific spills that reached the river," those on April 26, 2009 and January 12, 2010.  *Id.* at 57:22 – 58:6.

[25] With respect to this spill, in their Amended Rule 56.1 Statement (¶ 187) Plaintiffs cite page PLDW000060 of their Exhibit MM, a letter dated *November 21, 2006* from Mr. Yetter to Ms. Philipps, re:  "Sewage Spill – Twin Lakes Rd., Twin Lakes Pump station, *November 6, 2006.*"  *Id.* (emphasis added).  The letter makes clear that the actual event date for this spill was November 6, 2006 and not November 21, 2006, the date of the report.  Nonetheless, Defendant did not dispute Plaintiffs' statement that "[O]n November 21, 2006, an estimated 1,500 gallons was discharged from Manhole 10118 into a tributary of the Saddle River."  *See* Def.'s Resp. Pls.' 56.1 Stmt. ¶ 187.

- **10/12/2007:**  The Saddle River Pump Station failed and Manholes 10171 and 10172 released 500-1,000 gallons of sewage, which flowed into the Saddle River.  *Id.* ¶ 195 (Defendant only disputes spill quantity).

- **11/28/2007:**  An estimated 3,000 gallons of sewage overflowed from Manhole 10118 and drained into a tributary of the Saddle River.  *Id.* ¶ 194.

- **12/23/2007:**  Approximately 800 gallons of sewage overflowed from Manholes 10171 and 10172 in the vicinity of the Swim Club, and a portion of the sewage flowed to the Saddle River.  *Id.* ¶ 190.

- **3/5/2008:**  Approximately 3,000 gallons of sewage overflowed from Manholes 10171, 10172 and 10174, a portion of which flowed into the Saddle River.  *Id.* ¶ 197.

- **4/26/2009:**  Defendant admitted to a sewage overflow of 78,000 gallons from Manholes 10171 and 10172 at the Saddle River Pump Station, and Manhole 10434 on Ramapo Lane, through the 2012 Consent Order.  2012 Consent Order ¶ 5c.  A portion of this sewage was released into the Saddle River.  Def.'s Resp. Pls.' 56.1 Stmt. ¶ 199 (Defendant only disputes spill quantity).

- **3/14/2010:**  Manholes 10172, 10174 and 104346 overflowed and drained into the Saddle River.  *Id.* ¶ 201.

- **3/29/2010:**  Manholes 10172, 10174 and 10436 were found overflowing, and the overflow drained into a tributary of the Saddle River.  *Id.* ¶ 204.

- **4/1/2010:**  An overflow at the Twin Lakes Pump Station discharged 50,000 gallons of sewage into a tributary of the Saddle River.  *Id.* ¶ 206 (Defendant disputes volume); 2012 Consent Order ¶ 5k (admitting overflow into navigable waters).

Beyond the events admitted by Defendant above, according to Plaintiffs, the six additional dates on which Defendant's sewage spills "affected" the Saddle River are: 11/6/2006; 11/8/2006; 4/17 – 4/18/2007; 9/8/2008; 1/12/2010; and 2/17/2010. Pls.' Opening Br. 12-17.

The issue now before the Court is to what extent Defendant can be held liable for its sewage spills through a citizen suit brought under the Clean Water Act and state common law.

## II. Legal Standard on Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)) (internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported

assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14,

18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some

metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.

2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))

(internal quotation marks omitted).  To defeat a motion for summary judgment, "the non-moving

party must set forth significant, probative evidence on which a reasonable fact-finder could

decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477

U.S. 242, 256-57 (1986)).

 The same legal standard applies when analyzing cross-motions for summary judgment.

*See Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (quoting *Aviall, Inc. v. Ryder

Sys., Inc.*, 913 F. Supp. 826, 828 (S.D.N.Y. 1996)).  "[E]ach party's motion must be examined on

its own merits, and in each case all reasonable inferences must be drawn against the party whose

motion is under consideration."  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir.

2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).  The Court is

not required to grant summary judgment in favor of either moving party.  *See id.* (citing

*Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

### III. The Parties' Cross-Motions for Summary Judgment on Plaintiffs' Claims

#### A.  Continuing Violations Under the Clean Water Act (First Claim)

 Plaintiffs assert that the Court should grant summary judgment in their favor, and hold

Defendant strictly liable for violating the Clean Water Act, because they have proven that,

notwithstanding the entry of the 2006 Consent Order, Defendant repeatedly discharged—and

will likely continue to discharge—raw sewage wastewater into the Saddle River.  In support of

their motion, Plaintiffs offer several forms of evidence, including Defendant's internal spill

reports, correspondence with the DEC, DEC database records, photographs, testimony, and their expert's report.  Pls.' Opening Br. 1-2, 24; *see generally* Pls.' Am. 56.1 Stmt.

Defendant cross-moves for summary judgment on the grounds that Plaintiffs have failed to satisfy the constitutional and statutory requisites of their Clean Water Act claim.  Specifically, Defendant argues:  (1) Plaintiffs lack Article III standing; (2) Plaintiffs cannot prove that Defendant committed "ongoing violations" of the Clean Water Act at the time this suit was filed, as required by the Supreme Court's decision in *Gwaltney*; (3) the state's diligent prosecution of the 2006 Consent Order bars Plaintiffs' citizen suit, pursuant to § 1319(g)(6)(A)(ii) of the Clean Water Act; and (4) Defendant's compliance with the 2006 Consent Order, and improvements to its System, moot this action entirely.  Def.'s Opening Br. 1-2; Def.'s Opp. Br. 1-2.

The Court will address each of Defendant's arguments in turn, then evaluate whether Plaintiffs have adduced sufficient evidence to support a finding of liability.

## 1.  Constitutional Standing

### i.  Legal Standard

"Constitutional standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'"  *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  In order to show standing under Article III of the U.S. Constitution, a plaintiff has the burden of proving:  (1) "injury in fact," (2) a causal relationship between the injury and the challenged conduct, and (3) "it is likely, as opposed to merely speculative," that the injury will be redressed by a favorable decision.  *Laidlaw*, 528 U.S. at 180-81 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  At the summary judgment phase, the plaintiff must provide specific facts in support of its allegations, and then ultimately, it must prove them at trial.  *Lujan*, 504 U.S. at 561.

As a general matter, there is a low bar for standing in the context of Clean Water Act litigation:  "the issue is whether [the] plaintiff has established the 'identifiable trifle' of an injury that either has or will imminently occur as a result of the conduct."  *Mancuso v. Consol. Edison Co. of New York*, 130 F. Supp. 2d 584, 590 (S.D.N.Y. 2001), *aff'd sub nom.*, *Mancuso v. Consol. Edison Co. of New York, Inc.*, 25 F. App'x 12 (2d Cir. 2002) ("Every appellate court that has considered standing under the [Clean Water Act] has adopted a low threshold of entry.") (collecting cases).

### ii.  Discussion

#### a.  Injury

Defendant argues that Plaintiffs have failed to establish an injury-in-fact because they have not offered any evidence of persistent harm to the Saddle River resulting from the alleged violations.  Def.'s Opp. Br. 6-9.  This argument misses the mark.

Supreme Court precedent firmly establishes that, in the context of an environmental suit, "[t]he relevant showing for purposes of Article III standing…is not injury to the environment but *injury to the plaintiff*."  *Laidlaw*, 528 U.S. at 181 (emphasis added).  Requiring proof of damage to the environment would "raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit."  *Id.*

Plaintiffs adequately allege injury under the Act when they (1) use the allegedly affected area and (2) are persons "for whom the aesthetic and recreational values of the area will be lessened" as a result of permit violations.  *Id.* at 182 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *Riverkeeper*, 675 F. Supp. 2d at 350-51.  Allegations that a river looks and smells polluted, as well as allegations that plaintiffs affirmatively refrain from recreational

27

activities such as fishing, bird watching, camping, hiking, swimming, and picnicking because of a defendant's discharges, sufficiently establish Article III standing. *Laidlaw*, 528 U.S. at 181-82.

Here, the aesthetic injuries claimed by each of the Individual Plaintiffs—that the waters of the Saddle River have become murky and smell of sewage, as well as the adverse impact on the frequency and manner in which Plaintiffs use the Saddle River for recreational purposes— amply satisfy the injury-in-fact requirement. *Mancuso*, 130 F. Supp. 2d at 590-91 ("[W]here there is a direct nexus between the plaintiff and allegedly polluted area, no circuit has required scientific proof of contamination at the summary judgment stage."). A reasonable juror would be entitled to credit the testimony of Plaintiff Ostrom regarding the Saddle River's consistently "foul odors" and his observation of excrement in the river flowing through his backyard. Pls.' Ex. R (Ostrom Dep. 31:14 – 32:18). Likewise, a juror might credit the testimony of Plaintiff MacDonald regarding two occasions in 2008 and 2009 during which a dark, mucky rush of water appeared in the brook in her backyard. Pls.' Ex. S (MacDonald Dep. 23:1 – 31:23). Plaintiffs have presented additional evidence of sewage overflows negatively affecting the Swim Club and Lions Park, recreational centers that they patronize. Pls.' Ex. QQ (Mar. 5, 2008 images); Pls.' Ex. P (Florio Dep. 21:11 – 22:2); Pls.' Am. 56.1 Stmt. ¶¶ 102-103, 105.

Thus, the Court finds that Plaintiffs have adduced sufficient evidence of injury-in-fact to defeat summary judgment. *Laidlaw*, 528 U.S. at 181-82; *Mancuso*, 130 F. Supp. 2d at 590-91.

### b.  Causation

Plaintiffs assert, and the Court agrees, that they have also adequately established a causal relationship between their injury and the challenged conduct. Pls.' Opp. Br. 5. "The threshold requirement of 'traceability does not mean that plaintiffs must show to a scientific certainty that defendant's effluent … caused the precise harm suffered by the plaintiffs in order to establish

standing." *Riverkeeper*, 675 F. Supp. 2d at 351 (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) (*en banc*)).  Proof of a causal link merely requires a showing that "a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern."  *Id.*  Defendant admits, through myriad internal reports and letters, to spilling sewage—an undeniable pollutant—in the Saddle River and its tributaries.  *See* Section I.B. ("Factual Background"), *supra*; Pls.' Exs. NN, OO, TT, VV (Spills Files).  Given that the injuries articulated by Plaintiffs include harm caused by sewage overflowing about their community and in close proximity to their property, Plaintiffs have satisfied the causality element of standing.  *Mancuso*, 130 F. Supp. 2d at 593.

### c. Redressability

Defendant most vigorously attacks Plaintiffs' Article III standing on what it claims are "redressability" grounds, arguing that, "well prior to the filing of Plaintiffs' complaint," the 2006 Consent Order created an adequate remedy for the violations that they complain of.  Def.'s Opening Br. 12; Def.'s Opp. Br. 4.  Defendant argues that the standard for evaluating mootness in Clean Water Act cases should apply with equal force to the Court's assessment of redressability, as mootness is just "the doctrine of standing set in a time frame."  Def.'s Opening Br. 16-17 (citing *Arizonans for Off'l English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)).

While Defendant seeks to collapse the two inquiries, mootness and redressability are not synonymous; Defendant's arguments address the former, not the latter concept.  Redressability queries whether judicial action can abate or prevent the harm that the defendant allegedly caused or is causing.  *Laidlaw*, 528 U.S. at 185-86.  As it is a standing requirement, the plaintiff bears the burden of proving redressability, and it is evaluated based upon the state of affairs on the filing date of the complaint.  *Id.* at 190-91; *accord Riverkeeper*, 675 F. Supp. 2d at 352.  The

standards with respect to establishing standing and establishing mootness crucially differ, however, and the Court will therefore separately analyze the facts relative to each. *Laidlaw*, 528 U.S. at 181, 189 (the plaintiff has the burden of proving standing while the party asserting mootness shoulders the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again" (citation and internal alteration omitted)).[26]

To demonstrate that an environmental injury can be redressed through judicial action, "[p]laintiffs need not show that [a] waterway will be returned to pristine condition." *Pub. Int. Res. Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 73 (3d Cir. 1990). Rather, as discussed *infra*, they must show that violations of the Act were "ongoing" or likely to continue as of the date on which they filed their suit. *Atl. States Legal Found., Inc. v. Pan Am. Tanning Corp.*, 993 F.2d 1017, 1019-20 (2d Cir. 1993); *see also Laidlaw*, 528 U.S. at 190 ("[I]n a lawsuit brought to force compliance, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue."). The Clean Water Act provides that a civil action premised on "any violation" of its standards may seek "appropriate relief, including a permanent or temporary injunction." 33 U.S.C. § 1319(b). Moreover, despite the fact that civil penalties are paid to the U.S. Treasury and not to plaintiffs, their deterrent effect affords redress to those injured or

---

[26] Moreover, in *Laidlaw*, the Supreme Court explicitly rejected Defendant's proposed approach as not comprehensive:

> [I]f mootness were simply "standing set in a time frame," the exception to mootness for acts that are "capable of repetition, yet evading review" could not exist. Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum. Standing doctrine ensures, among other things, that the resources of the federal courts are devoted to disputes in which the parties have a concrete stake. Yet by the time mootness is an issue, abandonment of the case may prove more wasteful than frugal. Courts have no license to retain jurisdiction over cases in which one or both of the parties plainly lacks a continuing interest, but the foregoing examples highlight an important difference between the two doctrines.

528 U.S. at 170-71 (internal citations omitted).

threatened with injury as a consequence of a polluter's ongoing unlawful conduct, and thereby benefits the public interest.  *Laidlaw*, 528 U.S. at 186; *Riverkeeper*, 675 F. Supp. 2d at 352.

Here, setting aside the question of mootness, the Court finds that, as of January 5, 2007, the date on which Plaintiffs filed this action, the requested judicial remedies—civil penalties, injunctive and declaratory relief—could provide redress for Plaintiffs' injuries, given that, as detailed *infra*, Defendant violated the terms of its SPDES Permit immediately prior to, as well as soon after, Plaintiffs initiated the suit.  *See* Def.'s Resp. Pls.' 56.1 Stmt. ¶¶ 187, 191-92, 196 (Defendant does not dispute spilling sewage into the Saddle River in November 2006, March 2007 and April 2007).  Additionally, even assuming, as Defendant claims, that the DEC was diligently prosecuting the 2006 Consent Order at the time Plaintiffs filed this action, "diligent prosecution" is not a jurisdictional requirement, and therefore cannot deprive Plaintiffs of Article III standing.  *See, e.g.*, *Louisiana Envtl. Action Network v. City of Baton Rouge*, 677 F.3d 737, 749 (5th Cir. 2012) ("No Supreme Court cases have determined that the 'diligent prosecution' provision of the [Act], or any similar provision in other environmental statutes, is jurisdictional.").  In any event, the state's diligent prosecution would not render Plaintiffs' request for judicial action meaningless because diligent prosecution can only bar a citizen-suit for civil penalties, not injunctive relief.  *See, e.g.*, *Orange Env't, Inc. v. Cnty. of Orange*, 860 F. Supp. 1003, 1018 (S.D.N.Y. 1994).

The Court therefore DENIES Defendant's motion for summary judgment with respect to Article III standing.

## 2. Statutory Standing

### i. Ongoing Violations—Standing Under *Gwaltney*

#### a. Legal Standard

In *Gwaltney of Smithfield, Inc. v. Chesapeake Bay Foundation, Inc.*, the Supreme Court held that, in light of its prospective purpose and language, section 505(a) of the Clean Water Act does not confer federal jurisdiction over a citizen suit premised on "wholly past violations." 484 U.S. at 64. Rather, to obtain standing, citizen-plaintiffs must allege—and ultimately prove—that the defendant's violation was "continuous or intermittent" at the time when they filed their suit. *Pan. Am. Tanning Corp.*, 993 F.2d at 1019. Because courts assess the existence of a continuing violation based upon the filing date of the complaint, *Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co.*, 989 F.2d 1305, 1311 (2d Cir. 1993), *Gwaltney* does not bar citizen suits where, after the commencement of the lawsuit, the defendant eliminates the source of its pollutants; the relevant question remains whether the citizen-plaintiff can establish ongoing violations at the time of the filing of the complaint. *Hudson River Fishermen's Ass'n v. Westchester Cnty.*, 686 F. Supp. 1044, 1051 (S.D.N.Y. 1988); *HVFG*, 2010 WL 1837785, at *6.

Though *Gwaltney* did not precisely identify the point at which a violation "ceases to be ongoing and becomes 'wholly past,'" *Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 120-21 (E.D.N.Y. 2001), precedent in this Circuit establishes that a plaintiff can prove "ongoing violations" through evidence of violations at the time of, or predating, the filing of the complaint combined with evidence of post-complaint violations. *HVFG*, 2010 WL 1837785, at *6. At summary judgment, "[d]oubts with respect to whether the allegations of continuing violations are a sham are resolved in favor of the citizen-plaintiff," and the defendant carries the burden of "demonstrating that there are no genuine material factual disputes and that it is entitled to

judgment as a matter of law." *Connecticut Coastal*, 989 F.2d at 1311. The plaintiff need only offer evidence from which a reasonable juror could find "a likelihood of continuing violations."[27]

### b. Discussion

Defendant asserts that Plaintiffs' First Claim fails because they have neither adequately alleged nor substantiated their accusations of Defendant's ongoing violations of the Act. Def.'s Opp. Br. 2-3. Defendant argues that Plaintiffs exclusively premise this suit on "wholly past" violations, as they have not provided any admissible evidence showing that any of the alleged sewage spills reached the Saddle River after they filed the SAC. Def.'s Reply Br. 1.

As a threshold matter, the parties dispute whether the reference date for assessing statutory standing is May 17, 2010—the date on which Plaintiffs filed the SAC (Defendant's position)—or January 5, 2007, the date on which Plaintiffs filed the initial complaint (Plaintiffs' position). Pls.' Reply Br. 1. Defendant does not cite any authority in support of its position. Def.'s Opp. Br. 3; Def.'s Reply Br. 1-2.[28] Plaintiffs argue, based upon the Second Circuit's decision in *Building and Construction Trades Council of Buffalo, New York v. Downtown*

---

[27] *Compare Foti v. City of Jamestown Bd. of Pub. Utilities*, No. 10 Civ. 575 (RJA) (HBS), 2011 WL 4915743, at *14-*15 (W.D.N.Y. Aug. 15, 2011) *report and rec. adopted*, 2011 WL 4915739 (W.D.N.Y. Oct. 17, 2011) (finding genuine issue of material fact with respect to "likelihood of continuing violations" where the court identified two equally plausible explanations for the cessation of defendant's sewage spills: (1) an unexpected lack of heavy rainfall and (2) defendant's efforts to repair manhole covers) *and Atl. States Legal Found., Inc. v. Hamelin*, 182 F. Supp. 2d 235, 248 (N.D.N.Y. 2001) (denying defendant's motion for summary judgment where plaintiff argued that an "unpermitted discharge of dredged or filled materials into wetlands is a continuing violation of the [Clean Water Act] for as long as the fill remains") *with Connecticut Coastal*, 989 F.2d at 1312 (holding, in suit where complaint did not even allege ongoing violations, that "no fair-minded juror" could find a likelihood of continuing violations because defendant presented evidence that it ceased violations prior to the complaint date, and ultimately dismantled the sources of pollution) *and George v. Reisdorf Bros., Inc.*, 696 F. Supp. 2d 333, 341 (W.D.N.Y. 2010), *aff'd*, 410 F. App'x 382 (2d Cir. 2011) (continued presence of oil, caused by discharge years prior to complaint, did not constitute an ongoing violation, absent evidence that discharges would be likely to continue).

[28] With respect to an argument relating to the applicable statute of limitations period, Defendant argues that the May 17, 2010 filing date of the amended complaint, not the January 5, 2007 filing date of the initial complaint, is the appropriate date to use because of the Court's November 27, 2007 "dismissal on the merits, without prejudice" of the initial complaint. Def.'s Opp. Br. 7 n.2. However, Defendant does not explicitly make this argument with respect to the applicable timeframe for evaluating "ongoing violations" under *Gwaltney*.

*Development, Inc.*, that the SAC relates back to the filing date of the original complaint.  Pls.'

Reply Br. 1 (citing *Blg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d

138, 151 (2d Cir. 2006)).

Plaintiffs have the right of it.  The Court finds that the SAC relates back to the initial

complaint.  Under Rule 15(c) of the Federal Rules of Civil Procedure, "[a]n amendment of a

pleading relates back to the date of the original pleading when ... the claim or defense asserted in

the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted

to be set forth in the original pleading."  Fed. R. Civ. P. 15(c)(2).  Here, the original complaint

alleged violations of the Clean Water Act premised on unauthorized discharge of pollutants in

violation of Defendant's SPDES permit, and the SAC repeats those allegations verbatim.

*Compare* Compl. ¶ 26 *and* SAC ¶ 34.  Thus, to establish standing, Plaintiffs must show that

Defendant's violations continued after January 5, 2007 or "present proof from which a trier of

fact could find a continuing likelihood that violations would recur."  *Connecticut Coastal*, 989

F.2d at 1311; *Bldg. & Constr. Trades Council*, 448 F.3d at 151 (citing *Laidlaw*, 528 U.S. at 175

(citing *Gwaltney*, 484 U.S. at 56-63)).

The Court finds that Plaintiffs have met their burden.  Noncompliance with an SPDES

Permit translates into a violation of the Act itself.  *HVFG*, 2010 WL 1837785, at *10-*11.  It is

beyond cavil that the 2006 Consent Order establishes that Defendant spilled sewage, in violation

of the terms of its SPDES Permit, on at least forty dates from 2003 to 2005.  *See* 2006 Consent

Order.  At her deposition, Ms. Philipps testified that Defendant continued to spill sewage into

areas affecting the Saddle River after the entry of the 2006 Consent Order, but that the DEC did

not issue violations for such spills.  Pls.' Ex. U (Philipps Dep. 220:1 – 223:2).  Moreover, it is

undisputed that Defendant's SPDES permit does not authorize it to discharge wastewater into the

Saddle River under any circumstances.   Yet, Defendant concedes that it discharged sewage *into the Saddle River* on twelve occasions after the entry of the 2006 Consent Order,[29] including on several occasions immediately after the filing of the complaint in January 2007.  Def.'s Resp. Pls.' 56.1 Stmt. ¶¶ 187, 190-92.[30]

While Defendant contests Plaintiffs' proof of the *amount* of certain spills that reached the Saddle River, the volume is irrelevant to determining liability because Defendant's SPDES Permit only allows Defendant to discharge waste water into the *Hudson River*.  Even a minimal spill constitutes a permit violation where, as here, the discharge permit does not authorize *any* discharge into the waterway at issue.  *Connecticut Fund for Env't, Inc. v. Upjohn Co.*, 660 F. Supp. 1397, 1418 (D. Conn. 1987) (because the Act "does not distinguish between small discharges and large discharges," even proof that defendant "discharged only a de minimus amount of wastewater into the river" can constitute a violation); *HVFG*, 2010 WL 1837785, at

---

[29] Technically, discharges of waste water from any point sources other than the Orangeburg plant violate the terms of Defendant's SPDES Permit.  Def.'s Resp. Pls.' 56.1 Stmt. ¶ 233.  Here, however, the Court discerns no reason to enforce Defendant's permit violations aside from those spills that have actually reached the Saddle River and its tributaries.  Indeed, "[b]ecause the Act requires NPDES permits *only* when there is an addition of a pollutant "to navigable waters," imposing liability for discharges that fail to reach navigable waters would counter the spirit of the Act.  *S. Florida Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 106 (2004) (emphasis added); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) (district court had discretion to refuse to grant preliminary injunctive relief for procedural or technical violations of the Act); *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 165 (S.D.N.Y. 2010), *aff'd in part, appeal dismissed in part*, 406 F. App'x 557 (2d Cir. 2011) ("the objective of the … [Act] is to 'restore and maintain the chemical, physical and biological integrity of the Nation's waters,' not to maintain 'the integrity of the permit process.'" (citing *Romero-Barcelo*, 456 U.S. at 320)).

[30] Defendant's internal "spill" reports detail myriad sanitary sewage overflows affecting the Saddle River, including many post-dating January 5, 2007.  For example, a letter dated April 23, 2007, from Mr. Yetter to Ms. Philipps, states that, after some particularly heavy April showers, a manhole in the Village of Airmont overflowed on April 15, 2007, and two manholes at the Saddle River Pump Station overflowed on April 16, 2007.  Mr. Yetter further stated that these overflows drained into the Saddle River and one of its tributaries.  Pls.' Ex. NN at PLDW000121 ("[B]ecause the inflow to this station was greater than [its] capacity … overflows continued, ponded in the area[,] and drained into the Saddle River").  Mr. Yetter estimated the volume of the April 15 sewage spill as 12,000 gallons, whereas "more than *390,000* gallons of dilute sewage may have been released" on April 16.  *Id.* (emphasis added).  Another letter dated December 26, 2007, again from Mr. Yetter to Ms. Philipps, details how, after rain and snowmelt on December 23, 2007, and due to "[e]xcessive rag [and] debris buildup in both operable pumps," 800 gallons of sewage affected the Saddle River and overflowed into the vicinity of the Saddle River Swim Club.  *Id.* at PLDW000117-18.  Moving forward in time, a March 26, 2010 letter from Mr. Yetter to Ms. Philipps identifies a sewage overflow that drained into a tributary of the Saddle River on March 14, 2010, after rainfall onto frozen ground.  Pls.' Ex. VV at PLDW000224.

*7 n.15 (specific number of violations does not impact liability); *Connecticut Fund for Env't v. Stewart-Warner Corp., Bassick Div.*, 631 F. Supp. 1286, 1288 (D. Conn. 1986) ("technical" permit violations are violations nonetheless).  Indeed, in her deposition, Ms. Philipps conceded that all discharges into the Saddle River violate the terms of Defendant's SPDES permit.  Def.'s Resp. Pls.' 56.1 Stmt. ¶ 35; Pls.' Ex. U (Philipps Dep. 177:1 – 177:6).  Thus, Plaintiffs have adduced sufficient evidence of "ongoing violations" occurring at the time they filed this action and during the years thereafter.

Accordingly, the Court DENIES Defendant's motion for summary judgment to the extent that it is based on an argument that Plaintiffs have failed to demonstrate "ongoing violations."

### ii.  Diligent Prosecution—Standing Under § 1319(g)(6)

#### a.  Legal Standard

The Clean Water Act precludes citizen suits for civil penalties where the EPA or state regulatory agency has (1) "commenced and is diligently prosecuting a civil or criminal action" in state or federal court; or (2) "issued a final order not subject to further judicial review and the violator has paid a penalty assessed."  33 U.S.C. § 1319(g)(6)(A)(i)-(iii); *Laidlaw*, 528 U.S. at 175.[31]  Courts assess the diligence of a state's enforcement action based upon whether it could be so categorized at the time when the citizen suit was commenced.  *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 154 (S.D.N.Y. 2010), *aff'd in part, appeal dismissed in part*, 406 F. App'x 557 (2d Cir. 2011).  Yet, § 1319(g)(6)'s limitation on citizen suits applies only to claims for *civil*

---

[31] Section 1319(g)(6) describes two situations in which its restriction of citizen suits does not apply:  (1) where the filing date of the citizen suit precedes the commencement of the state action, or (2) where the prospective plaintiff gives notice of its intent to file a citizen suit before the commencement of the state action, then files the citizen suit within 120 days after giving notice.  *See* 33 U.S.C. § 1319(g)(6)(B).  Neither exception applies here.

*penalties*, not claims for declaratory or injunctive relief.  *Id.* at 155-56; *see also HVFG*, 2010 WL 1837785, at *5 (citing *Consol. Rail Corp.*, 768 F.2d at 63).[32]

The standard for evaluating the state's diligence is "a low one," and "requires due deference to the state's plan of attack."  *Orange Env't*, 860 F. Supp. at 1017 (citizen suit precluded where polluter's "recalcitrant and cavalier" attitude, not state's willful blindness, derailed enforcement efforts); *cf. Dague v. City of Burlington*, 935 F.2d 1343, 1353 (2d Cir. 1991), *rev'd in part on other grounds*, 505 U.S. 557 (1992) (finding lack of diligent prosecution where regulator granted defendant multiple extensions for deadlines); *New York Coastal Fisherman's Ass'n v. New York City*, 772 F. Supp. 162, 168 (S.D.N.Y. 1991) (diligence absent where state "act[s] as a pen pal, not a prosecutor.").  The continuation of a violation despite the state's conduct does not disprove the state's diligence.  *New York Communities for Change v. New York City Dep't of Educ.*, No. 11 Civ. 3494 (SJ), 2012 WL 7807955, at *8 (E.D.N.Y. Aug. 29, 2012), *report and rec. adopted*, No. 11 Civ. 3494 (SJ) (CLP), 2013 WL 1232244 (E.D.N.Y. Mar. 26, 2013).  Rather, "[t]he court must presume the diligence of the State's prosecution of a defendant absent persuasive evidence that the State has engaged in a pattern of conduct in its prosecution … that could be considered dilatory, collusive or otherwise in bad faith."  *Conn. Fund for Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1293 (D. Conn. 1986) (Cabranes, J.).

---

[32] Defendant asks this Court to follow the First and Eighth Circuits in concluding that, upon a showing of diligent prosecution, 33 U.S.C. § 1319(g)(6)(A)(ii) precludes a citizen suit for both civil penalties and injunctive relief. Def.'s Opening Br. 18-20.  Second Circuit courts have explicitly rejected this reasoning.  *See Coal. for a Liveable W. Side, Inc. v. New York City Dep't of Envtl. Prot.*, 830 F. Supp. 194, 196-97 (S.D.N.Y. 1993).  In this Circuit, even if a plaintiff cannot seek civil penalties, injunctive relief remains available.  *See, e.g., Sarna*, 690 F. Supp. 2d at 155-56; *Orange Env't*, 860 F. Supp. at 1017-19.

The Court also declines Defendant's invitation to adopt the First Circuit's test for preclusion under § 1319(g)(6), which, Defendant claims, broadly queries whether the government's diligently pursued corrective action plan remedies the concerns raised by an analogous citizen's suit.  *See* Def.'s Opp. Br. 11-12 (citing *North & South Rivers Watershed Ass'n v. Town of Scituate*, 949 F.2d 552, 558 (1st Cir. 1991)).

The purpose of the Act's "diligent prosecution" bar to citizen-suits is to allow state and federal agencies to devise remedies to violations based on their expertise.  "[W]hen the Government is actively litigating a corollary enforcement effort, plaintiffs bringing citizen suits under the Act are not entitled to maintain their actions simply to secure 'personalized' relief." *Hudson River*, 686 F. Supp. at 1052.  However, "[s]uch actions are not barred … when it appears that the Government's effort does not address the factual grievances asserted by private attorneys general."  *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 777 F. Supp. 173, 184 (D. Conn. 1991), *aff'd in part, rev'd in part*, 989 F.2d 1305 (2d Cir. 1993) (citing *Hudson River*, 686 F. Supp. 1052-53); *Riverkeeper*, 675 F. Supp. 2d at 346 (finding that, where terms of a DEC Consent Order only addressed permit violations that occurred in 2004, and "neither purported to modify the SPDES Permit, nor could validly have done so," citizen suit seeking to enforce permit for years after 2004 could not be precluded).  Under circumstances where it is unclear whether the government's prosecution encompasses the citizen-plaintiffs' specific claims, "it cannot be said that the two actions are duplicative or are addressed to the same concerns."  *Hudson River*, 686 F. Supp. at 1052-53; *cf. Sarna*, 690 F. Supp. 2d at 155 (limiting plaintiffs' remedies to injunctive relief where government diligently prosecuted the exact violations complained of by plaintiffs).

**b.  Discussion**

Here, the parties dispute (1) the scope of the 2006 Consent Order and (2) whether the DEC diligently prosecuted Defendant.  According to Plaintiffs, this case "is a perfect example of the state's lack of diligence" due to the relatively small penalty assessed against Defendant, the DEC's lack of effort to secure any public participation in the 2006 Consent Order, and the slow speed of its prosecution.  Pls.' Opp. Br. 11-13.  Plaintiffs also argue that, by its terms, the 2006

Consent Order does not apply to violations that occurred after May 10, 2006 (its execution date). *Id.* at 12, 16.  Plaintiffs claim that the mere fact that the 2012 Consent Order was separately entered, and not a continuation of the 2006 Consent Order, establishes that the 2006 Consent Order did not cover future sewage spills.  *Id.* at 14-15.  Defendant counters that the DEC diligently prosecuted the 2006 Consent Order, as well as the 2012 Consent Order, and that the latter "illustrates that the DEC was satisfied that the remedial measures required by the 2006 Consent Order adequately addressed the immediate causes of those SSOs (and others throughout the System)."  Def.'s Opp. Br. 14 (emphasis removed).

The Court finds that even if the DEC diligently prosecuted the 2006 Consent Order, Plaintiffs' lawsuit would still not be precluded because Plaintiffs' claims arise from factually different grievances than those covered by the 2006 Consent Order.   *Hudson River*, 686 F. Supp. at 1052-53.  A consent decree "is to be construed ... basically as a contract."  *Calderon v. Wambua*, No. 74 Civ. 4868 (LAP), 2012 WL 1075840, at *3 (S.D.N.Y. Mar. 28, 2012) (citing *United States v. ITT Continental Baking Co.*, 420 U.S. 233, 238 (1975)); *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."). While Defendant deems narrow construction of the 2006 Consent Order a "tortured" and "unsustainable" approach (Def.'s Opp. Br. 10), careful consideration of the plain meaning of its terms compels the conclusion that it did not cover the subsequent spills that form the basis of the instant suit.  *Orange Env't*, 811 F. Supp. at 933 (assessing whether consent order precludes citizen-suit based on "the explicit language of the Compliance Order"); *see also Perez v. Danbury Hosp.*, 347 F.3d 419, 424 (2d Cir. 2003) ("A court may not replace the terms of a

consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals."  (citation omitted)).

First, "Appendix A" of the 2006 Consent Order only lists sewage spills that occurred during the years 2003 to 2005, and only includes six violations in areas affecting the Saddle River.  Pls.' Opening Br. 13 (identifying dates).  Nothing in the text of the 2006 Consent Order indicates that it exempted or intended to exempt Defendant from liability for sewage spills occurring after December 16, 2005, the date of the last violation identified in the Order (or after the date of execution of the Consent Order:  May 10, 2006).  Additionally, Ms. Philipps' deposition testimony suggests that she understood the 2006 Consent Order to target discrete events.  Specifically, she testified that discharges from unapproved locations would violate the terms of the Sewer District's SPDES Permit, which only allows "discharge from our waste water treatment plant … [b]ut I don't know that the DEC has ever, other than the [2006] Consent Order, never really issued violations for specific events."  Pls.' Ex. U. (Philipps Dep. 183:4 – 183:23).  In addition, as discussed above, the Defendant *specifically negotiated* the "cease and desist" provision out of the proposed, unsigned consent order because it knew that it would not be able to comply with a directive to prevent future violations.  Pls.' Ex. U (Philipps Dep. 359:16 – 361:25).  Indeed, Defendant's own expert characterized the remedial efforts required by the Order as directed at "the SSOs identified in the Order on Consent," and not all prospective SSOs. Gonnella Decl. Ex. 11 (Bell Rpt. at 3), Doc. 105-14.  Likewise, Defendant's Dry Weather Abatement and Engineering Reports limited their focus to the causes of, and proposed solutions for, SSOs that occurred from 2003 to 2005.  Thus, based on its terms, the Court finds that the 2006 Consent Order did not exempt violations occurring after its execution.  *Riverkeeper*, 675 F. Supp. 2d at 346; *see also HVFG*, 2010 WL 1837785, at *13 (limiting effect of consent order

based on whether its terms expressly listed the violations asserted by plaintiff, and finding that
violations not listed therein "were not contemplated, let alone resolved" by the consent order).

The Court also rejects Defendant's contention that the 2006 Consent Order bars this
action because it targeted *locations* of the sewage spills identified in Appendix A, and not just
violations by date.  Def.'s Opp. Br. 13.  Plaintiffs complain of overflows into the Saddle River
occurring from certain locations identified in the 2006 Consent Order (Manholes 10172 and
10174, and the Saddle River Pump Station), as well as locations *not* identified in the 2006
Consent Order (numerous additional manholes, the Cherry Lane Pump Station, and the Twin
Lakes Pump Station).  Thus, complete factual overlap is lacking between the locations in the
2006 Consent Order and the locations complained of by Plaintiffs.  *Hudson River*, 686 F. Supp.
at 1052-53; *see also Pan Am. Tanning*, 993 F.2d at 1021 (where settlement, entered prior to
complaint date, covered only some, but not all, violations alleged by plaintiffs, settlement did not
foreclose plaintiffs' suit).  Additionally, the 2012 Consent Order includes locations also
identified in the 2006 Consent Order (Manholes 10172, 10174 and 10434), which suggests that
the earlier consent order did not cover all future spills at the locations identified therein, or spills
during years not specifically identified therein—because if it had, there would be no need for a
new consent order regarding these locations.  *Riverkeeper*, 675 F. Supp. 2d at 346.

The Court also notes that, although the 2006 Consent Order directed Defendant to
prepare a description of its SSO abatement program for "the locations listed in Appendix A,"
2006 Consent Order at 4, Defendant's initial report did not include anything about the Saddle
River Pump Station, which was a location of one of the spills in Appendix A.  Then, months
after Plaintiffs filed this suit, and presumably in light of this suit,[33] by letter dated September 18,
2007, the DEC asked that Defendant expand the coverage of its report to also address the Saddle

---

[33] The letter describes "a lawsuit from a bordering community in NJ."

River Pump Station.  Jan. 16, 2008 Letter at 6.  To the extent that, after the filing date of the complaint, the scope of the 2006 Consent Order expanded to address the root causes of all SSOs at the Saddle River Pump Station, it could potentially moot Plaintiffs' claims arising from spills there.  Yet, it cannot serve as a basis for statutory preclusion because, at the time the complaint was filed, the 2006 Consent Order was not clearly directed at resolving the exact violations or locations complained of by Plaintiffs.

Thus, because the Court cannot confidently conclude that this suit and the DEC's prosecution of the 2006 Consent Order "are duplicative or are addressed to the same concerns," *Hudson River*, 686 F. Supp. at 1052-53, the Court DENIES Defendant's motion to the extent that it is based on 33 U.S.C. § 1319(g)(6).  Accordingly, Plaintiffs may pursue relief for violations *not* covered by the 2006 Consent Order.  *Riverkeeper*, 675 F. Supp. 2d at 346.

### 3.  Mootness

#### i.  Legal Standard

Finally, the Court returns to Defendant's assertion that the 2006 Consent Order rendered Plaintiffs' claims moot (and without redress).   "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  *Already, LLC v. Nike, Inc.*, -- U.S. --, 133 S. Ct. 721, 726, 184 L. Ed. 2d 553 (2013) (citations omitted).  Unlike redressability, mootness can be assessed based upon any timeframe.  Events subsequent to the complaint that make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" may moot a case.  *Laidlaw*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)).  The Supreme Court has stated clearly that it is the party claiming mootness that bears the "heavy burden of

persuading the court that the challenged conduct cannot reasonably be expected to start up again."  *Id.*

Defendant submits that as of the date of its execution, the 2006 Consent Order mooted Plaintiffs' claims because it forced Defendant to resolve the underlying causes of Plaintiffs' grievances.  Def.'s Opening Br. 12-18; Def.'s Reply Br. 2-3.  Defendant contends that a different standard for evaluating mootness applies to cases involving the defendant's compelled, as opposed to voluntary, cessation of challenged conduct.  Def.'s Reply Br. 2.  Citing the Fifth Circuit's decision in *Environmental Conservation Organization v. Dallas*, 529 F.3d 519, 528-29 (5th Cir. 2008), Defendant argues that where the state *compels* a defendant to stop the wrongful conduct that forms the basis of the citizen suit, the case must be dismissed as moot unless the *citizen-plaintiff* "prove[s] a realistic prospect that the wrongful behavior will continue."  Def.'s Reply Br. 2-3 (citing *Eastman Kodak*, 933 F.2d at 127).  By contrast, Defendant claims that if it *voluntarily* ceases the wrongful conduct, the *defendant* carries the burden of proving with "absolute clarity" that its wrongful conduct could not reasonably be expected to recur.  *Id.* Defendant ultimately asks this Court to adopt a rule whereby, if a defendant enters a consent decree with the state before a citizen-plaintiff files suit—and even if, at the time the complaint is filed, the defendant has not actually started to comply with the consent decree or cured its ongoing violations—the citizen-plaintiff must prove that the defendant's *future* compliance with the consent decree will not solve the problems identified in the complaint.  Def.'s Opening Br. 15-16.

Supreme Court precedent and simple logic compel this Court to reject Defendant's wayward proposal.  Courts do not shift the burden of proving mootness upon the plaintiff in the event that the defendant's theory of mootness is based on anticipated compliance with state-

ordered remedial measures.  *Laidlaw*, 528 U.S. at 189; *Pan Am. Tanning*, 993 F.2d at 1019-20; *see also Coal. for a Liveable W. Side, Inc. v. New York City Dep't of Envtl. Prot.*, 830 F. Supp. 194, 196-97 (S.D.N.Y. 1993) (where state ordered defendant to complete a remedial plan that, if executed, would eliminate plaintiff's claimed injuries, and the state's order imposed fines of $25,000 per day for failure to implement the remedial plan, the defendant asserting mootness still bore the burden of proving that its violations "could not reasonably be expected to recur").

Consent orders between polluters and enforcement agencies do not immunize polluters from citizen suits regarding future violations.  *Riverkeeper*, 675 F. Supp. 2d at 344.  In this Circuit, a citizen-suit can still be brought if, notwithstanding the settlement agreement, a "realistic prospect of continuing violations exists." *Eastman Kodak*, 933 F.2d at 127-28.

Defendant's proposed standard is particularly unsupportable in light of the Second Circuit's decision in *Pan American Tanning*.  There, the Court held that, even if the defendant comes into compliance with a consent order after the initiation of a citizen-suit, and even if there is no prospect of continuing violations, the citizen-plaintiffs' action will only be moot with respect to *injunctive* relief.  *Pan Am. Tanning*, 993 F.2d at 1019-22.  The well-reasoned basis for this rule is that "mooting an entire suit based upon post-complaint compliance would weaken the deterrent effect of the Act by diminishing the incentives for citizen plaintiffs to sue and by encouraging defendants to use dilatory tactics in litigation." *Id.* at 1021.  Indeed, such a regime would remove any incentive to refrain from polluting before the initiation and near-conclusion of a lawsuit, as, "[u]nder such a rule, a penalty suit would *always* become moot and a defendant would escape *all* liability if it could show, at any time before judgment, 'that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* at 1020 (emphasis in original).  At a minimum, then, even if Defendant can prove its assertion that it came into

complete compliance with the 2006 Consent Order by the end of 2011, or that the 2012 Consent

Order moots this claim, Plaintiffs may still bring an action for civil penalties premised on any

violations ongoing as of January 5, 2007 or occurring thereafter, through the end of 2011.

*Riverkeeper*, 675 F. Supp. 2d at 347-48.

### ii.  Discussion

The Court finds that Plaintiffs have adduced sufficient evidence that, notwithstanding the

2006 Consent Order, there remained a "realistic probability" that Defendant would continue to

violate the Act, and that Defendant has failed to prove that its violations ceased without

likelihood of recurrence.  Starting with the terms of the 2006 Consent Order itself, as discussed

*supra*, the Court finds that it only covered violations that occurred from January 2, 2003 to

December 16, 2005.  Accordingly, the 2006 Consent Order cannot moot, or provide redress, for

Plaintiffs' specific grievances, because Plaintiffs' claims arise from violations that occurred after

the entry of the 2006 Consent Order and outside of its scope.  Pls.' Opp. Br. 8; *Pan Am. Tanning*,

993 F.2d at 1021 (settlement entered prior to complaint date did not bar plaintiffs' suit where it

covered some, not all, of the violations alleged by the plaintiffs).

As additional evidence of likelihood of recurrence, Plaintiffs point to the pre-execution

draft of the 2006 Consent Order and Ms. Philipps' deposition testimony stating that the Sewer

District successfully asked the DEC to remove the cease and desist provision from the draft of

the 2006 Consent Order because it would not be able to comply with such a mandate.  Pls.' 56.1

Stmt. ¶¶ 144-47; Pls.' Ex. U (Philipps Dep. at 359:16 – 361:6); Pls.' Ex. JJ (Feb. 22, 2006

Letter).  Indeed, Defendant continued to spill sewage into the Saddle River after the 2006

Consent Order.  Def.'s Resp. Pls.' 56.1 Stmt. ¶¶ 187, 190-92, 197, 199.  If nothing else, the

discharges into waters of the State admitted to by Defendant in the 2012 Consent Order, from

some of the *same* manholes identified in the 2006 Consent Order, establish that, notwithstanding

the prior 2006 Consent Order, Defendant continued to violate the Act.  *See* 2012 Consent Order;

2006 Consent Order at Appendix A.  This evidence gives rise to an inference that the 2006

Consent Order did not foreclose the possibility of Defendant's continued violations.  *Sarna*, 690

F. Supp. 2d at 156 (past record of pollution can afford basis to project future likelihood of

pollution); *Pan Am. Tanning*, 993 F.2d at 1019-20.[34]

       While Defendant argues that it has not violated the Act since 2011, testimony from

Defendant's own witness, Mr. Yetter, belies this assertion.  As of the date of his deposition—

January 14, 2011—Mr. Yetter testified that the Sewer District's design changes to the System,

including improvements to manholes by Defendant's engineers, failed to prevent Defendant's

sanitary sewage spills.  *See* Pls.' Ex. V (Yetter Dep. 77:1 – 82:24).  Specifically, Mr. Yetter

testified that the effect of Defendant's upgrades was to divert sewage spills that used to affect the

Swim Club into the Saddle River itself.  *Id.*  Mr. Yetter also testified that spills continue during

both wet and dry weather conditions.  *Id.*  Thus, Mr. Yetter's testimony undercuts the idea that

Defendant's violations "have ceased without likelihood of recurrence."  *Coal. for a Livable W.*

*Side*, 830 F. Supp. at 198; *cf. Riverkeeper*, 675 F. Supp. 2d at 347 (no likelihood of recurrence

where defendant "produced undisputed evidence that the generating station has been shut down

and demolished").  Moreover, Ms. Philipps' testimony also indicates that the Sewer District's

pump replacements at the Saddle River Pump Station, completed in January 2008, failed to

address the problem of the SSOs there.  Pls.' Ex. U (Philipps Dep. 260:6 – 260:17, 274:17 –

274:23).  Additionally, to the extent that the "high head" conditions at the Saddle River Pump

Station described by Ms. Philipps, or "understaffing" described by Mr. Yetter, might be root or

---

[34] In reaching this conclusion, the Court does *not* base its decision on the DEC spill reports submitted by Plaintiffs that purport to document spills caused by Defendant in New York in 2012 and 2013 (Burke Aff. Exs. A-B).

contributing causes of Defendant's discharges into the Saddle River, Defendant has not proven that it has taken action to eliminate them.

As for Defendant's attempt to defend its discharges by arguing that Plaintiffs' evidence only shows that it has been "barely noncompliant for the past seven [years]" (Def.'s Opp. Br. 7), marginal noncompliance is still noncompliance. "Minimizing the significance or importance of the post-complaint discharges by characterizing them as small or isolated events does not meet defendants' burden—which the Supreme Court has said 'is a heavy one,' *Gwaltney*, 484 U.S. at 66—of proving that it is 'absolutely clear' that the discharges will not recur." *Concerned Area Residents for The Env't v. Southview Farm*, 834 F. Supp. 1410, 1416 (W.D.N.Y. 1993). Thus, the Court finds that, for the purposes of this motion, "a realistic prospect of continuing violations exists," and accordingly, Plaintiffs' claims are not moot. *Riverkeeper*, 675 F. Supp. 2d at 347 (quoting *Eastman Kodak*, 933 F.2d at 128).

Defendant's motion for summary judgment is therefore DENIED.

## B. Plaintiffs' Motion for Summary Judgment on Liability

### 1. Legal Standard

To establish liability for its Clean Water Act claims, Plaintiffs must show that Defendant (1) discharged a pollutant (2) from a point source (3) into navigable waters and (4) in violation of the terms of its SPDES Permit. 33 U.S.C. § 1311(a). Plaintiffs correctly note that each discharge of a pollutant represents a distinct violation of the Act. SAC ¶ 40; *Catskill Mountains*, 273 F.3d at 487.[35] Unpermitted discharges of pollutants are subject to civil penalties of up to $25,000 per day for each violation, on a strict liability basis. 33 U.S.C. § 1319(d); *Coal. for a Liveable W. Side*, 830 F. Supp. at 198 (the Act imposes strict liability when the undisputed facts

---

[35] For the purpose of determining civil penalties, however, "a single operational upset which leads to simultaneous violations of more than one pollutant parameter shall be treated as a single violation." 33 U.S.C. § 1319(d).

establish permit violations); *Mumford Cove Ass'n, Inc. v. Town of Groton*, 640 F. Supp. 392, 395 (D. Conn. 1986) (Cabranes, J.) ("[Co]urts have consistently held that parties are strictly liable for violations of the Clean Water Act.").

Defendant does not dispute that the Saddle River is a "water body of the United States," or that any discharge of sewage into the Saddle River constitutes a violation of its SPDES Permit. Def.'s Resp. Pls.' 56.1 Stmt. ¶¶ 35, 336. Nor can there be any doubt that pump stations and manholes that convey sanitary sewage constitute "point sources" under the Act.[36] Thus, the only issue before the Court is whether Defendant's discharges reached the Saddle River and its tributaries, and if so, on how many occasions.

Proof that a point source discharge reached navigable waters requires more than "vague references to potential surface water runoff and windblown dust." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 224 (2d Cir. 2009); *see also George v. Reisdorf Bros., Inc.*, 696 F. Supp. 2d 333, 342-44 (W.D.N.Y. 2010) (speculation by an expert that the discharge of a pollutant might have entered groundwater and flowed into a creek failed to demonstrate proof of a violation). A defendant's own discharge reporting can support a finding of strict liability on a motion for summary judgment. *HVFG*, 2010 WL 1837785, at *6; *Mumford Cove*, 640 F. Supp. at 395 n.7 (collecting cases). Eyewitness testimony and photographic evidence have also been held admissible to support a finding of liability on summary judgment. *Concerned Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 118 (2d Cir. 1994) (witnesses' observations of manure joining a stream that ultimately flowed into the Genesee River, combined with photographic evidence, admissible to establish violation).

## 2. Discussion

---

[36] *Foti*, 2011 WL 4915743, at *15; *Rapanos v. United States*, 547 U.S. 715, 743 (2006) (the Act "makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'" (citation omitted)).

The Court finds Defendant strictly liable for the sewage spills that they have not contested reached the Saddle River, as well as for sewage spills into the Saddle River that their own internal reports confirm.  To the extent that Defendant attacks Plaintiffs for failing to show any negative effects on the Saddle River resulting from its wastewater discharge (Def.'s Opp. Br. 8), the content of pollutants in the Saddle River is only relevant to remedies, not liability, under the Clean Water Act.  *Stewart-Warner Corp.*, 631 F. Supp. at 1288 (requiring a plaintiff to prove the statistical significance of violations would frustrate "[t]he legislative intent to provide 'an objective evidentiary standard' for citizens' enforcement suits.").  Thus, on the basis of Defendant's concession and internal spill reports,[37] the Court finds Defendant liable for the twelve discharges into the Saddle River and its tributaries that occurred on the following dates, as described in Section I.B. ("Factual Background"), *supra*:  11/21/2006 (Def.'s Resp. Pls.' 56.1 Stmt. ¶ 187); 3/2/2007 (*id.* ¶ 196); 4/15/2007 (*id.* ¶ 192); 4/16/2007 (*id.* ¶ 191); 10/12/2007 (*id.* ¶ 195); 11/28/2007 (*id.* ¶ 194); 12/23/2007 (*id.* ¶ 190); 3/5/2008 (*id.* ¶¶ 163, 197); 4/26/2009 (*id.* ¶ 199); 3/14/2010 (*id.* ¶ 201); 3/29/2010 (*id.* ¶ 204); 4/1/2010 (*id.* ¶ 206).

As for the additional six sewage spills identified by Plaintiffs as allegedly affecting the Saddle River during the years 2006 to 2011 (occurring on 11/6/2006; 11/8/2006; 4/17 – 4/18/2007; 9/8/2008; 1/12/2010; and 2/17/2010), Defendant's internal reports and other documentary evidence substantiate that two affected the Saddle River:  (1) an overflow from manholes 10172 and 10174 on April 17, 2007 (Pls.' Ex. NN, Letter from E. Yetter to D. Philipps, Apr. 23, 2007, at PLDW000121); and (2) an overflow from the Twin Lakes Pump

---

[37] As Defendant's own expert observed at his deposition, "[t]here is no reason" that the Sewer District "would report[] that [a spill] got to the river … something that wasn't good for them[,] if it wasn't true."  Pls.' Ex. X (Bell Dep. 57:2 – 58:2).

Station on January 12, 2010.[38]  With respect to the January 12, 2010 overflow at the Twin Lakes

Pump Station, this overflow was the subject of—and part of the impetus for—the 2012 DEC

Consent Order.  Pls.' Ex. ZZ; 2012 Consent Order ¶ 5g.  Although Mr. Yetter's report to Ms.

Philipps concerning this incident merely states that, "[a] review of the flow data supports an

estimate that 70,000 gallons *may have* been discharged into a small stream adjacent to the pump

station, a tributary of the Saddle River" (Pls.' Ex. VV at PLDW000227 (emphasis added)), a

letter from the DEC on January 19, 2010 describes that, "[o]n January 12, 2010, this office was

notified that due to a failure of all three pumps at the Twin Lakes Pump Station, a sanitary sewer

overflow of approximately 10,000 gallons of sewage was being discharged into the Saddle

River."  Pls.' Ex. ZZ.  Accordingly, as Defendant has not rebutted this evidence, the Court also

finds that this spill reached the Saddle River and thus violated the Act.

However, based on the record presented, the Court could not confirm that Defendant's

spills entered into the Saddle River or its tributaries on the remaining dates proposed by

Plaintiffs (11/8/2006; 4/18/2007; 9/8/2008; and 2/17/2010).[39]  Pls.' Opening Br. 14-17.

Accordingly, the Court DENIES summary judgment with respect to alleged violations on those

dates.

---

[38] Because the Court finds that the November 6, 2006 violation is duplicative of the "November 21, 2006" violation, additional liability is not warranted for that spill.  *See* note 37, *supra*; *see also* Pls.' Ex. MM (Letter from E. Yetter to D. Philipps, Nov. 21, 2006, at PLDW000060).

[39] As a general matter, speculative statements, such as those Plaintiffs point to in Defendant's internal records that the Saddle River "may" have been affected by certain spills, or that a certain tributary "probably" or "likely" flows into the Saddle River, cannot support findings of additional violations.  *See, e.g.*, Pls.' Am. 56.1 Stmt. ¶¶ 128, 157. The Court could not find corroboration in the record, nor did Plaintiffs clearly cite any support, for evidence that overflows affected the Saddle River on November 8, 2006 or April 18, 2007.  While Plaintiffs did not cite, and the Court also could not find, any records that matched the exact date of September 8, 2008, a spill report from Mr. Yetter for the dates September 6 and 7, 2008 describes an estimated overflow of 15,000 gallons of sewage, but only states that "[o]verflows in this area flow to the Saddle River."  Pls.' Ex. OO, at PLDW000197.  Similarly, although a spill on February 17, 2010 is identified in the 2012 Consent Order as an overflow from Manhole 10172 at the Saddle River Pump Station, into navigable waters of the State, the order does not specify *which* waters were impacted.

Finally, the Court notes that because many of the spills identified by Plaintiffs' expert in "Table 1" to his supplemental report—cited by Plaintiffs as proof of SSOs—do not even purport to have reached the Saddle River or its tributaries, Plaintiffs cannot use these entries as an additional basis on which to find Defendant liable.  Pls.' Ex. III; *Reisdorf Bros.*, 696 F. Supp. 2d at 340-42 (speculation by an expert that the discharge of a pollutant might have flowed into a creek failed to demonstrate proof of a violation); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) ("Expert opinion based on insufficient facts or data, or on unsupported suppositions is not acceptable.").[40]  Beyond that, Plaintiffs have not cited, and the Court's review of the record has not revealed, further evidence to corroborate Plaintiffs' claims.

Therefore, the Court DENIES Defendant's motion for summary judgment with respect to Plaintiffs' First Claim, and GRANTS Plaintiffs' motion for summary judgment on liability for their First Claim, but only to the extent outlined above, i.e., Plaintiffs have proven that Defendant violated the Clean Water Act by discharging sewage into the Saddle River (or its tributaries) fourteen times, on the following dates:  11/21/2006 (actually, 11/6/2006); 3/2/2007; 4/15/2007; 4/16/2007; 4/17/2007; 10/12/2007; 11/28/2007; 12/23/2007; 3/5/2008; 4/26/2009; 1/12/2010; 3/14/2010; 3/29/2010; and 4/1/2010.  For the five spills covered by the 2012 Consent Order (4/26/2009; 1/12/2010; 3/14/2010; 3/29/2010; and 4/1/2010), Plaintiffs' relief is limited to civil penalties.  *Pan Am. Tanning*, 993 F.2d at 1019-21.

### 3.  Remedies

---

[40] In support of the instant motion, Plaintiffs' expert also submitted records obtained via the DEC database which purport to document sewage spills by Defendant in 2013.  Burke Aff. Exs. A-B.  Defendant objects to the admissibility of these documents because they (1) do not contain any expert opinions (2) were compiled by Mr. Lindsay after the close of discovery and (3) contain unauthenticated DEC spill records, which are hearsay.  Def.'s Reply Br. 1 n.1.  These documents were not produced during discovery.  Even if the Court admitted these unauthenticated records (Burke Aff. Exs. A-B), on their face, they do not document spills into the Saddle River or its tributaries.

The Act authorizes both civil penalties and injunctive relief.  The Supreme Court has recognized that, where sufficient injury to the environment has been demonstrated, injunctive relief is the favored remedy.  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).  In the context of environmental litigation as elsewhere, the salient inquiry is whether "the intervention of a court of equity 'is essential in order effectually to protect … against injuries otherwise irremediable.'"  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted).  However, plaintiffs cannot obtain injunctive relief merely because the Court has made a finding of liability under the Clean Water Act.  Rather, they must still establish irreparable harm.  *HVFG*, 2010 WL 1837785, at *14 (citations omitted); *Town of Huntington v. Marsh*, 884 F.2d 648, 654 (2d Cir. 1989) (plaintiffs bear burden of proving irreparable injury).

Moreover, as between injunctive relief and civil penalties, "the district court has discretion to determine which form of relief is best suited, in the particular case, to abate current violations and deter future ones."  *Laidlaw*, 528 U.S. at 192; *see also Catskill Mountains*, 451 F.3d at 87.  In cases where the defendant has voluntarily come into compliance with permit requirements, a court might decline to issue injunctive relief but nonetheless impose civil penalties to advance the Act's deterrence goals and compensate for past harm to the environment.  *Laidlaw*, 528 U.S. at 192-93; *cf. HVFG*, 2010 WL 1837785, at *14 (issuing injunctive relief, but declining to impose civil penalties, where the court found that the defendant made good-faith attempts to comply with permit requirements and had already paid a significant amount of past penalties levied by the DEC).

Here, Plaintiffs seek several forms of equitable and monetary relief.  Plaintiffs do not seek a specific amount of civil penalties, but propose imposition of "escalating stipulated penalties for future violations."  Pls.' Opp. Br. 7.  Plaintiffs also argue that the Court should enjoin Defendant from "all wet weather spills from 2005 to the present, and all dry weather spills from 2005 to April 2009, then from April 3, 2009 to the present."  *Id.* at 15.  Without stating more specifically what kind of injunctive relief they desire, in their reply brief, they assert that "broader injunctive relief" is appropriate in this case because Defendant's release of thousands of gallons of sewage into "the [N]ation's waterways" presents a "substantial danger to the environment."  Pls.' Reply Br. 7-8 (citing *Marsh*, 884 F.2d at 653; *NRDC v. Callaway*, 524 F.2d 79 (2d Cir. 1975)).

Defendant argues that the Court should not grant either injunctive relief or civil penalties because Plaintiffs have failed to prove that they face any irreparable harm.  The relevant showing of harm required for injunctive relief, Defendants claim, is whether the waste water discharged into the Saddle River had any lasting negative effects.  Def.'s Opp. Br. 6-8.

With respect to proof of harm, Plaintiffs present their own testimony (i.e., regarding the smells of sewage at Lions Park and in Mr. Ostrom's backyard) and photographs (i.e., of past spills at the Swim Club), as well as expert testimony regarding the effect of sewage spills on the Saddle River.  Plaintiffs' expert concludes that the "low stream flow" in the Saddle River exacerbates the pollution effect of sewage spills, and estimates that an "average" SSO discharge would cause 200 times the current base-line level and "almost 500 times the NJ DEP standard" level of fecal coliform, an "indicator organism" of pollution.[41]  Gonnella Decl. Ex. 11 (Bell Rpt.

---

[41] Mr. Bell—Defendant's expert—correctly notes that Mr. Lindsay—Plaintiffs' expert—conflated the New Jersey DEP standard, which measures E. Coli levels, with the New York standard, which uses fecal coliform, to assess pollutant levels in his initial report; Mr. Lindsay countered that both metrics measure indicator organisms of pollution and under either standard, "the reported SSOs exceeded stream standards."  Pls.' Ex. III (Lindsay Supp.

at 14); Pls.' Ex. III (Lindsay Supp. Rpt. ¶ 8).  Defendant's expert claims that Plaintiffs' expert's

conclusion is flawed because his calculations fail to account for sewage dilution, are based on

volumes of sewage that the record does not support, and improperly use an estimated SSO

duration of three hours.  Gonnella Decl. Ex. 11 (Bell Rpt. at 12).  Defendant's expert also claims

that the Saddle River's flow velocities are such that "it is unlikely that any suspended

material/organic material settled out to form sludge banks … during SSO events."  *Id.* at 15.

Defendant's expert attacks the Lindsay Report on many additional grounds, and opines that the

portion of the Saddle River in Upper Saddle River is only impaired as to the parameter for

temperature, but that sewage spills are not a cause of this impairment.  *Id.* at 12.

### i.   Civil Penalties

Defendant faces a maximum penalty of $25,000 per day for each of its violations of the

Clean Water Act.  33 U.S.C. § 1319(d).  In determining the appropriate amount of a civil

penalty, the Act obligates courts to consider the following factors:  "the seriousness of the

violation or violations, the economic benefit (if any) resulting from the violation, any history of

such violations, any good-faith efforts to comply with the applicable requirements, the economic

impact of the penalty on the violator, and such other matters as justice may require."  *Id.*; *see*

*also, e.g.*, *Laidlaw*, 528 U.S. at 175.

Notwithstanding the Court's determination of liability, at the present juncture, the record

is insufficiently developed with respect to key factors bearing on the appropriateness of civil

penalties.  *New York Coastal Fishermen's Ass'n*, 772 F. Supp. at 169.  While the Court has been

provided with evidence applicable to certain factors, such as Defendant's history of violations,

the dearth of information available concerning Defendant's present financial situation leaves the

---

Rpt. ¶ 8).  He also prepared revised calculations using both standards in his supplemental report.  Mr. Bell contends,
in his supplemental report, that Mr. Lindsay's recalculations with respect to these pollutants still contain major
errors.  Gonnella Decl. Ex. 12 (Bell Supp. Rpt. at 4-5).

Court ill-equipped to fairly assess the economic impact of civil penalties on the violator.

Similarly, the Court has little, if any, evidence of economic benefits that Defendant may have

obtained from its violations, and disputed fact issues prevent the Court from reaching a

conclusion with respect to Defendant's good-faith efforts to comply with the applicable

requirements, the actual volume of the spills, and the seriousness of their impact.  Plaintiffs

correctly note, for example, that there is not any evidence in the record as to how Defendant

appropriated the $30.5 million that it purportedly spent on improvements to the System (Philipps

Aff. ¶ 6), and whether this expenditure truly resolved the problems underlying Defendant's

violations.  Pls.' Opp. Br. 6.  Accordingly, an evidentiary hearing will be necessary for the

purpose of assessing civil penalties.  *New York Coastal Fishermen's Ass'n*, 772 F. Supp. at 169;

*Farbotko v. Clinton Co. of New York*, 433 F.3d 204, 209 (2005) (citing *Crescent Publ'g Group,*

*Inc. v. Playboy Enters.*, 246 F.3d 142, 147 (2d Cir. 2001)) (evidentiary hearings may be

necessary for fee determinations where material facts genuinely remain in dispute).

### ii.  Injunctive Relief

In *Romero-Barcelo* and *Amoco*, the Supreme Court denied injunctive relief based upon

the technical nature of the permit violations at issue as compared with the policy underlying the

Clean Water Act.  Here, however, Defendant's discharges into the Saddle River directly

contravene "the Act's major underlying purpose of 'establish[ing] a comprehensive long-range

policy for the elimination of water pollution.'"  *United States v. City of Niagara Falls*, 706 F.

Supp. 1053, 1059 (W.D.N.Y. 1989) (citing *Romero–Barcelo,* 456 U.S. at 319).

Notwithstanding the existence of valid environmental policy-based reasons to issue

injunctive relief for the type of violations committed by Defendant, as well as Plaintiffs'

evidence of *some* harm, material fact issues remain unresolved regarding the *extent* of harm

caused by Defendant's violations.  The parties' experts dispute whether and to what extent

Defendant's spills inflated the level of fecal coliform/E. Coli, "indicator organisms" for

pollution, as well as the volume of spills that may have reached the river.  *Cohalan v. Genie

Indus., Inc.*, No. 10 Civ. 2415 (JMF), 2013 WL 829150, at *6 (S.D.N.Y. Mar. 1, 2013)

("Summary judgment 'is not favored in cases involving materially conflicting expert reports.'"

(quoting *Solorio v. Asplundh Tree Expert Co.*, 402 F. Supp. 2d 490, 497 (S.D.N.Y. 2005)).

Likewise, proof of aesthetic harm to the environment here ultimately hinges on credibility

determinations of the witnesses.  *McClellan*, 439 F.3d at 144 ("It is a settled rule that

'[c]redibility assessments, choices between conflicting versions of the events, and the weighing

of evidence are matters for the jury, not for the court on a motion for summary judgment.'"

(quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir. 1997)).

Moreover, it remains unclear whether and when Defendant came into full compliance

with each of the two consent orders—particularly the 2012 Consent Order—and whether

Defendant has adequately resolved, or is working to resolve, the underlying causes of the

violations that have aggrieved Plaintiffs.  Thus, the Court cannot fairly assess what, if any, threat

Defendant's actions pose at the present juncture, or whether issuance of an injunction would

simply create an unnecessary burden.  Given that the Court cannot say that it is "absolutely

certain that no further violations of the Act will occur," but it "also cannot say that [it is]

convinced that future violations will occur establishing a need for injunctive relief," the Court

DENIES Plaintiffs' request for injunctive relief, without prejudice, and will await submission of

further evidence on the issue.  *Orange Env't*, 860 F. Supp. at 1019-20.

### C.  State Common Law Claims (Second through Fourth Claims)

Plaintiffs Ostrom, Upper Saddle River and MacDonald also bring, and seek summary judgment on, state common law claims for private nuisance (Second Claim), public nuisance (Third Claim) and trespass (Fourth Claim).  Pls.' Opening Br. 20-24.  Defendant argues that all of Plaintiffs' state law claims should be dismissed because they have failed to prove proximate causation, and in the alternative, that material fact issues preclude summary judgment.  Def.'s Opening Br. 21-25.

In the first instance, the parties dispute whether New York or New Jersey substantive law applies to Plaintiffs' Second and Fourth Claims.  The SAC does not specifically mention the law of any state in the allegations pertaining to Plaintiffs' Second and Fourth Claims.  By contrast, the Third Claim explicitly alleges a cause of action under "**New Jersey** state common law principles."  SAC ¶ 48 (emphasis in original).  Given that the "general statement of the case" section of the SAC exclusively cites New Jersey common law, the Upper Saddle River Code and the Clean Water Act as bases for relief, the language of the SAC suggests that Plaintiffs' common law claims only arise under New Jersey law.  SAC ¶ 1.  Indeed, in its opening summary judgment brief, Defendant characterizes Plaintiffs' choice of law as New Jersey law, and states that it does not object to Plaintiffs' choice.  Def.'s Opening Br. 21 n.11 (citing *Smith v. Railworks Corp.*, No. 10 Civ. 3980 (JPO), 2012 WL 752048, at *13 (S.D.N.Y. Mar. 6, 2012) for proposition that implied consent to the law of a particular state obviates the need for the district court to conduct choice-of-law analysis).  Despite the fact that they are New Jersey residents seeking relief for injuries that occurred *in New Jersey*, Plaintiffs object to Defendant's portrayal of their claims and contend that New Jersey law only applies to their Third Claim, whereas *New York* substantive law applies to their Second and Fourth Claims.  Pls.' Opp. Br. 17.

The Court finds that, because the place of injury claimed by Plaintiffs is New Jersey, New Jersey substantive law governs Plaintiffs' Second and Fourth Claims.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (federal court sitting in diversity applies choice of law rules of forum state for choice of substantive law analysis); *Schultz v. Boy Scouts of Am. Inc.*, 480 N.E.2d 679, 682-83 (N.Y. 1985) (under New York choice of law doctrine, place of injury determines applicable law for torts cases).

### 1.  Private Nuisance (Second Claim)

Plaintiff Ostrom claims that he is a victim of private nuisance because, by injuring and unreasonably interfering with his "use and enjoyment of his dwelling and property," Defendant has proximately caused him to suffer injury or loss of property value.  SAC ¶¶ 42-45.

"The essence of a private nuisance claim is an unreasonable interference with the [private] use and enjoyment of land."  *EPEC Polymers, Inc. v. NL Indus., Inc.*, No. 12 Civ. 3842 (MAS), 2013 WL 2338711, at *12 (D.N.J. May 28, 2013) (quoting *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 459 (D.N.J. 2009) (quoting *Sans v. Ramsey Golf & Country Club, Inc.*, 29 N.J. 438, 149 A.2d 599 (N.J. 1959))).  Under New Jersey law, liability for private nuisance exists where the defendant's conduct "is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either:  (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities."  *Gourley v. Twp. of Monroe*, No. A-1595-11T2, 2013 WL 68715, at *4 (N.J. App. Div. Jan. 8, 2013).

"To constitute an actionable nuisance, the operation complained of must be such as to affect [injuriously] and to an unreasonable extent the health or comfort of ordinary people living within the vicinity." *S. Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, 254 F. Supp. 2d 486, 504 (D.N.J. 2003) (quoting *Hrycenko v. Bd. of Adjustment of the City of Elizabeth*, 27 N.J. Super. 376, 381, 99 A.2d 430, 433 (N.J. App. Div. 1953)).  "[W]hether there is a 'significant harm' is based on the perception of 'a normal person in the community.'" *Rowe*, 262 F.R.D. at 459 ("subjective opinions of the named plaintiffs are not dispositive as to whether a nuisance claim survives" (citation omitted)).[42]  Additionally, the plaintiff's land "must be near the nuisance such that the nuisance actually affects his enjoyment of land," although "it need not be immediately *contiguous*." *Id.* (emphasis in original).

The Supreme Court of New Jersey "long ago recognized that the pollution of a watercourse may constitute an actionable nuisance." *Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes*, 90 N.J. 582, 592, 449 A.2d 472, 477 (N.J. 1982) (citations omitted).[43]  In *Birchwood*, the New Jersey Supreme Court explained that "[a]n intentional

---

[42] The court explained that, under the Restatement, "significant harm" means:

> harm of importance, involving more than slight inconvenience or petty annoyance. The law does not concern itself with trifles, and therefore there must be a real and appreciable invasion of the plaintiff's interests before he can have an action for either a public or a private nuisance. In the case of a ... private nuisance, there must be a real and appreciable interference with the plaintiff's use or enjoyment of his land before he can have a cause of action.

> … [i]n determining whether the harm would be suffered by a normal member of the community, *fears and other mental reactions common to the community are to be taken into account,* even though they may be without scientific foundation or other support in fact. Thus the presence of a leprosy sanatarium in the vicinity of a group of private residences may *seriously interfere* with the use and enjoyment of land because of the *normal fear* that it creates of possible contagion, even though leprosy is in fact so rarely transmitted through normal contacts that there is no practical possibility of communication of the disease.

*Rowe*, 262 F.R.D. at 460 (emphasis in original) (quoting Restatement (Second) of Torts § 821F cmts. b and f).

[43] However, as discussed further *infra*, in recent years, "New Jersey has moved away from 'such common law claims as trespass and nuisance' in environmental pollution cases, and toward a potentially strict liability scheme."

invasion of another's use is unreasonable if: (a) the gravity of the harm outweighs the utility of the actor's conduct, or (b) the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible." 449 A.2d at 477 (citing Restatement (Second) of Torts § 826 (1979)). Specifically with respect to "the discharge of treated sewage effluent into a running stream," the Court held that it is "not necessarily an unreasonable riparian use in today's civilization, but that it may be unreasonable if the harm from doing so outweighs the benefit." *Id.* (citing *Borough of Westville v. Whitney Home Builders*, 40 N.J. Super. 62, 68, 122 A.2d 233 (N.J. App. Div. 1956)).

New Jersey courts have also applied the so-called "reasonable use rule" in cases "where damages are sought by one landowner against the other as the result of the diversion of and expulsion of water." *Gourley*, 2013 WL 68715 at *5 (citing *Armstrong v. Francis Corporation,* 20 N.J. 320, 329–339 (N.J. 1956)). The "reasonable use rule" provides that an owner or possessor of land can be held liable for the "casting of surface waters from one's own land upon the land of another, in circumstances where the resultant material harm to the other was foreseen or foreseeable." *Id.*

Defendant argues that all of Plaintiffs' state law claims suffer from a lack of proximate causation. Def.'s Opening Br. 21-24. Specifically with respect to Plaintiff Ostrom's private nuisance claim, Defendant argues that he cannot prove that Defendant operated its System in an unreasonable manner, given that his claimed injuries "pale in comparison" to the vitality of sewage processing services to Rockland County. Def.'s Opp. Br. 20-21. Defendant is not immune from liability simply because it performs the important function of treating and disposing of Rockland County's sewage. *Sheppard v. Twp. of Frankford*, 261 N.J. Super. 5, 8,

---

*Player v. Motiva Enterprises LLC*, No. 02 Civ. 3216 (RBK), 2006 WL 166452, at *12 (D.N.J. Jan. 20, 2006) *aff'd,* 240 F. App'x 513 (3d Cir. 2007) (citations omitted); *see also Rowe*, 262 F.R.D. at 459-60.

60

617 A.2d 666, 668 (N.J. App. Div. 1992) ("lower land property owners have rights to relief for the unreasonable discharge onto their properties of storm water by others, including local governmental agencies.").  Moreover, the Court is not inclined to deem Defendant's sewage spills reasonable as a matter of law, as it seems unlikely that provision of sewage treatment services to Rockland County necessarily requires Defendant to repeatedly spill sewage in a manner that violates its SPDES Permit.

Defendant also claims that, because Mr. Ostrom testified that he does not "own up to the river," the injuries that he claims are limited to being subjected to the Saddle River's smell, which "should be accorded little weight."  Def.'s Opp. Br. 21.  Defendant argues that Plaintiff Ostrom has failed to prove that the alleged foul odor emanating from the Saddle River rises to the level of a "significant harm … of a kind that would be suffered by a normal person in the community."  *Id.* (citing *S. Camden Citizens in Action*, 254 F. Supp. 2d at 504 (applying N.J. law)).  Defendant attempts to cast doubt on Plaintiff Ostrom's testimony regarding the river's odor by citing testimony from Plaintiff Miller, who took children behind Mr. Ostrom's house between 2005 and 2008, and did not report foul odors at that time.  *Id.* at 22.

The Court finds that genuine issues of material fact preclude granting summary judgment to either party.  Specifically, construing the facts in the light most favorable to Mr. Ostrom, a reasonable trier of fact might find that his use of his backyard has been impaired by the Saddle River's smell.  Conversely, in construing Plaintiffs' motion, a reasonable trier of fact might find that Defendant's operations outweigh the inconvenience to Mr. Ostrom.  At the very least, the SSOs conceded by Defendant raise an issue of material fact regarding causation.  Thus, the Court DENIES both Defendant's and Plaintiffs' motions as to this claim.

### 2.  Public Nuisance (Third Claim)

Plaintiff Upper Saddle River asserts a claim for public nuisance.  As distinguished from private nuisance, public nuisance does not necessarily center on interference in the use and enjoyment of land; rather, a public nuisance may exist when the complained of activity constitutes "a continuing course of conduct that is calculated to result in physical harm or economic loss to so many persons as to become a matter of serious concern."  *James v. Arms Tech., Inc.*, 359 N.J. Super. 291, 329-30, 820 A.2d 27, 50-51 (N.J. App. Div. 2003) (citing Restatement (Second) of Torts § 821B cmt. h).  Section 821B of the Second Restatement of Torts provides:

> (1) A public nuisance is an unreasonable interference with a right common to the general public.
> (2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

*Id.* ("By its very terms, § 821B does not confine "unreasonable" interference to conduct that is proscribed by statute or other legislative act.").

As further articulated by the Supreme Court of New Jersey, public nuisance claims require proof of an interference with a public right "common to all members of the general public, rather than a right merely enjoyed by a number, even a large number, of people."  *In re Lead Paint Litig.*, 191 N.J. 405, 434, 924 A.2d 484, 502 (N.J. 2007) (citing Restatement (Second) of Torts § 821C(2) cmt. a (internal quotation marks omitted)).  In the context of a pollution claim, "pollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does not for that reason

alone become a public nuisance," but if pollution equally impacts all members of the community, such as by depriving all residents of the right to fish by killing the stream's fish population, then it becomes a public nuisance. *Id.* A public entity pursuing a public nuisance action "vindicates the common right and thus [can] pursue[] either criminal penalties or civil actions to abate the nuisance," "at the expense of the one in control of the nuisance." 191 N.J. at 429, 924 A.2d at 499.

Defendant claims that summary judgment in its favor is warranted on this claim because its activities are "fully authorized by statute" and "subject to a comprehensive legislative and regulatory scheme." Def.'s Opp. Br. 23. Defendant also argues, as it does with respect to all of Plaintiffs' state law claims, that proximate cause is lacking and in the alternative, that various sources of pollution in the Saddle River, other than SSOs, create material fact issues. *Id.* at 18-19. The Court cannot dispose of the motion on any of these bases.

First, it cannot fairly be disputed that discharge of sewage into the Saddle River is prohibited by statute, and thus may, under the Second Restatement of Torts, provide grounds for a public nuisance claim. And, as discussed *supra*, Defendant has conceded spilling sewage into the Saddle River on at least twelve occasions from 2006-2011.

Second, Defendant argues, based upon a host of publicly available documents, that fertilizer, animal feces, dirt and oil contaminate Upper Saddle River's water. Def.'s Opp. Br. 18-19. Plaintiffs oppose Defendant's request that Court take judicial notice of these documents, albeit impermissibly through an attorney affirmation and not their briefing. Burke Reply Aff. ¶¶ 4, 9, Doc. 129. The documents include the *Upper Saddle River Bulletin*, a local publication, an issue of which provides a list of "preventative tips" for curbing storm water pollution (Gonnella Opp. Decl. Ex. 23); an "online brochure" by the DEP advising residents to refrain from littering,

clean up after their pets and limit their use of pesticides (Gonnella Opp. Decl. Ex. 24); and a purported 2003 Amendment to the DEP's Northeast Water Quality Management Plan (Gonnella Opp. Decl. Ex. 25) that, on its face, lacks an "approval date" from the DEP and concludes, based on data from *2002*, that "[s]tormwater, geese, and wildlife" are "potential sources" of fecal coliform.  These documents are not only inadmissible, but also insufficient to support Defendant's "alternate causation" theory on the basis of the information that they contain.  Moreover, the raw sewage complained of by Plaintiff—feminine products and toilet paper— could not conceivably have been produced by birds or other animals.

Upper Saddle River claims that it is entitled to summary judgment on this claim because "it has provided sufficient evidence to prove that the spills by [Defendant] cause[d] significant harm, and that the failure to comply with its SPDES permit after a continuous *ten* years, 2003 through 2013, … is a calculated action … that has resulted in economic loss and has significantly interfered with the public's use and enjoyment of land."  Pls.' Opp. Br. 20 (emphasis in original). Without discussing the facts therein, Upper Saddle River merely cites paragraphs 52-115 of its Amended Rule 56.1 Statement, and Exhibits FF and HH thereto (their responses to Defendant's interrogatories).  The Court also denies this request.

First, it is unclear to the Court what public health risk Defendant's actions posed, if any, in light of the disputes concerning the volume of sewage spilled and the parties' conflicting expert reports.  *Compare* Pls.' Ex. III (Lindsay Supp. Rpt. ¶ 8) *and* Gonnella Decl. Ex. 12 (Bell Supp. Rpt. at 4-5); Pls.' Reply Br. 6 *and* Def.'s Opening Br. 22.  Second, for the purposes of a nuisance claim, proving that a course of conduct is "calculated" to cause harm requires a proof of some *mens rea* or in the alternative, proof that the defendant engaged in an abnormally dangerous activity.  *Clover Leaf Plaza, Inc. v. Shell Oil Co.*, No. 96 Civ. 5457 (SSB), 1998 WL

35288754, at *3 (D.N.J. Aug. 13, 1998).  Upper Saddle River has submitted proof of neither.

Without citing any cases to support its proposition, Plaintiff merely asks the Court to infer that

Defendant acted in a calculated manner based upon the large number of sewage spills that it

caused from 2003-2013, and states, in conclusory fashion, that "Defendant owed [Upper Saddle

River], and by extension its residents, a duty of care so as to refrain from illegally discharging

sewage."  Pls.' Opening Br. 23.  Accordingly, summary judgment in Upper Saddle River's favor

is also inappropriate.

Thus, the Court DENIES both parties' motions for summary judgment on Plaintiff Upper

Saddle River's Third Claim.

### 3.  Trespass (Fourth Claim)

Finally, Plaintiffs Ostrom and MacDonald each bring a claim for trespass.  Under New

Jersey law, "[t]respass constitutes the unauthorized entry (usually of tangible matter) onto the

property of another."  *NJTA v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 478 (D.N.J. 1998) (citations

omitted) (applying N.J. law).  Thus, Plaintiffs must prove two elements:  (1) an unauthorized

entry[44] (2) onto their property.  *Rowe*, 262 F.R.D. at 463.  As a claim for trespass centers on the

---

[44] Numerous New Jersey federal courts have expressed that uncertainty clouds the *mens rea* requirement for trespass under New Jersey state law.  *Compare In re Paulsboro Derailment Cases*, No. 13 Civ. 784 (RBK) (KMW), 2013 WL 5530046, at *6 (D.N.J. Oct. 4, 2013) (suggesting that a showing of intent is necessary, as, "[g]iven the uncertain requirement as to mental state to bring a common law claim in trespass, this Court would be reluctant to expand trespass liability beyond what the New Jersey courts have announced") *and Phoenix Pinelands Corp. v. United States*, No. 09 Civ. 2237, 2010 WL 1704743, at *5 (D.N.J. Apr. 26, 2010) (in light of the "substantial[] uncertain[ty] as to whether New Jersey law recognizes (or will recognize) the tort of negligent trespass," it is "prudent to adopt the position taken by the [Second] Restatement [of Torts], which does recognize the tort of negligent trespass") *with Clover Leaf Plaza, Inc. v. Shell Oil Co.*, No. 96 Civ. 5457, 1998 WL 35288754, at *7 (D.N.J. Aug. 13, 1998) (holding that, because New Jersey has not adopted the Second Restatement, it will not recognize "negligent trespass," and thus trespass requires "an *intentional* entry, sojourn, or failure to remove as articulated in Restatement § 158" (emphasis in original)).

Consistent with their contention that they have asserted claims under New York law, Plaintiffs state that "trespass is the intentional invasion of another's property."  Pls.' Opp. Br. at 20 (citing *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996)).  This Court is loath to expand trespass liability under New Jersey law in the absence of a clear directive from the New Jersey Supreme Court, particularly under circumstances where, as here, the New Jersey Plaintiffs advocate for a legal standard that includes a higher intent requirement (albeit based on an untenable

right of property owners to exclude others from their domain, New Jersey law plainly requires proof of exclusive possession as an element of trespass. *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 488, 468 A.2d 150, 157 (N.J. 1983); *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, MDL No. 1358 (SAS), 2014 WL 840955, at *3 (S.D.N.Y. Mar. 3, 2014) (applying N.J. law).  "[A] trespass on property, whether real or personal, is actionable, irrespective of any appreciable injury." *Pinkowski v. Twp. of Montclair*, 299 N.J. Super. 557, 571, 691 A.2d 837, 843-44 (N.J. App. Div. 1997) (citation omitted).  Here, both Plaintiffs' theory of liability seems to be that Defendant's sewage spills caused an unlawful entry into a waterway in their respective backyards.

Plaintiff MacDonald seeks summary judgment based upon her testimony regarding two incidents during which she witnessed a big "flush or rush" of water that caused the brook behind her home, "which she believes to be a tributary to the Saddle River," to become "dark or black." Pls.' Opening Br. 24.[45]  With respect to Plaintiff Ostrom, Plaintiffs merely cross-reference their private nuisance arguments, which characterize Mr. Ostrom's testimony as "includ[ing] [that] [he saw] squished up toilet paper" and human waste in the river.  *Id.* at 22.  Plaintiffs MacDonald and Ostrom also claim that summary judgment is warranted based upon photographs, DEC spill reports and expert testimony which, they argue, show that Defendant's spills would have reached, and polluted, the Saddle River.  Pls.' Opp. Br. 20-21.

Defendant argues that Plaintiff MacDonald has not offered adequate proof that she owns the creek or that any creek water encroached on her property, and that Mr. Ostrom "has not alleged (much less proven) an invasion of anything onto his property."  Def.'s Opp. Br. 24.

---

assertion that New York law applies here).  Accordingly, the Court will apply the rule set forth in *Clover Leaf Plaza*: trespass liability obtains where the defendant *intentionally* enters the plaintiff's land.  1998 WL 35288754, at *7.
[45] Defendant does not dispute that "[t]here is a brook in the back of Mrs. MacDonald's home, which is a part of the Saddle River."  Def.'s Resp. Pls.' 56.1 Stmt. ¶ 108.

Defendant also argues that Plaintiffs' trespass claim, like their nuisance claims, fails due to lack of proximate causation.  *Id.*  Among other things, Defendant disputes whether the volume of sewage spilled by Defendant could have conceivably reached the branches of the Saddle River near Plaintiffs' property.  Def.'s Opening Br. 22.

The Court finds that, viewing the evidence in the light most favorable to them, Plaintiffs MacDonald and Ostrom have failed to establish the absence of a genuine issue of material fact that anything unlawfully entered property that they exclusively own.  Even if the Court assumes that Defendant emitted the two "dark or black" rushes of water that Ms. MacDonald observed in a brook, when specifically questioned regarding her property lines, she merely testified as to a "belief" that her property line runs up to the brook, but stated that she did not know whether she has a survey of her property.  Pls.' Ex. S (MacDonald Dep. 31:13 – 32:1).  Moreover, Ms. MacDonald testified that during these two events, the water did not reach as far as the fence that she has in her backyard.  *Id.* at 23:16 – 31:17.  This testimony falls short of establishing that she owns the portion of the brook that she observed, let alone that she had a right to exclude others from it.  Thus, although it is possible that Plaintiff MacDonald may have observed something enter a brook that is possibly adjacent to her property line, a material fact exists as to whether an actual intrusion occurred upon property that she exclusively possesses, an essential element of her claim.  *See Klebe v. Tri Mun. Sewer Comm'n*, No. 07 Civ. 7071 (KMK), 2008 WL 5245963, at *2 (S.D.N.Y. Dec. 17, 2008) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.") (quoting *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006)); *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996) ("The possibility of the existence of an event does not tend to prove its probability.").

With respect to Plaintiff Ostrom, given that he only argues that he saw toilet paper and excrement "in the river" (Pls.' Opening Br. 22), the Court finds that, in light of his concession that his property ownership does not extend to the river, denial of his motion for summary judgment is also warranted. [46]  *Ventron*, 94 N.J. at 488 (an actionable trespass is "any actual invasion that ... interfered with the plaintiff's exclusive possession of his land").  Even if the Court applied the New York legal standard for trespass (erroneously) proposed by Plaintiffs, their trespass claims would similarly fail due to insufficient proof of ownership.  *See, e.g.*, *Romeo v. Sherry*, 308 F. Supp. 2d 128, 143 (E.D.N.Y. 2004) (dismissing trespass claim where the state, not the plaintiff, owned the land in question).

The Court also notes that the concept of exclusive private ownership rights over the waterways in Plaintiffs' respective backyards is at odds with their contention that such waterways constitute portions of the Saddle River and its tributaries—i.e., navigable waters of New Jersey.  *See Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 476 (1988) ("[L]ong-standing precedents ... hold that the States, upon entry into the Union, received ownership of all lands under waters subject to the ebb and flow of the tide.").  While the New Jersey legislature explicitly granted the DEP the right to bring trespass actions for intrusion upon navigable waters, unlike the Clean Water Act, this statute lacks a citizen-suit provision.[47]

---

[46] Mr. Ostrom testified that he "believe[s] [he] has seen squished up toilet paper, human [waste]," and foam "behind [his] house."  Pls.' Ex. R (Ostrom Dep. 40:16 – 40:24).  Mr. Ostrom further stated that these items "had to [have] come from the Swim Club," as he lives "a little bit down the River" from it.  *Id.* at 50:3 – 50:25.  However, Mr. Ostrom testified that he does not own property "to the River," and that a "gentleman" and the "Town" own the property on which the Saddle River is located.  *Id.* at 92:16 – 93:25.  Though Mr. Ostrom testified that "near the culvert [his] property will contact the River," the vagueness of his testimony fails to raise a more than a faint possibility that any items entered land that he exclusively owns.  *Id.* at 27:14 – 29:8; 92:16 – 93:20.

[47] Specifically, New Jersey's "[p]reventing encroachment on waterfront" law provides that:

> The Department of Environmental Protection may, by appropriate action in any court, prevent the encroachment or trespass upon the water front of any of the navigable waters of this State or bounding thereon, or upon the riparian lands of this State, and compel the removal of any such encroachment or trespass, and restrain, prevent and remove any construction, erection or accretion

Moreover, Plaintiffs' attempt to prove their claim by asserting that Defendant has generally harmed the Saddle River is unavailing for the purposes of establishing whether a trespass has occurred, because it has no bearing on (1) whether any sewage (or other item) entered the *specific* property owned by Plaintiffs or (2) the physical boundaries of Plaintiffs' property ownership.  Pls.' Opp. Br. 21.

Finally, Plaintiffs only offer a conclusory assertion that because Defendant failed to comply with its SPDES permit, its spills were necessarily intentional.  *Id.* at 20.  Particularly because New Jersey law has yet to authorize a claim for trespass premised on the negligent intrusion upon another's land (*see* note 44, *supra*), Plaintiffs' bald assertion fails to provide a basis on which to allow their trespass claims to survive.

Based upon Plaintiffs' failure of proof, and for the additional reason that trespass is a disfavored remedy for environmental harm in New Jersey,[48] the Court thus DENIES Plaintiffs' motion, and GRANTS Defendant's motion for summary judgment on their Fourth Claim.

### D.  Conclusion

For the reasons set forth above:

---

injurious to the flow of any such waters, which may be detrimental to the proper navigation thereof and the maintenance and improvement of commerce thereon.

N.J. Stat. Ann. § 12:5-2 (West).

[48] Nearly every court to decide the issue in recent years has deemed the "ancient" remedy of trespass a disfavored means of pursuing relief for environmental pollution in modern day New Jersey.  *Heller Urban Renewal, LLC v. FER Boulevard Realty Corp.*, No. 13 Civ. 431 (SRC), 2014 WL 252106, at *7 (D.N.J. Jan. 23, 2014) (dismissing trespass claim with prejudice "because this theory of liability, which holds a party liable for the 'unauthorized entry (usually of tangible matter) onto the property of another,' is not viable in cases involving environmental contamination." (citing  *EPEC Polymers*, 2013 WL 2338711, at *12); *In re Paulsboro*, 2013 WL 5530046, at *8 (questioning applicability of trespass liability to modern-day pollution claims); *Woodcliff, Inc. v. Jersey Construction, Inc.*, 900 F. Supp. 2d 398, 402 (D.N.J. 2012) (rejecting trespass claim as inapposite theory of liability in case involving delivery of contaminated soil); *Motiva Enterprises*, 2006 WL 166452, at *12 (same); *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 478 (D.N.J. 1998), *aff'd*, 197 F.3d 96 (3d Cir. 1999) (applying trespass to modern day pollution claims is an "endeavor to torture old remedies to fit factual patterns not contemplated when those remedies were fashioned." (citing *Kenney v. Scientific, Inc.*, 204 N.J. Super. 228, 256, 497 A.2d 1310, 1325 (N.J. Ch. Div. 1985) (regarding claims for trespass and battery in hazardous waste action, the court refused to "be sidetracked into a dissertation upon these ancient remedies," and granted summary judgment due to the availability of newer and better-suited forms of relief )).

- Plaintiffs Ostrom and MacDonald's motion for summary judgment on their claim for trespass, the Fourth Claim, is DENIED, and Defendant's motion on this claim is GRANTED; and

- In light of Plaintiffs' voluntary dismissal, their Fifth and Sixth Claims are also hereby DISMISSED.

The Clerk of the Court is respectfully directed to terminate the motions.  Docs. 102, 106.

The parties are directed to appear before the Court for a status conference on **April 17, 2014, at 2:00 p.m.**, at the Thurgood Marshall United States Courthouse, Courtroom 619, 40 Foley Square, New York, New York.

It is SO ORDERED.

Dated: March 31, 2014
New York, New York

Edgardo Ramos, U.S.D.J.